IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SUNOCO, INC., and<br>PUERTO RICO SUN OIL COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 02-466C<br>(Chief Judge Damich) |

**PLAINTIFFS' STATUS REPORT**

Plaintiffs, Sunoco, Inc., and Puerto Rico Sun Oil Company (collectively "Sunoco"), respectfully submit this Status Report in order to bring to the Court's attention the recent decision in *La Gloria Oil & Gas Company v. United States*, No. 02-465C (Fed. Cl. April 15, 2003) (attached). In that decision, the Court held, *inter alia*, that DESC's fuel prices and purported deviations are illegal, that an affected suppler is entitled to recovery under *quantum valebant*, and that a supplier may demonstrate harm by showing that it was not paid fair market value for the fuel it delivered.

Respectfully submitted,

s/ J. Keith Burt

J. Keith Burt
Mayer, Brown, Rowe & Maw
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3208 (Phone)
(202) 263-5208 (Fax)

Attorneys for Plaintiffs,
Sunoco, Inc. and
Puerto Rico Sun Oil Company

*Of Counsel:*

Gary A. Winters
Mayer, Brown, Rowe & Maw
1909 K Street, N.W.
Washington, D.C. 20006

April 28, 2003

# In the United States Court of Federal Claims

No. 02-465 C

(Filed: April 15, 2003)

| | | |
|---|---|---|
| LA GLORIA OIL AND GAS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | ) | Summary judgment; Military fuel supply contracts; Unauthorized economic price adjustment clause; Individual and class deviations from FAR §16.203; Quantum valebant relief |

J. Keith Burt, Washington, DC, for plaintiff. Kerry L. Edwards, Washington, DC, of counsel.

Steven J. Gillingham, with whom were Robert D. McCallum, Assistant Attorney General, David M. Cohen, Director, and Kyle Chadwick, United States Department of Justice, Washington, DC, for defendant. Bernard A. Duval, Donald S. Tracy, and Karen E. Schools, Defense Energy Support Center, Fort Belvoir, VA, of counsel.

## OPINION AND ORDER

HEWITT, Judge

Plaintiff, La Gloria Oil and Gas Company (La Gloria), seeks damages from defendant, the Defense Energy Support Center (DESC),[1] arising out of the use of an allegedly illegal economic price adjustment clause in a series of six competitively-awarded fuel supply contracts. The parties have filed cross-motions for partial summary judgment. For the following reasons, defendant's motion is DENIED, and plaintiff's

[1]DESC is part of the Defense Logistics Agency (DLA) in the Department of Defense (DoD). Complaint (Compl.) ¶ 7. Facts cited to the briefing of only one of the parties do not appear to be in dispute.

motion is GRANTED on the issue of quantum valebant relief and with respect to the invalidity of the individual and class deviations. Plaintiff's motion is DENIED with respect to the applicability of the judicial estoppel doctrine to the calculation of fair market value.

I. Background

Between 1993 and 1999, DESC awarded La Gloria six contracts to supply military jet and diesel fuel at various locations in the United States.[3] Plaintiff's Cross-Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Partial Summary Judgment (Pl.'s Mot. and Opp.) at 6; Complaint (Compl.) ¶¶ 1, 10, 24. The contracts were valued at approximately $157 million. Compl. ¶ 10. Each contract was to be performed for a one-year period. Defendant's Motion for Partial Summary Judgment (Def.'s Mot.) at 2.

Plaintiff's contracts contained a standard economic price adjustment (EPA) clause used by DESC. Compl. ¶ 11. Plaintiff's 1993 contract contained an EPA clause that adjusted the prices paid to La Gloria based on changes in price indexes published by the Department of Energy in the Petroleum Marketing Monthly (PMM Indexes). Id. at ¶ 13, 16; Def.'s Mot. at 6-7. Plaintiff's 1995, 1996, 1997, 1998, and 1999 contracts each contained an EPA clause that adjusted the prices paid to La Gloria based on changes reported in Platts Oilgram Price Report (Platts), a daily industry publication. Def.'s Mot. at 7. Except for the use of the different indexes, the EPA clauses in the 1993 and subsequent contracts were substantially identical to the EPA clause denominated B19.33 (Clause B19.33).

La Gloria alleges that the EPA clauses used in its contracts violated the Federal Acquisition Regulation (FAR). Compl. ¶¶ 3, 13-17. Based on the alleged illegality of the EPA clauses, plaintiff claims that it "is entitled to recover based on the fair market value of the fuel it delivered to DESC . . . by way of reformation, quantum valebant, or rescission and restitution." Id. at ¶ 33.

Defendant denies that the EPA clauses in plaintiff's contracts are illegal. Def.'s Mot. at 16-20. Defendant argues that even if the EPA clauses do not comply with the FAR, DESC may use the clauses based on properly obtained and approved deviations. Id.

---

[3]DESC awarded the following contracts to La Gloria: DLA600-93-D-0559 (1993 contract), SPO600-95-D-0480 (1995 contract), SPO600-96-D-047565 (1996 contract), SPO600-97-D-0464 (1997 contract), SPO600-98-D-0468 (1998 contract), and SPO600-99-D-0478 (1999 contract). Pl.'s Mot. and Opp. at 6 n.7; Plaintiff's Appendix (Pl.'s App.) at 106-45.

at 9-10. Defendant also contends that plaintiff cannot maintain its suit based on the alleged illegality of the EPA clauses because plaintiff has failed to show that it suffered any harm. Id. at 31-32.

The parties have cross-moved for partial summary judgment on the issue of liability.

## II. Discussion

### A. Standard of Review

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the Court of Federal Claims (RCFC); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387 (Fed. Cir. 1987). A genuine dispute of material fact that may significantly affect the outcome of the matter precludes the entry of judgment. Anderson, 477 U.S. at 248. When considering cross-motions for summary judgment, as in this case, the court evaluates each motion under the same standard. Cubic Defense Sys., Inc. v. United States, 45 Fed. Cl. 450, 457 (1999). Issues of contract interpretation are appropriate for summary judgment. See Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996); P.J. Maffei Bldg. Wrecking v. United States, 732 F.2d 913, 916 (Fed. Cir. 1984). The cross-motions focus on issues of contract interpretation--whether defendant's EPA clause is authorized by the FAR, or if not, whether the use of the clause was authorized by deviations from the FAR.

### B. Whether the EPA Clauses Used in Plaintiff's Contracts were Illegal

Plaintiff argues that defendant's EPA clause violates the terms of the FAR, that defendant has conceded its EPA clauses do not comply with the FAR, and that the testimony of a FAR drafter supports a finding that defendant's EPA clauses are illegal. Pl.'s Mot. and Opp. at 9-22.

Defendant challenges the holdings in Barrett Refining Corp. v. United States, 242 F.3d 1055 (Fed. Cir. 2001) (Barrett III) and MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992) (MAPCO), see Def.'s Mot. at 25-26; Defendant's Reply and Opposition to Plaintiffs' (sic) Cross-Motion for Partial Summary Judgment (Def.'s Reply) at 2-3, and denies making any concession that its EPA clauses are illegal. See Def.'s Reply at 8-10. Defendant contends that the declaration of Ms. Etha Quinn, one of the FAR drafters, reflects her personal opinion and "is not admissible regulatory history." Def.'s Reply at 10-11. Because defendant has asserted in this case substantially identical

arguments to those addressed by this court in MAPCO and Gold Line Refining, Ltd. v. United States, 54 Fed. Cl. 285 (2002) (Gold Line), the court addresses defendant's contentions as economically as possible.

1. The Applicable FAR Provisions and the Case Law Interpreting Those Provisions

The FAR authorizes the use of an EPA clause in a fixed-price contract to "provide[] for [the] upward and downward revision of the stated contract price upon the occurrence of specified contingencies." 48 C.F.R. § 16.203-1 (FAR § 16.203-1) (2003).[4] The FAR recognizes three general types of economic price adjustments: (1) adjustments based on a contractor's established prices; (2) adjustments based on actual costs of labor or material; and (3) adjustments based on cost indexes of labor or material. FAR § 16.203-1. Significantly, FAR § 16.203-1 does not authorize an adjustment based on price indexes. In deciding to use an EPA clause in a contract, a contracting officer must determine that it is "necessary either to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices."[5] FAR § 16.203-3.

In MAPCO,[6] this court considered the enforceability of EPA clause, Clause B19.33, the same EPA clause that La Gloria challenges in this case. The plaintiff-contractor in MAPCO challenged the legality of the EPA clause using the PMM Index contained in its fuel supply contract with DESC because the PMM Index was a price index, rather than a cost index of labor or material permitted under FAR § 16.203-1. 27

---

[4]This language in the current version of the FAR was in effect prior to defendant's issuance of the solicitations for the fuel supply contracts that are the subject of this case. See FAR § 16.203-1 (1992).

[5]When the government shifted in the 1980s to the use of illegal EPA clauses based on price indexes, its purpose was to shift risk off of the government and onto the contractor. See Appendix to Plaintiff's Cross-Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Partial Summary Judgment (Pl.'s App.) at 239-40; Appendix to Defendant's Motion for Partial Summary Judgment (Def.'s Ex.) 4.

[6]After the parties settled their dispute, the court denied defendant's motion to reconsider its refusal to vacate the opinion granting summary judgment to plaintiff on all liability issues. See MAPCO Alaska Petroleum, Inc. v. United States, 30 Fed. Cl. 153 (1993). The court stated that "[i]n the circumstances at bar, [it found] vacatur to be contrary to the public interest." Id. at 155.

Fed. Cl. at 406-08. Following careful analysis of the pertinent FAR provisions, review of the regulatory history, examination of the record, and consideration of the parties' arguments, the court held that the EPA clauses were "plainly inconsistent with the FAR." Id. at 408. The court found that, "[h]aving chosen to use the mechanism of an economic price adjustment clause, defendant [was] obligated to comply with applicable regulations limiting its use . . . . [but that defendant] offer[ed] no principled reason for not doing so." Id. at 416. The court determined that the EPA clause used in the fuel supply contract did not comply with FAR § 16.203. Id.

Subsequently, in Barrett Refining Corp. v. United States, 42 Fed. Cl. 128 (1998) (Barrett I), another plaintiff-contractor sought damages from the DESC on the ground that the government had used an unauthorized EPA clause, the same Clause B19.33 at issue in this case, in its fuel supply contract. Barrett I, 42 Fed. Cl. at 133. At trial in that case, the government "concede[d] that the pricing mechanisms used in the contracts . . . were unauthorized." Id. at 130. After further proceedings to determine whether the government was entitled to damages on its counterclaim, the Federal Circuit affirmed on appeal that the Court of Federal Claims properly exercised jurisdiction over plaintiff's claims for quantum valebant relief because plaintiff's claim was premised on an implied-in-fact contract. Barrett III, 242 F.3d at 1059, aff'g-in-part and rev'g-in-part Barrett v. United States, 45 Fed. Cl. 166, 170 (1999) (Barrett II).[7]

La Gloria asserts here that FAR § 16.203 is a mandatory regulatory provision. Plaintiff's Reply to Defendant's Opposition to Plaintiff's Cross-Motion for Partial Summary Judgment (Pl.'s Reply) at 4-10. La Gloria argues that in Barrett III, the Federal Circuit adopted the court's holding in MAPCO, thereby establishing the illegality of defendant's EPA clause. Pl.'s Mot. and Opp. at 9-13.

Defendant disputes the correctness of the MAPCO decision and asserts that FAR § 16.203 does not prohibit use of the EPA clauses in plaintiff's contracts. Def.'s Mot. at 25-30. Moreover, defendant argues that Barrett III does not establish the illegality of the EPA clause. "Because the 'illegality' issue was not raised in the trial court, it also was not before the appeals court in Barrett[III]." Id. at 4. Stating that "FAR 16.203-1 does not purport to be proscriptive," defendant contends that the regulations governing EPA clauses do not prohibit use of DESC's EPA clause. Id. at 25-26. Defendant also argues that the MAPCO decision is irrelevant to most of this case because five of the six contracts challenged in this action were authorized by deviations, id. at 15, an argument addressed in Part II.C of this opinion.

---

[7]The Federal Circuit vacated, on other grounds, part of the decision of Court of Federal Claims and remanded. See 50 Fed. Cl. 567 (2001) (on remand).

Defendant's position with respect to FAR § 16.203, specifically whether or not FAR § 16.203-1 is mandatory and whether Clause B19.33 comports with the FAR, has been directly considered and addressed by this court in MAPCO and most recently in Gold Line. For the reasons stated briefly above and in detail in those decisions, it is the view of this court that Clause B19.33 was not a type of EPA clause permitted by the FAR.

2. Defendant's Prior Statements Concerning the Illegality of the Challenged EPA Clause

Plaintiff also contends that, by seeking FAR deviations to permit continued use of the challenged EPA clauses after the MAPCO decision, defendant has conceded the illegality of the price adjustment clauses in plaintiff's contracts. Pl.'s Mot. and Opp. at 13-15. Plaintiff argues that prior statements by defendant concerning the challenged EPA clause constitute "admissions" of illegality. Id. Plaintiff cites Barrett I, Phoenix Petroleum Co. v. United States, 40 Fed. Cl. 862 (1998), rev'd, 215 F.3d 1345 (1999), and Pride Cos. v. United States, 2000 U.S. Claims LEXIS 213 (May 10, 2000) (Pride Cos.), to support its argument that defendant has acknowledged the illegality of its EPA clause in cases before both the Federal Circuit and this court. Pl.'s Mot. and Opp. at 13-14.

Defendant states that plaintiff has "unfairly characterized" its statements and positions in other cases. Def.'s Reply at 8. Citing Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 289 (1917) and Hegeman-Harris & Co. v. United States, 440 F.2d 1009, 1012 (Ct. Cl. 1971), defendant asserts that "[a]dmissions and concessions of law are generally not . . . binding upon a court, and thus, do not bind parties." Id. Thus, defendant reasons that "[e]ven if [its] conduct were interpreted as an admission," it would not be binding on the court because "[w]hether the EPA clauses complied with the FAR is a question of law." Id.

The court agrees that defendant is not bound by its positions in Barrett III or the other cases. But the court notes that defendant's own explanation of why it sought FAR deviations for its 1993 and subsequent procurements supports the court's view that Clause B19.33 violates the FAR.[8]

---

[8]In a memorandum accompanying DESC's internal agency request for a deviation from FAR §16.203, dated January 5, 1993, defendant references the decision of the United States Court of Federal Claims in MAPCO. See Pl.'s App. at 234-35, 238. Reviewing the relevant FAR provisions, defendant states that "[t]he types of EPA provisions specifically authorized by the FAR are not satisfactory alternatives to the market indexes DFSC utilizes in petroleum contracting." Id. at 238. Defendant explains:

3. Ms. Quinn's Declaration

Plaintiff relies on a declaration by Ms. Etha Quinn, the principal drafter of FAR § 16.203, for support of its argument. Plaintiff contends that because the drafters of the FAR expressly considered and rejected establishing prices based on price indexes, defendant's interpretation of FAR § 16.203 cannot stand.[9] Pl.'s Mot. and Opp. at 15-18.

Defendant urges the court to disregard Ms. Etha Quinn's declaration because "with respect to the [challenged] EPA provisions . . . the FAR Project did not draft the provisions at issue, it simply preserved and repackaged them." Def.'s Reply at 10 (emphasis deleted) (citing MAPCO, 27 Fed. Cl. at 409). Defendant asserts that Ms. Quinn "has no relevant insight into the intent of the provisions, and is not competent to testify about them." Id. Defendant contends that "Ms. Quinn's opinion is not admissible regulatory history." Id. at 10-11 (relying on MAPCO, 27 Fed. Cl. at 409 n.6 (finding that "post hoc statements by drafting officials . . . hold no probative value, especially when 'uttered in the context of a vigorous dispute'")).

The court agrees with defendant that the court should not rely on Ms. Quinn's declaration to establish the interpretation of FAR § 16.203. At the time of the 1978 FAR Project, FAR § 16.203 was based on the then-existing Defense Acquisition Regulation (DAR) and Federal Procurement Regulation (FPR). Pl.'s Mot. and Opp. at 16. The charter of the 1978 FAR Project was to "unify and simplify federal procurement system" without making substantive or policy changes to the existing regulations. Id. In her declaration, Ms. Quinn stated that the drafters of FAR § 16.203 rejected a specific proposal, submitted during the period for public comment, to change the current regulation FAR § 16.203-1 to include price indexes. Id. She explained that the proposal was rejected because "to add a new provision providing for price indexes in addition to cost indexes would have been a substantive policy change from the DAR and FPR which

---

> DFSC has studied and used EPA provisions for many years and has tried several different types . . . . [C]rude oil escalators, which would reflect 80-90 per cent of the refiner's cost to produce a petroleum product, and are authorized by FAR 16.203-1(b, c), are not normally reflective of product prices and create evaluation problems in competitive procurements. Refinery postings, on the other hand, which are authorized by FAR 16.203-1(a), are not always available or reliable . . .

Id.

[9]Ms. Quinn's declaration was originally submitted to the court in the MAPCO case. Pl.'s Mot. and Opp. at 16 n.19.

was not permitted by the Office of Federal Procurement Policy guidelines." Id. Ms. Quinn's declaration is of limited assistance to the court, however, because her testimony was prepared in connection with the MAPCO litigation. See id. at 16 n.19.

The court observes that, while attacking Ms. Quinn's declaration, defendant does not dispute various factual statements in her testimony which are consistent with the views of the court in MAPCO, Gold Line and here that price indexes are not contemplated by FAR §16.203. However, for the reasons stated by this court in MAPCO, the court does not rely on Ms. Quinn's testimony.[10]

C. Whether FAR Deviations Permit Use of the EPA Clause in Plaintiff's Contracts

Defendant argues that, consistent with FAR subpart 1.4, five of the six contracts awarded to plaintiff contained EPA clauses that were used in accordance with agency-authorized deviations. See Def.'s Mot. at 12-13. Defendant asserts that it obtained

---

[10] The court notes that, notwithstanding that her testimony was prepared in connection with litigation, Ms. Quinn's testimony is entirely consistent with the regulatory history describing the purpose of the 1978 FAR Project. As the court in MAPCO observed:

> Periodically between [the commencement of the 1978 FAR Project] and September 19, 1983, [the publication date of the final draft of the FAR] . . . the Office of Federal Procurement Policy ran a statement as to the purposes underlying the FAR:
>
> > The fundamental purposes of the FAR are to reduce proliferation of regulations; to eliminate conflicts and redundancies; and to provide an acquisition regulation that is simple, clear and understandable. The intent is not to create new policy. However, because new policies may arise concurrently with the FAR project, the notice of availability of draft regulations will summarize the section or part available for review and describe any new policies therein.
>
> See, e.g., "Types of Contracts," 46 Fed. Reg. 42,303 (1981) (emphasis added). No new policies were described in the portion of the draft summarizing FAR Part 16, which governs the present dispute. See id. at 42,304.

27 Fed. Cl. at 409. The portion of the draft summarizing FAR Part 16 that governed the dispute in MAPCO also governs the dispute in this case.

individual deviations for two of its contracts with plaintiff, specifically, its 1995 and 1996 contracts, Def.'s Reply at 11; Transcript of March 7, 2003 Oral Argument (Tr.) at 23-29, and that it obtained a class deviation which applied to three of its contracts with plaintiff, specifically, its 1997, 1998, and 1999 contracts. Def.'s Reply at 11. Defendant notes that, in an internal memorandum concerning the deviations, DESC "plainly record[ed] [its] disagreement with MAPCO" but decided to obtain the deviations as a "prudent response to the MAPCO decision . . . ." Def.'s Reply at 8.

Plaintiff contends that the deviations were not issued in compliance with the applicable regulatory law and are therefore invalid.[11] Pl.'s Mot. and Opp. at 22-32. Plaintiff also argues that even if the class deviation were found valid, it expired on October 5, 1998 and cannot apply to the last contract awarded to La Gloria in 1999. Id. at 32-33.

As defined in FAR § 1.401(a), a deviation is "[t]he issuance or use of a policy, procedure, solicitation provision . . ., contract clause . . ., method, or practice of conducting acquisition actions of any kind at any stage of the acquisition process that is inconsistent with the FAR." FAR § 1.403 governs individual deviations. FAR § 1.404 governs class deviations.

1. Whether the 1995 and 1996 Contracts Were Authorized by Individual Deviations

FAR § 1.403 addresses individual deviations. At the time that DESC sought individual deviations for plaintiff's 1995 and 1996 contracts, FAR § 1.403 stated that "[i]ndividual deviations affect only one contracting action." See Pl.'s Mot. and Opp. at 23 n.26 (emphasis added); Pl.'s App. at 74.

Plaintiff interprets the regulatory language to require that an individual deviation apply only to "one contract." Pl.'s Mot. and Opp. at 23. La Gloria asserts that, in

[11]The court declines to address at length plaintiff's arguments concerning defendant's alleged violation of the Regulatory Flexibility Act (RFA), 5 U.S.C. §§ 601-612. See Pl.'s Mot. and Opp. at 29-32; Pl.'s Reply at 15-16. The express terms of the RFA provide that only "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements [of certain prescribed statutory provisions]." 5 U.S.C. § 611(a)(1). Contrary to plaintiff's argument that it is entitled to argue defendant's failure to comply with all the applicable regulations in procuring its military fuel supplies, see Pl.'s Reply at 29, it is the view of the court that because plaintiff is not a small business, it lacks standing to challenge defendant's compliance with the requirements of the RFA.

violation of the law, DESC obtained two "individual" deviations that each applied to more than one contract. Pl.'s Mot. and Opp. at 22-23; Tr. at 42. Plaintiff argues that the deviations are invalid and cannot be applied to its 1995 and 1996 contracts. See Pl.'s Mot. and Opp. at 22.

In support of its position, plaintiff points out that in March 2002, a language change from the term "contracting action" to "contract action" became effective throughout the FAR. See Pl.'s Mot. and Opp. at 23 n.26; Final Rule for Federal Acquisition Regulation: Definitions for "Contract Action" and "Contracting Action," 67 Fed. Reg. 13053-1 (Mar. 20, 2002). Asserting that the change in language "was merely editorial," plaintiff states that corresponding changes were made to FAR § 1.404 which addresses class deviations and to FAR § 5.001 which defines a contract action. Pl.'s Mot. and Opp. at 23 n.26. Noting that prior to the March 2002 language change throughout the FAR, a "[c]ontracting action" was defined for purposes of FAR subpart 5 as "an action resulting in a contract,"see FAR § 5.001, plaintiff argues that the same definition must "have been intended in FAR subpt. 1.4[.]" Pl.'s Mot. and Opp. at 23 n.25. Plaintiff further argues that DLAR § 1.403, a provision of the Defense Logistics Acquisition Directive corresponding to FAR §1.403,[12] as in effect both before and after the March 2002 FAR language change provided that individual deviations "affect only one contract or transaction." Pl.'s Mot. and Opp. at 23; Appendix to Plaintiff's Cross-Motion for Partial Summary Judgment and Opposition to Defendant Motion for Partial Summary Judgment (Pl.'s App.) at 99.

Plaintiff complains that defendant obtained two "individual" deviations for fuel supply procurements that were not single contract actions as contemplated by the FAR but resulted in the award of as many as 30 contracts worth $4 billion dollars. See Pl.'s Mot. and Opp. at 23; Pl.'s Reply at 11; Tr. at 42-44. Challenging defendant's practice of "seeking one deviation for 'all domestic fuel solicitations' for an indefinite period," plaintiff contends that "DESC could rely on individual deviations to support its use of price indexes only by obtaining a separate deviation for each contract." Pl.'s Mot. and Opp. at 23.

Plaintiff argues that defendant's fuel procurements, which occurred in the fall and again in the spring, involved a "class of contracts" and therefore, required a class deviation rather than individual deviations. Pl.'s Reply at 11. Plaintiff notes that DESC itself had previously treated "the same [type of fuel supply] procurements" as a class of contracts. Pl.'s Mot. and Opp. at 24. In particular, plaintiff points to an occasion when

---

[12]The current Defense Logistics Acquisition Directive (DLAD) was formerly known as the DLAR or Defense Logistics Acquisition Regulation.

the Commander of DESC authorized an exemption from the statutory requirement for public advertising for "the proposed class of contracts."[13] See Pl.'s App. at 220-23.

Defendant contends that "[plaintiff's] reading of 'contracting action' is crabbed and unconventional." Def.'s Reply at 13. Defendant claims that it properly obtained individual deviations for multiple contracts awarded under one solicitation because the multiple contracts were part of a single "contracting action." Def.'s Reply at 12-13.

Defendant asserts that the FAR broadly defines "contracting" to include "selection and solicitation of sources, preparation and award of contracts, and all phases of contract administration." Def.'s Reply at 13. Citing FAR § 1.201, defendant contends that FAR § 5.001 "does not limit a 'contracting action' to only one contract" but rather defines a contracting action as "an action resulting in a contract." Id. (second emphasis added). Reasoning that a "'contracting action' includes the issuance of a single solicitation to obtain multiple contracts," defendant claims that approval of a deviation for a solicitation is sufficient and that subsequent approval of a deviation for the resulting contract awards is unnecessary. Id.

In light of the rule of statutory construction that "[a] statute should be construed so that effect is given to all its provisions," 2A Norman J. Singer, Sutherland Statutes and Statutory Construction (Sutherland) § 46:06, at 181 (6th ed. 2000), the court has some difficulty discerning what would be left over to constitute a class of contracts requiring a class deviation if defendant's interpretation of "contracting action" in the pre-March 2002 FAR is correct. However, the court will consider the possibility that the language of FAR § 1.403 that was in effect when defendant obtained the two individual deviations

---

[13]Plaintiff recognizes that the documented findings supporting the DESC Commander's decision to authorize the exemption from the statutory formal advertising requirement for the "class of [fuel supply] contracts" accompanied a 1984 procurement, nine years before the earliest of the contracts in dispute here. Pl.'s Mot. and Opp. at 24 n.27. But plaintiff points out that the fundamental structure of defendant's fall and spring procurements for fuel supplies has remained the same, id., a point defendant does not dispute. See Def.'s Mot. at 6 (stating "[a]ll of DESC's contracts contained a version of a DESC economic price adjustment clause ('EPA') that DESC had used since 1984.")

Plaintiff asserts that defendant's own documented characterization of the fuel supply procurements as a "class of contracts" rather than as an "individual contract action" evidences an inconsistency in defendant's view and "[a]t a bare minimum, . . . creates a genuine issue of material fact concerning whether a 'class' deviation was required." Pl.'s Reply at 11; see Pl.'s Mot. and Opp. at 24. The court believes this issue is resolvable as a matter of law and notes but, does not rely on, the fact that this extrinsic evidence is consistent with the court's interpretation of the FAR.

could be reasonably subject to both of the interpretations urged by the parties. If the pertinent regulatory language, in particular, the term "contracting language" would be "capable of being understood by reasonably well-informed persons in two or more senses," see 2A Sutherland, § 46:04, at 145-46, the court may "take into account some background or contextual considerations" to clarify the meaning of the regulatory language. 2A Sutherland, § 46.04, at 153.

Of particular interest is the discussion in the Federal Register addressing the 2002 language change throughout the FAR from "contracting action" to "contract action." The proposed rule states that "[t]he Councils do not intend to make any substantive change to the FAR by this proposal." Proposed Rule for Federal Acquisition Regulation: Definitions for "Contract Action" and "Contracting Action," 65 Fed. Reg. 34894 (May 30, 2000). The final rule states that it "amends the FAR to provide for consistent use of the term 'contract action,'" and to that end, "[t]he rule changes the term 'contracting action' to 'contract action' throughout the FAR and makes other editorial changes to clarify the text." Final Rule for Federal Acquisition Regulation: Definitions for "Contract Action" and "Contracting Action," 67 Fed. Reg. 13053-1 (Mar. 20, 2002).

The regulatory provision in effect from March 2002 forward states that "[i]ndividual deviations affect only one contract action." FAR § 1.403. The court interprets "one contract action" to mean, unambiguously, an action related to one contract award.

The interpretation of FAR §1.403 before and after March 2002 as referring to a single contract award is supported as well by the text of FAR § 5.001, in effect both before and after March 2002, which defined a "contract action" as "an action resulting in a contract," see 50 Fed. Reg. 1726, 1728 (Jan. 11, 1985) (emphasis supplied), not, as defendant urges, an action resulting in many contracts. See Def.'s Reply at 13. It is also supported by the text of DLAR § 1.403 in effect both before and after the March 2002 change in FAR § 1.403, which provides that individual deviations "affect only one contract or transaction." See Pl.'s App. at 99. Because the court construes the term "contracting action" in FAR § 1.403 to apply to only one contract, it is the opinion of the court that defendant obtained the two individual deviations, each of which applied to multiple contracts, in violation of the FAR. Accordingly, the court finds that the two individual deviations were invalid and that plaintiff's 1995 and 1996 contracts were not authorized by those deviations.

2. Whether the 1997, 1998, and 1999 Contracts Were Authorized by a Class Deviation

In contrast to an individual deviation, a class deviation applies to "more than one contract action." FAR § 1.404. The FAR also provides that "[w]hen an agency knows that it will require a class deviation on a permanent basis, it should propose a FAR revision, if appropriate." FAR § 1.404. In this case, defendant sought internal agency approval of a permanent regulatory revision in the same document in which it requested a class deviation. See Def.'s Exs. 20-21, 23; Tr. at 34. This is important because the dispute about the validity of the defendant's class deviation revolves around this issue of whether the proposed deviation is required to be published, and if so, whether it was published. It is undisputed that defendant did publish its proposed permanent FAR revision, and defendant relies on that publication for compliance with the publication requirements applicable to its class deviation.

a. Whether Publication of the Deviation Request Was Required

Citing FAR subpart 1.5, DLAR § 1.490(b), and section 22 of the Office of Federal Procurement Policy Act (the OFPP Act), plaintiff argues that defendant was required to publish for public comment each of its requests to deviate from the FAR. Pl.'s Mot. and Opp. at 24. Plaintiff also argues that DLAR § 1.490 required defendant to seek DAR Council review and approval of its request for a class deviation. Id. Plaintiff contends that defendant's "failure to publish its deviations or to seek DAR Council review of its class deviation renders all of the deviations unenforceable." Id. at 25.

Contrary to the argument in plaintiff's briefing, the FAR does not specifically address publication requirements for class deviations. The FAR does require that "for significant revisions" to FAR provisions, "the opportunity to submit written comments on the proposed significant revisions shall be provided by placing notice in the Federal Register." FAR §§ 1.505-1, 1.5502-2; Pl.'s App. at 76 (emphasis added). Under FAR subpart 1.5, a revision is deemed significant if it "alter[s] the substantive meaning of any coverage in the FAR System having significant cost or administrative impact on contractors [or having] . . . a significant effect beyond the internal operating procedures of the issuing agency." FAR § 1.505-1.

DLAR § 1.490(b), by contrast, does require publication for certain class deviations. It provides that "[r]equests for class deviations which have a significant cost or administrative impact upon contractors or offerors must be published in the Federal Register" and, following publication, must be approved by the DAR council. See Pl.'s App. at 99; DLAR § 1.490(b).

Section 22 of the OFPP Act does not specifically address class deviations but

contains publication requirements for certain categories of procurement changes, in particular, changes in "procurement policy, regulation, procedure or form." 41 U.S.C. § 418b. Section 22 of the OFPP Act provides:

> [N]o procurement policy, regulation, procedure, or form (including amendments or modifications thereto) relating to the expenditure of appropriated funds that has
>
> (1) a significant effect beyond the internal operating procedures of the agency issuing the procurement policy, regulation, procedure or form, or
> (2) a significant cost or administrative impact on contractors or offerors,
>
> may take effect until 60 days after the procurement policy, regulation, procedure, or form is published for public comment in the Federal Register pursuant to subsection (b) of this section.

41 U.S.C. § 418b. The court believes that there is some argument for placing a class deviation in all of these categories, but it surely involves a change in a "regulation," that is, the plan to deviate immediately from FAR § 16.203, as well as a change in a "form," that is, the approval of the immediate use of the non-standard EPA Clause B19.33.

Defendant's view is that the 1995 publication in the Federal Register of notice of defendant's proposed FAR revision also, in effect, publicized defendant's request for a class deviation pending approval of the revision,[14] Def.'s Reply at 15, and that plaintiff's reliance on § 22 of the OFFP Act is misplaced because "[t]he class deviation was published as the proposed rule." Id. The court disagrees. Notwithstanding that the proposed revision was "substantively identical" to the class deviation, see Def.'s Reply at 14, notice of the proposed revision does not provide notice of defendant's intent to use immediately its illegal EPA clause prior to the FAR revision, as is required by DLAR §

---

[14]Defendant notes that, following the 1992 approval by DLA's Director of Defense Procurement for use of certain DESC-prescribed clauses, see Supplemental Appendix to Defendant's Reply and Opposition to Plaintiffs' (sic) Cross-Motion for Partial Summary Judgment (Def.'s Supp.) Ex. 1, Pentagon officials informed DESC in 1993 that a deviation for the its EPA clauses was not needed. See Def.'s Reply at 14 n.6; Def.'s Supp. Ex. 2. However, defendant observes that in 1994, DESC decided to resume seeking a deviation on the ground that the 1992 approval might not provide the same immunity for DESC's use of its EPA clause as a deviation would. Def.'s Reply at 14 n.6. These internal views are not material to the legality of defendant's use of either individual or class deviations in this case.

1.490(b). The fact is that the class deviation was never published. Final approval for the proposed permanent deviation did not occur until 1999, after the date of the contracts at issue in this case. See Pl.'s Mot. and Opp. at 25 n.29.

As plaintiff argues in it briefing, the Federal Register notice failed to serve as publication of the purported class deviation because the proposed rule in the Federal Register did not "even remotely refer[] to a class deviation." Pl.'s Reply at 12. Plaintiff notes the difference between notice of a permanent revision (or permanent deviation) and notice of a class deviation, and points out that published notice of a permanent FAR revision informs the public of a potential, but not immediate, change in the law, while published notice of a class deviation informs the public of an immediate, but not permanent, change in the law.[15] Id. at 12-13. The court notes that defendant's effort to make an immediate change in policy is relevant as well to the issue of compliance with § 22 of the OFFP Act. Defendant's notice of a possible FAR revision failed to afford notice in compliance with the OFPP Act.

In defendant's memorandum, dated January 4, 1995, accompanying its request for internal regulatory approval of the class deviation and the proposed FAR revision, defendant concedes that the substance of the class deviation is of a type and significance that requires publication under the DLAR and the OFPP Act:

---

[15]In further support of its argument that defendant was required to publish notice of its class deviation, plaintiff relies on defendant's statement in a brief filed with the Federal Circuit in Barrett III. In that briefing, DESC stated: "It was not until 1996, that D[E]SC learned that approval by the Director of Defense [Procurement] was not sufficient for obtaining a deviation from FAR 16.203 and that publication of the deviation in the Federal Register was also required." Pl.'s App. at 547 (emphasis added).

Plaintiff also argues that, although defendant failed to comply with the publication requirements for the class deviation challenged in this case, defendant did publish--pending approval of the proposed permanent deviations--the temporary deviations from FAR requirements for other procurements during the same time period DESC sought the permanent class deviation at issue here. See Pl.'s Mot. and Opp. at 26-27. Plaintiff specifically references (1) DoD's proposed deviation "from the [FAR] record keeping and physical inventory requirements for Special Tooling, Special Test Equipment and Plant Equipment with an acquisition cost of $1,500 or less" published in March 1995, see Pl.'s App. at 560 (quoting 60 Fed. Reg. 15,740 (Mar. 27, 1995)) and (2) DoD's proposed deviation "from the [FAR] that simplifies the method of determining the rental charges for government property" published in September 1995, see Pl.'s App. at 563 (quoting 60 Fed. Reg. 46,259 (Sept. 6, 1995)). Pl.'s Mot. and Opp. at 26-27. The court notes that the extrinsic evidence is consistent with the court's interpretation of the publication requirement for class deviations, but does not rely on that fact for its interpretation of the plain language of the statute and regulations.

> In accordance with FAR 1.301(b) and Subpart 1.5 and as required by section 22 of the Office of Federal Procurement Policy Act, DLA intends to have this revised DLAR language [pertaining to authorized economic price adjustment clauses] published for public comment, because the coverage will have a significant effect beyond the internal operating procedures of DLA and may have a modest impact on contractors and offerors.

Def.'s Ex. 20. Defendant's own requests for the class deviation and proposed FAR revision at issue acknowledge that the impact of its request was significant enough to trigger the regulatory publication requirements of FAR subpart 1.5 (as to the proposed FAR revision) and § 22 of the OFPP Act. Although defendant did not reference the DLAR, the terms of the DLAR apply as well to requests for class deviations and impose the same standard for Federal Register publication as FAR § 1.505-1 and § 22 of the OFPP Act.

The court finds that, based on the regulatory publication requirements and the acknowledged impact of the proposed class deviation, publication of the class deviation was required by the DLAR and § 22 of the OFPP Act. Defendant did not publish notice of the proposed class deviation and, contrary to defendant's assertion, the published notice of the proposed permanent revision did not provide notice of the class deviation. Because defendant obtained the class deviation in contravention of the publication requirements established by DLAR § 1.490, defendant's own regulation, and § 22 of the OFPP Act, the class deviation was not authorized and is not valid for plaintiff's 1997, 1998, and 1999 contracts.

b. Whether the Class Deviation Expired After Three Years

Plaintiff contends that even if the class deviation were deemed to be valid, it had expired before the date of plaintiff's 1999 contract. See Pl.'s Mot. and Opp. at 33. The class deviation was approved by a letter from the Director of Defense Procurement to DLA's Deputy Director of Acquisition dated October 5, 1995. See Pl.'s App. at 496A. Plaintiff argues that, on October 5, 1998, three years after the alleged approval date, the class deviation expired. Pl.'s Mot. and Opp. at 32-33.

DLAR §1.490(a)(i) states that, with respect to requests for authority to deviate from the provisions of the FAR or DFARS, "[r]equests for new deviations which will be needed beyond the normal three year expiration period should be submitted . . . as permanent deviations to be incorporated into the DLAD." Pl.'s App. at 99 (emphasis added). Citing DLAR § 1.490(a)(i), plaintiff asserts that class deviations are limited to three years and any request for a deviation longer than "the normal three year expiration

period" must be submitted for approval as a permanent deviation. See Pl.'s Mot. and Opp. at 33.

As further support for its position, plaintiff relies on the text of defendant's request for the class deviation in which defendant specifically stated, "D[E]SC requests that the substance of the new deviation be incorporated into the DLAR because the class deviation will be needed beyond the normal three-year expiration period." Pl.'s App. at 526. Plaintiff claims that, based on the effective date of its last contract award (March 8, 1999), the class deviation does not apply because it expired nearly five months earlier. See Pl.'s Mot. and Opp. at 33; Pl.'s App. at 144.

Defendant denies the expiration of its class deviation asserting that the § 4.105.1 of the Defense Logistics Acquisition Directive (DLAD) (formerly DLAR) does not prescribe a time limit. Def.'s Reply at 16. Alternatively, defendant argues that, even if a three-year time limit were found to apply, the three contracting actions alleged to be covered by the class deviation, namely the solicitations for plaintiff's 1997, 1998, and 1999 contracts, fall within the prescribed time period. See Tr. at 39.

As an initial matter, the court notes that defendant's suggestion that the class deviation applied to the solicitations rather than the contracts is inconsistent both with the regulatory language of FAR § 1.404, which provides that a class deviation applies to a class of contracts, see FAR § 1.404, and with the language in defendant's application for the class deviation. See Pl.'s App. at 496A (seeking the approval of a class deviation from the requirements of FAR §§ 16.203-1 and 16.203-4(a) when using economic price adjustment clauses in fixed-price contracts).

According the ordinary and common meaning of the words "normal" and "expiration" to their use in the phrase "normal three year expiration period" in DLAR § 1.490(a)(1), see 2A Sutherland § 47:27, at 336-338, the court understands "normal" to mean "[a]ccording to a regular pattern . . .[or] . . .to an established rule or norm," see Black's Law Dictionary (7th ed. 1999), and understands "expiration" to mean "[a] coming to an end." Id. Applying the "plain meaning rule" of statutory interpretation, see 2A Sutherland § 46:01, at 113, to interpret the phrase "beyond the normal three year expiration period" in DLAR § 1.490 (a)(1), the court construes that language to impose, in ordinary circumstances, a three-year time limitation on the validity of a class deviation. In this case, defendant did not argue that an extension of time was warranted by any circumstance out of the ordinary. Absent argument by the parties that a special circumstance warranted deviation from the "normal . . . expiration period," the court finds that plaintiff's 1999 contract was awarded after the expiration of the class deviation and was therefore not covered by it.

D. Whether Defendant Was Required to Label Clause B19.33 As A Deviation

FAR § 52.103(a) requires the identification, by number, title and date, of provisions and clauses used in a solicitation or contract and states that "if the FAR provision or clause is used with an authorized deviation . . . the contracting officer shall then insert (DEVIATION) after the date." FAR § 52.103(a); Pl.'s App. at 89. FAR § 52.252-5 governs the use of authorized deviations in provisions and states that "[w]henever any FAR or supplemental provision is used with an authorized deviation, the contracting officer shall identify it by the same number, title and date assigned to the provision when it is used without deviation . . . except that the contracting officer shall insert (DEVIATION) after the date of the provision." FAR § 52.252-5; Pl.'s App. at 93.

Plaintiff argues that, in violation of FAR §§ 52.103(a) and 52.252-5, defendant did not label the EPA clause, Clause B19.33, as a "DEVIATION" and, as a result, defendant failed expressly to notify the contractor in its contract that defendant was deviating from the FAR in establishing and adjusting the contract prices. Pl.'s Mot. and Opp. at 28-29.

Alleging that these regulatory provisions only apply if defendant deviates from a clause prescribed by the FAR, defendant argues that such designation was unnecessary because its EPA clause was not a prescribed FAR clause. See Tr. at 82-83. Moreover, citing FAR §12.301(d),[16] defendant asserts that, after 1996, when it began procuring its fuel supply pursuant to FAR Part 12, "the 'deviation' designation was not mandated, because FAR [§] 52.252-2 was not a required clause." Def.'s Reply at 12 n.4.

Plaintiff states that a material issue exists with respect to whether the subject procurements were in fact "undertaken under FAR subpart 12" because military jet fuel is not used by commercial airlines. Tr. at 57. Nonetheless, plaintiff asserts that even if FAR Subpart 12 properly applies to its contracts, "there are only certain portions of the

---

[16]FAR § 12.301(d) provides:

Notwithstanding prescriptions contained elsewhere in the FAR, when acquiring commercial items, contracting officers shall be required to use only those provisions and clauses prescribed in this part. The provisions and clauses prescribed in this part shall be revised, as necessary, to reflect the applicability of statutes and executive orders to the acquisition of commercial items.

FAR §12.301(d).

FAR from which . . . [the contracts] are exempt." Tr. at 56. Plaintiff contends:

> There are certain items that are viewed as commercial items and you are permitted to put aside some of the standard FAR clauses but where you are using a required clauses and there's no argument that FAR 16.203 which is economic price adjustment clauses somehow doesn't apply . . . . Where you're going to deviate from the requirements that you still do have to follow you've got to give notice.

Id. at 55-56.

FAR Subpart 52 "gives instructions for using provisions and clauses in solicitations and/or contracts . . . ." FAR § 52.000. FAR § 52.103(b) requires clear identification "by number, title, date, and name" of "[a]ny provision or clause that supplements the FAR." If such supplemental provision or clause is used with an authorized deviation, FAR § 52.103(b) also requires the insertion of the term "(DEVIATION)" after the name of the regulation. FAR § 52.101(b)(2)(i)(C) defines "[p]rovisions or clauses that supplement the FAR" to include those provisions or clauses "[d]eveloped for use at a suborganizational level of an agency, not meant for repetitive use, but intended to meet the needs of an individual acquisition and, thus, impractical to include in either an agency or suborganization acquisition regulation."

Defendant here concedes that its EPA clauses are "clauses that supplement the FAR" as contemplated by FAR § 52.101(b)(2)(i)(C), but denies any regulatory requirement to attach the "(Deviation)" label to its agency-drafted EPA clause. Defendant's Supplemental Brief (Def.'s Supp. Br.) at 3-4. Defendant asserts that "[t]he requirements of FAR § 52.103(a) apply only when 'any FAR provision or clause' is used." Id. at 2. Moreover, defendant argues that attaching the "(Deviation)" label to its EPA clause "would have served little or no purpose - and, indeed, could have caused confusion," id. at 3, because "DESC's EPA clause (Clause B19.33, "Economic Price Adjustment-Published Market Price") . . . upon its face, is unlike anything in the FAR." Id. at 2.

Defendant's argument, however, ignores the labeling requirements set forth in FAR § 52.103(b). FAR § 52.103(b) requires that "[a]ny provision or clause that supplements the FAR" must be clearly identified "by number, title, date, and name," and further requires that if such supplemental provision or clause is used with an authorized deviation, it must also be labeled "(DEVIATION)." The court finds that the labeling requirements prescribed in FAR § 52.103(b) apply in this case and that defendant failed to comply with that regulatory requirement.

E. Whether Plaintiff is Entitled to Recover Under a Quantum Valebant Theory for Defendant's Use of the Unauthorized EPA Clause in Plaintiff's Contracts

Defendant argues that La Gloria has failed to demonstrate that it was harmed by the use of the EPA clauses in its contracts and thus cannot recover. Def.'s Mot. at 31. Defendant contends that "La Gloria first must demonstrate that the [challenged EPA] clause did not perform as required, i.e., did not protect the Government and the contractor from substantial fluctuations in costs." Def.'s Reply at 25. Quoting LaBarge Products, Inc. v. West, 46 F.3d 1547, 1557 (Fed. Cir. 1995), defendant states that, notwithstanding even a clear violation of the FAR, the Federal Circuit requires that a plaintiff show that it was "harmed . . .in [a] concrete way contemplated by the FAR" to be entitled to relief. Def.'s Mot. at 31. Defendant asserts that "simply alleging that the mechanism was not one 'permitted' by the FAR (even if true), is an allegation only of wrong without harm and, therefore, [plaintiff's complaint] must be dismissed." Def.'s Reply at 25.

Plaintiff contends that it has been harmed as a matter of law "[i]n the absence of an enforceable [contract] price." Pl.'s Mot. and Opp. at 47. Plaintiff argues that it is entitled to recover under a quantum valebant theory the fair market value of the fuel delivered to defendant. Pl.'s Mot. and Opp. at 33-37.

In Barrett I, the plaintiff sued DESC after fully performing its contracts for the supply of military jet fuel seeking, inter alia, damages under a quantum valebant theory of relief. See Barrett I, 42 Fed. Cl. at 134. The trial court found that plaintiff was entitled to damages on a quantum valebant theory, Barrett I, 42 Fed. Cl. at 134, and, in a subsequent proceeding, declined to award damages to the United States on a counterclaim. Barrett II, 45 Fed. Cl. at 170. On appeal, the Federal Circuit declined to disturb the trial court's finding that "once the unauthorized [price escalation] clause is struck out, . . . [the] express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value for the fuel delivered by [the contractor] under the contract." 242 F.3d at 1059 (quoting Barrett II, 45 Fed. Cl. at 170). The Federal Circuit stated:

> Given that the price escalation clause was unauthorized and unenforceable, . . . we agree with the Court of Federal Claims' implicit legal conclusion that there was no longer any express clause covering price escalation, and thus, nothing to preclude an implied in fact agreement on that term. We also agree with the Court of Federal Claims' factual finding of a promise by the government to pay at least fair market value.

242 F.3d at 1060.

The EPA clause addressed in Barrett III is substantially the same as the EPA clause used in La Gloria's contracts, which have also been fully performed. Moreover, there is evidence in this case that supports a finding that defendant promised to pay fair market value for the military fuel it procured. In discussing DESC's rationale for using its EPA clause in its fuel supply contracts with La Gloria, defendant points to the 1993 memorandum prepared by the DLA requesting "an interim deviation from FAR [§] 16.203 to permit DFSC [DESC's predecessor agency] to continue the use of . . . [its EPA] provisions . . . " following the MAPCO decision. Def.'s Mot. at 21-22; Def.'s Ex. 4. The 1993 memorandum requesting such deviation states:

> D[E]SC contracts contain EPA provisions based on market indexes of the product being purchased or of a similar product. All EPA references are tested for accuracy and then recommended for use by D[E]SC's Office of Market research and analysis. These EPA provisions ensure that the Government, like commercial customers, will pay the market price for the fuel throughout the duration of the contract, whether market prices increase or decrease.

Def.'s Mot. at 21-22; Def.'s Ex. 4. The court construes DESC's representation that "the [g]overnment, like commercial customers, [would] pay the market price for the fuel throughout the duration of the contract," Def.'s Mot. at 22, to be a commitment to pay fair market value to contractors supplying the fuel.

The Federal Circuit decision in Barrett III teaches that the use of an illegal EPA clause together with an implied-in-fact governmental promise to pay at least fair market value entitles a plaintiff to quantum valebant relief. Because it is the court's view that the EPA clause used in plaintiff's contracts was unauthorized and that the government evinced an intention to pay fair market value for its fuel supply procurements, the court finds that, consistent with the Federal Circuit's guidance in Barrett III, plaintiff is entitled to quantum valebant relief. In determining the quantum valebant relief, the measure of actual harm incurred by La Gloria must be determined. Thus, contrary to defendant's assertions, plaintiff is entitled to prove harm by establishing, under an appropriate valuation methodology, that it failed to receive fair market value.

F. Whether the Doctrine of Judicial Estoppel Requires the Same Fair Market Value Calculation to Which Defendant Stipulated In Prior Litigation

Plaintiff argues that defendant is estopped by the doctrine of judicial estoppel from

asserting a different fair market value calculation than the calculation to which defendant stipulated in Pride Cos. v. United States, 2000 U.S. Claims LEXIS 213 (May 10, 2000). Pl.'s Mot. and Opp. at 37-42.

Citing Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1453-54 (Fed. Cir. 1988), defendant states that "the court of appeals has held that a party may take a position strictly contrary to one that it litigated successfully against a different party unless the current adversary demonstrates '(1) personal reliance on the decision granted in the prior suit, (2) prejudice to its litigation of the issues in the current suit by reason of the decision in the prior suit, or (3) . . . apparent misuse of the court.'" Def.'s Reply at 29. Defendant contends that the different plaintiff here, La Gloria, has neither demonstrated direct reliance on Pride Cos. nor any litigating prejudice. Id. at 30. Defendant asserts that "[l]itigants may adjust their positions based upon new information." Id. (quoting Data Gen'l Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir. 1996)).

Judicial estoppel is the well-settled doctrine that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." Davis v. Wakelee, 156 U.S. 680, 689 (1895). In Pride Cos., the defendant conceded liability, 2000 U.S. Claims LEXIS 213, at *2-3, and although defendant disputed whether plaintiff suffered any harm, see id. at *3, the parties stipulated to a formula for determining the fair market value of fuel in a market neighboring plaintiff's. Id. at *4. It is difficult to characterize defendant's position in Pride Cos. as a case where a party "succeeds in maintaining [a] position." Davis, 156 U.S. at 689. Rather, that position appears to be a litigating concession which did not yield success to defendant. In these circumstances, the calculation of fair market value in Pride Cos. does not appear to the court to be an apt subject for application of the doctrine of judicial estoppel.

G. Whether Plaintiff Has Waived its Claims of Illegality

In defendant's responsive briefing to plaintiff's cross-motion for partial summary judgment, defendant argues for the first time in this case that La Gloria has waived its right to challenge the legality of the EPA clause used in its contracts because plaintiff completed its contract performance without objection. Def.'s Reply at 18-24. See Tr. at 100. Among the authorities on which defendant relies is the Federal Circuit's recent decision in American Tel. & Tel. Co. v. United States, 307 F.3d 1375 (Fed. Cir. 2002) (AT&T). See Def.'s Reply at 22-23.

After determining that plaintiff had failed to state a valid claim, the Federal Circuit in AT&T observed that, even if plaintiff had stated a valid claim, it had waived its claim.

307 F.3d at 1380. The Federal Circuit noted, in particular, that plaintiff was a sophisticated contractor, that had "successfully underbid technically superior competitors to win the . . . contract, and [had] retained the contract with a vigorous defense against a competitor's protest action." Id. The court declined to relieve AT & T "of the risk that it so aggressively pursued" stating that "the proper time for AT & T to have raised the issues that it now presents was at the time of contract negotiation, when effective remedy was available. This, AT & T did not do." Id. at 1381. Quoting Whittaker Elec. Sys. v. Dalton, 124 F.3d 1443, 1446 (Fed. Cir. 1997), the Federal Circuit noted in AT&T, "The doctrine of waiver precludes a contractor from challenging the validity of a contract, whether under a DAR [defense acquisition regulation] or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge." 307 F.3d at 1381 (internal citations omitted).

Plaintiff contends that it has not waived its claim. See Pl.'s Reply at 17-29. In support of its position, plaintiff quotes the Federal Circuit's opinion in Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988), stating that "[t]he government's insistence during negotiations on use of [the EPA clause] in its entirety, and the contractor's acquiescence, does not immunize the government from the consequences of failure of the EPA clause to comply with the law stated as in the DAR." Pl.'s Reply at 19. Plaintiff asserts that "Beta Systems is binding precedent that is materially indistinguishable from the present case." Id.

The court agrees with plaintiff that the facts in Beta Systems are substantially similar to the facts in this case and preclude the application of the waiver doctrine. Each of La Gloria's contracts contained a statement that defendant's use of Clause B19.33 as an EPA clause was non-negotiable. See Pl.'s App. at 154, 246; Tr. at 8-9, 58. It is the view of the court that defendant is unable to invoke the waiver doctrine when the terms of the solicitation expressly prohibited bidders from challenging defendant's use of an unauthorized economic price escalation clause. The government appears to have benefitted from its market position with its resort to self-help measures to circumvent the terms of the FAR in the administration of its fuel supply procurements.[16] In these

---

[16]As the purchaser of military fuel supplies, defendant acknowledged in an internal memorandum requesting an interim deviation from FAR § 16.203 pending defendant's application for a permanent deviation:

> [W]e request approval to continue using product index escalators to adjust the prices of fuel we purchase. We have made successful use of these or similar provisions with DLA's approval since the early 1980's. However, a court has ruled that the provisions are not specifically authorized by the FAR, and are

circumstances, the court declines to apply to waiver doctrine.

III. Conclusion

For the foregoing reasons, defendant's motion is DENIED. Plaintiffs' motion is GRANTED on the issue of quantum valebant relief and with respect to the invalidity of the individual and class deviations. Plaintiff's motion is DENIED with respect to the applicability of the judicial estoppel doctrine to the calculation of fair market value. On or before May 6, 2003, the parties shall submit a joint status report proposing a schedule for further proceedings in this case.

IT IS SO ORDERED.

EMILY C. HEWITT
Judge

---

therefore invalid.

. . . . We intend to seek a permanent deviation from the FAR in order to validate our EPA provisions. However, that can be a time consuming process. It makes good business sense to continue doing business as we have been for many years while our permanent deviation request is pending. There is no good alternative to our present system of price escalation.

Pl.'s App. at 234.