# In the United States Court of Federal Claims

No. 02-704C
(Filed: September 15, 2003)

* * * * * * * * * * * * * * * * * * * * * * * *

TESORO HAWAII CORPORATION, and
TESORO ALASKA COMPANY,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*.

* * * * * * * * * * * * * * * * * * * * * * * *

Summary judgment; Military fuel supply contracts; Unauthorized economic price adjustment clause; Individual and class deviations from FAR § 16.203; Quantum valebant relief

*J. Keith Burt*, Mayer, Brown, Rowe & Maw, Washington, D.C., for plaintiffs. With him were *Michael E. Lackey, Jr.*, *Monica A. Aquino*, and *David H. Leonard*, of counsel.

*Steven J. Gillingham*, Senior Trial Counsel, Commercial Litigation Branch, United States Department of Justice, Washington, D.C., for defendant. With him were *Kyle Chadwick*, Trial Attorney, *David M. Cohen*, Director, *Robert D. McCallum, Jr.*, Assistant Attorney General, *Bernard A. Duval*, and *Howard M. Kaufer*, of counsel.

OPINION

BRUGGINK, *Judge*.

This is an action arising out of the use of an economic price adjustment clause in a series of competitively-awarded fuel supply contracts. Defendant's October 15, 2002 motion for partial summary judgment and plaintiffs' December 12, 2002 cross-motion are now pending. The parties were allowed to file supplemental briefing. For the reasons set out below, plaintiffs' motion is granted in part, and denied in part. Defendant's motion is denied.

## BACKGROUND

Plaintiffs, Tesoro Hawaii and Tesoro Alaska, are wholly-owned subsidiaries of Tesoro Petroleum Corporation,[1/] which operates five refineries in the western United States. Plaintiffs entered into at least thirty-seven contracts with the Defense Energy Support Center ("DESC")[2/] to supply military jet fuel to the government from 1983 through 1999.[3/] DESC is a field activity of the Defense Logistics Agency ("DLA") which is a component of the Department of Defense. Among other things, DESC purchases refined fuels for the military worldwide. Tesoro's contracts were awarded pursuant to different government programs including (1) the domestic bulk fuels program, (2) the overseas bulk fuels program, and (3) the "cool barge" program. Each contract with plaintiffs contained one of DESC's Economic Price Adjustment ("EPA") clauses, which modified fuel prices according to certain market-based indexes.[4/] DESC used several different versions of the agency-drafted EPA

---

[1/] They are referred to herein collectively as "Tesoro."

[2/] Until 1998, DESC was called the Defense Fuel Supply Center. We use the current name.

[3/] DESC awarded the following contracts to Tesoro Hawaii Corporation: DLA600-83-D-0577, DLA600-84-D-0518, DLA600-85-D-0486, DLA600-86-D-0491, DLA600-86-D-0645, DLA600-88-D-0457, DLA600-88-D-0554, DLA600-89-D-0586, DLA600-90-D-0466, DLA600-90-D-0570, DLA600-91-D-0469, DLA600-92-D-0494, DLA600-92-D-0542, DLA600-93-D-0519, DLA600-94-D-0461, DLA600-94-D-0534, SPO600-95-D-0458, SPO600-95-D-0505, SPO600-96-D-0496, SPO600-99-D-0524.

DESC awarded the following contracts to Tesoro Alaska Corporation: DLA600-84-D-0559, DLA600-86-D-0481, DLA600-86-D-0537, DLA600-86-D-0594, DLA600-86-D-0873, DLA600-87-D-0577, DLA600-87-D-1060, DLA600-88-D-0586, DLA600-88-D-1017, DLA600-89-D-0580, DLA600-89-D-1016, DLA600-91-D-0562, DLA600-91-D-1023, DLA600-93-D-0536, DLA600-94-D-1270, SPO600-95-D-1281, SPO600-99-D-0538.

[4/] There is some dispute over whether one contract at issue–DLA600-86-D-0537–contains an EPA clause. Since that contract has not been offered into the record by either party, the scope of this opinion does not cover that contract. We leave it to be resolved at a later stage of the litigation.

(continued...)

clause B19.33, which provides that "[t]he prices payable under this contract for listed items shall be the base price for the listed item increased or decreased per like unit of measure from the base reference price."

From 1984 to 1994, Tesoro's domestic bulk fuels contracts contained an EPA clause that indexed the contract prices to prices reported in Petroleum Market Monthly ("PMM"), a publication issued monthly by the Energy Information Agency, a division of the Department of Energy. Beginning in 1995, largely in response to this court's decision in *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 405 (1992), discussed *infra*, Tesoro's domestic bulk fuel contracts contained an EPA clause based on regional average prices reported in a widely used industry publication, *Platt's Oilgram Price Report* ("Platt's"), rather than PMM. All of Tesoro's contracts awarded under the overseas bulk fuels program contained a Platt's-based EPA clause, and all of Tesoro's contracts awarded under the "cool barge" program contained EPA clauses based upon either the *Oil Price Information Service* or the *Lundberg Letter*.

In December of 1992, this court ruled in *MAPCO* that DESC's PMM-based EPA clauses were inconsistent with the Federal Acquisitions Regulations ("FAR") and, therefore, unauthorized. *Id*. at 416. In January 1993, the Acting Executive Director of the DLA granted an individual deviation for the use of the PMM-based EPA clause in contracts awarded pursuant to solicitation DLA600-93-R-0061. Tesoro's contract DLA600-93-D-0519 was awarded pursuant to that solicitation. In January of 1995, DESC requested a permanent revision to the DLA Acquisitions Regulation to expressly permit the use of such EPA clauses not withstanding any other FAR or DLA regulation. On February 28, 1995, DLA published the proposed revision to the DLA procurement directive in the Federal Register, providing a 60-day comment period.

In March of 1995, while its request for a permanent revision was pending, DESC was granted an individual deviation to allow it to use the Platt's-based EPA clause in solicitation SPO600-95-R-0161 and Tesoro was awarded contract SPO600-95-D-0505 pursuant to that solicitation. In October of 1995,

---

[4/](...continued)
The term "market-based" is used rather loosely. In *MAPCO*, we specifically found that although there was some tenuous connection between the relevant fuel market and the PMM index, PMM did not legitimately reflect any established market. *MAPCO*, 27 Fed. Cl. at 410.

the Director of Defense Procurement granted DESC's request for a class deviation for the use of Platt's-based EPA clauses and Tesoro was awarded three contracts—SPO600-96-D-0496, SPO600-99-D-0524, and SPO600-99-D-0538—after the date that class deviation was granted.[5/] In August of 1999, the final rule revising the DLAR in accordance with DESC's 1995 request was published in the Federal Register.

In its motion for summary judgment, the government makes the following arguments: (1) As to the 31 contracts containing standard EPA clauses, we should reject, or at least distinguish, the legal conclusions found previously by this court concerning such clauses; (2) Even if the standard EPA clauses are found illegal, Tesoro is unable, as a matter of law, to establish any harm resulting from the illegal clauses; (3) Even if Tesoro was harmed, any claim it may have had was waived by failing to object to the EPA clauses at an earlier time; and (4) the five contracts containing deviations are consistent with the FAR and are, consequently, not illegal.

In their cross-motion for summary judgment, plaintiffs argue that the standard EPA clauses used here, as well as those granted through individual and class deviations, are illegal. They ask us to strike all such clauses from the contracts and award them, as a quantum valebant remedy, the difference between the fair market value price of the fuel delivered to DESC and what they were actually paid.

DISCUSSION

I. Legality of the standard EPA clauses

Initially, the parties disagree over whether the standard EPA clauses are legal. This dispute, however, as far as clauses B19.33 and B19.22 are concerned, has been resolved by several prior decisions considering equivalent contracts. *Phoenix Petroleum Co. v. United States*, No. 97-315C, slip op. (Fed. Cl. April 30, 2003); *La Gloria Oil & Gas Co. v. United States*, 56 Fed. Cl. 211 (2003); *Gold Line Refining, Ltd. v. United States*, 54 Fed. Cl. 285 (2002); *Barrett Refining Corp. v. United States*, 42 Fed. Cl. 128 (1998); *MAPCO*, 27 Fed. Cl. at 407-16.

---

[5/] As discussed *infra*, the parties disagree as to whether publication was required before the class deviation could be implemented.

In *MAPCO*, this court found that B19.33 and a similar PMM-based EPA clause, B19.22, were inconsistent with the FAR. *MAPCO*, 27 Fed. Cl. at 408. Recognizing that "applicable provisions of the FAR are incorporated into every federal government procurement contract, and have the same effect as if they were set forth in the contract itself," we examined whether DESC's standard EPA clauses B19.33 and B19.22 were consistent with the applicable provisions of the FAR and found them wanting. *See id*. FAR § 16.203-1, entitled "Description," explicitly provides that economic price adjustments must fit into one of three identifiable types: (1) adjustments based on established prices; (2) adjustments based on actual costs of labor or material; or (3) adjustments based on cost indexes of labor or material. 48 C.F.R. § 16.203-1. In *MAPCO*, we found that clauses B19.33 and B19.22, which used PMM as a price escalator, did not fit into one of these three types, and were therefore illegal. *MAPCO*, 27 Fed. Cl. at 416.

The government argued in *MAPCO* that clauses B19.33 and B19.22 satisfied FAR § 16.203-1(a) because these EPA clauses, providing for price adjustments indexed to PMM, were "adjustments based on established prices." *Id*. at 408. We disagreed, finding that the phrase "established prices" did not mean the average of other refiners' prices compiled by the government in an index such as PMM, as was the case with EPA clauses B19.33 and B19.22.[6/] *See id*. at 408-09. The standard EPA clauses for "adjustments based on established prices" authorized under the FAR were set out in FAR § 52.216-2 and § 52.216-3. These clauses based adjustments on either the contractor's own "catalog prices" or "market prices." *See* FAR §§ 52.216-2, 52.216-3. We found that the PMM Index could not reasonably be described as reflecting either "catalog prices" or "market prices" because the PMM was not a catalog, did not reflect any established catalog prices, and did not reflect any established market. *MAPCO*, 27 Fed. Cl. at 410. The PMM was not maintained by MAPCO, nor did it state MAPCO's prices to buyers in the general public. Rather, the PMM was an average of month-old sales compiled by the government, which did not reflect any specific vendor's current price.

Additionally, we found that although the government may diverge from

[6/] We also rejected the government's argument that the PMM Index was valid pursuant to FAR § 16.203-1(c) as an "adjustment based on cost indexes of labor or material." *MAPCO*, 27 Fed. Cl. at 411.

the standard EPA clauses when appropriate under the FAR,[7/] any such clauses are still restricted by the limitations found in FAR § 16.203-3, which mandates that EPA clauses must be drafted "to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices." FAR § 16.203-3; *see MAPCO*, 27 Fed. Cl. at 411-13. Defendants argued that § 16.203-3 did not set forth the *only* purposes for using an EPA clause. *Id*. at 412. We disagreed, however, finding that for the limitations clause to have any effect, it had to serve "not only as an entry point for using an EPA clause, but also as the method to justify the clause actually used." *Id*.

Our holding in *MAPCO* was endorsed in *Gold Line Refining, Ltd. v. United States*, 54 Fed. Cl. 285 (2002). In *Gold Line*, the plaintiff challenged the legality of EPA clause B19.33 in its jet fuel contract with DESC. In its motion for summary judgment, the government sought reconsideration of the court's ruling in *MAPCO. Id*. at 289. That request was rejected.

> [T]he proper inquiry for the court is not whether Clause B19.33 operated consistently with the "objectives" of the FAR, but whether the clause complied with the requirements of the FAR. Seeing no salient distinction between the legal arguments addressed in *MAPCO* and advanced by defendant here, the court concludes that Clause B19.33 did not comply with . . . the FAR.

*Id*. at 295.

Within the last few months, the same result has obtained in three other decisions of this court. *See Calcasieu Refining Co. v. United States*, No. 02-1219C, slip op. (Fed. Cl. July 31, 2003); *La Gloria*, 56 Fed. Cl. 211; *Phoenix Petroleum*, No. 97-315 C, slip op. at 4 ("The Court finds defendant's arguments—that clause B19.33 was valid under the FAR—to be unpersuasive. Defendant's same arguments were thoroughly analyzed and rejected in both *MAPCO* and *Gold Line*, and defendant has not demonstrated that the court's holdings in those cases were erroneous."). Here, at least 22 of the disputed contracts contain either B19.33 or B19.22. We find no reason to depart from the consistent holding of this court that those clauses are illegal.

---

[7/] FAR § 16.203-4(a) permits a contracting officer to replace the standard EPA clause with an agency-prescribed clause if the contracting officer determines that the standard clause is inappropriate.

Seven of the present contracts contain either EPA clause B19.19 or B19.34, which index prices to market standards other than PMM. Three of Tesoro's contracts contain clause B19.34, which is similar to B19.33 in structure but uses Platt's as a price escalator rather than PMM. Likewise, four of Tesoro's contracts contain EPA clause B19.19, referencing price to *Oil Price Information Service* or the *Lundberg Letter*, rather than PMM.[8/] While B19.19 and B19.34 are similar in many respects to B19.33 and B19.22, we are aware of no court directly addressing the legality of either B19.34 or B19.19 and the parties have made no real effort in their briefing to address these clauses. We decline to rule on them until after the parties have fully addressed whether *MAPCO*'s reasoning concerning §§ 16.203-1 and 16.203-3 should be extended to them. We thus deny both motions in this respect.

II. Deviations

The FAR, at subpart 1.4, expressly provides for deviations, which allow exceptions to the provisions of the FAR not expressly required by any other law. An "individual deviation," permitted by FAR § 1.403, excludes a single "contracting action" from a FAR requirement. A "class deviation," permitted by FAR § 1.404, affects more than one "contract action." Immediately after this court announced the *MAPCO* decision, DESC approached the DOD for a formal review of its clauses through the deviation process.

In attempting to sustain the legality of the EPA clauses in several of the contracts at issue, defendant alleges that legality is independently established by the fact that DESC obtained individual and class deviations through legally authorized channels. Defendant claims that five of its contracts with Tesoro contained individual or class deviations permitted by the FAR, providing independent grounds for the legality of the EPA clauses contained in those contracts. Plaintiffs disagree, asserting that both the individual and class deviations were inconsistent with the FAR.

A. Individual Deviations

At the time DESC sought individual deviations for two of its contracts

[8/] One additional contract—DLA600-89-D-1016—contains an EPA clause that adjusts prices based on OPIS but does not specifically contain clause B19.19.

with Tesoro,[9] FAR § 1.401(a) stated that individual deviations affected "only one contracting action." However, rather than actually obtaining separate deviations for each contract, or going through the more time consuming process of obtaining a class deviation, in 1993 DESC sought and was granted an individual deviation to cover all domestic fuels solicitations for a period of one year. One of Tesoro's contracts was awarded pursuant to that deviation.[10] Again in 1995, DESC requested and was granted an individual deviation covering all domestic bulk fuel solicitations for that year. Tesoro was awarded one contract under this deviation.[11]

Plaintiffs contest defendant's use of the individual deviation mechanism in this manner, arguing that defendant was required to seek individual deviations for each single contract. Defendant, on the other hand, argues that Tesoro's reading of FAR § 1.403 is "crabbed and unconventional," and that the FAR's definition is "broad and includes . . . 'selection and solicitation of sources, preparation and award of contracts, and all phases of contract administration,'" thus allowing DESC to award numerous contracts pursuant to one individual deviation. Def.'s Reply & Opp'n to Pl.'s Mot. for Summ. J. at 19 (quoting FAR § 1.201). Defendant raised this argument in *La Gloria*. 56 Fed. Cl. at 217-19. It was rejected there, and we reject it here.

Relying on the rule of statutory construction that "[a] statute should be construed so that effect is given to all of its provision," NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 46:06, at 181 (6th ed. 2000), the court in *La Gloria* explained that if defendant's interpretation were accepted, it would be difficult to discern "what would be left over to constitute a class of contracts requiring a class deviation." *La Gloria*, 56 Fed. Cl. at 219. However, the court found that even granting that the language in § 1.403 could reasonably be subject to either interpretation, further evidence clearly established that DESC's interpretation was unacceptable. The court specifically pointed out that a recent language revision in 2002 changed the term "contracting action" to "contract action" throughout the FAR. *Id*. at 12. The court accepted the rationale stated in the proposed rule that the purpose of the change was "merely editorial," and was intended to clarify the text so that "contracting action" and "contract action" were given the same effect—*i.e.*, an action related to only one

---

[9] DLA600-93-D-0519, SPO600-95-D-0505.

[10] DLA600-93-D-0519.

[11] SPO600-95-D-0505.

contract. *Id*. The court's construction was further supported by FAR § 5.001 which defined a "contract action" as "an action resulting in *a* contract." *Id*. (quoting FAR § 5.001) (emphasis added). Accordingly, the court found the individual deviations presented in *La Gloria*, which applied to multiple contracts, to be inconsistent with the FAR's deviation scheme and were, consequently, invalid. We adopt the thorough reasoning of that decision. The facts here are not materially different. We hold that the 1993 and 1995 individual deviations applicable to two of Tesoro's contracts were invalid.

B. Class Deviations

In October of 1995, DESC alleges it was granted a class deviation for the use of Platt's-based EPA clauses and that Tesoro was awarded three contracts[12/] after the date the class deviation was granted. Tesoro asserts that the class deviation was invalid because DESC failed to publish it as required by the FAR, the DLAR (which also allegedly requires defendant to seek DAP Council review), and the Office of Federal Procurement Policy Act (OFPPA). Defendant argues that there is no requirement to publish deviations, and even if there was, that obligation was satisfied.

Nothing in the FAR specifically addresses publication requirements for class deviations. However, as pointed out by the court in *La Gloria*, the FAR does require that "for significant revisions" to FAR provisions, "the opportunity to submit written comments on the proposed significant revisions shall be provided by placing notice in the Federal Register." *La Gloria*, 56 Fed. Cl. at 220 (citing FAR §§ 1.505-1, 1.5502-2). Under subpart 1.5 of the FAR, a revision is only considered "significant" if it "alter[s] the substantive meaning of any coverage in the FAR System having significant cost or administrative impact on contractors [or having] . . . a significant effect beyond the internal operating procedures of the issuing agency." FAR § 1.505-1. DLAR § 1.490(b), however, specifically requires publication of certain class deviations. That regulation states, "[r]equests for class deviations which have a significant cost or administrative impact upon contractors or offerors must be published in the Federal Register," and "[c]lass deviations for which publication is required should be submitted . . . in sufficient time to allow for a 60 day public comment period, resolution of public comments [and] review of the resolved comments by the DAR Council," following publication.

---

[12/] SPO600-96-D-0496, SPO600-99-D-0524, and SPO600-99-D-0538.

Additionally, section 22 of OFPPA, although it does not address class deviations specifically, does require that certain procurement "policies, regulations, procedures and forms" be published in the Federal Register for public comment before taking effect:

> [N]o procurement policy, regulation, procedure, or form (including amendments or modifications thereto) relating to the expenditure of appropriated funds that has (1) a significant effect beyond the internal operating procedures of the agency issuing the procurement policy, regulation, procedure or form, or (2) a significant cost or administrative impact on contractors or offerors, may take effect until 60 days after the procurement policy, regulation, procedure, or form is published for public comment in the Federal Register pursuant to subsection (b) of this section.

41 U.S.C. § 418b (2002).

In *La Gloria*, the court noted that there was some argument for placing a class deviation in all possible categories listed within § 4189b, but that a class deviation "surely involves a change in a 'regulation,' that is, a plan to deviate immediately from FAR § 16.203, as well as a change in 'form,' that is, the approval of the immediate use of the non-standard EPA clause B19.33." *La Gloria*, 56 Fed. Cl. at 220. We agree with the *La Gloria* court's reasoning and note that although DESC has raised legitimate issues concerning the scope of FAR subpart1.5,[13/] it was at least required to publish notice of the class deviation pursuant to DLAR § 1.490(b) and section 22 of OFPPA. Both DLAR § 1.490(b) and section 22 of OFPPA require publication of any deviation that would have a significant cost or administrative impact upon contractors or regulators. We agree with the *La Gloria* court's finding that the class deviation at issue here, permitting the government to significantly alter the form and operation of EPA clauses contained within fuel contracts, would indeed have a significant impact on the contractors and the government. For that reason, we find that DESC was required to publish notice of the class deviation and provide a 60 day window to

---

[13/] Defendant argues that the language of subpart 1.5 only requires publication of significant *revisions*, not necessarily *deviations*. Here, we find it unnecessary to resolve the issue of whether, if ever, a deviation may be considered a revision for purposes of subpart 1.5 because DESC was required to publish notice of the class deviation independently by OFPPA and the DLAR.

allow for public comment.

Defendant next argues that even if publication of the class deviation was required, publication was simultaneously effected by the 1995 publication in the Federal Register of notice of defendant's proposed FAR revision – *i.e.*, "Publishing the proposed rule also publicized DESC's requested class deviation, which was substantively identical." Def.'s Reply & Opp'n to Pl.'s Cross-Mot. for Summ. J. at 21. However, nothing in the proposed rule remotely refers to a class deviation intended to take effect immediately. *See* 60 Fed. Reg. 10,826 (Feb. 28, 1995). Publishing an intent to make a permanent revision to the FAR in the future did not adequately inform the public that DESC intended thereby to obtain a specific class deviation. DESC raised this identical argument in *La Gloria*. It was rejected there, and we reject it here. As the court stated in *La Gloria*, "Notwithstanding that the proposed revision was 'substantively identical' to the class deviation, notice of the proposed revision does not provide notice of defendant's intent to use immediately its illegal EPA clause prior to the FAR revision . . . . The fact is that the class deviation was never published." *La Gloria*, 56 Fed. Cl. at 220.

Because defendant implemented the class deviation here without fulfilling the publication requirements provided in DLAR § 1.490 and OFPPA § 22, that deviation was unauthorized and the EPA clauses contained in plaintiffs' contracts awarded pursuant to that class deviation are invalid.[14/]

III. Waiver

Defendant, relying on both *Whittaker Electronic Systems v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997), and *American Telephone & Telegraph Co. v. United States*, 307 F.3d 1374 (Fed.Cir. 2002), next argues that plaintiffs have waived their right to challenge the legality of the EPA clauses because, at the a time when they knew of the illegality, they nevertheless completed the contracts. We disagree.

---

[14/] Because we have found the class deviation at issue here invalid pursuant to the publication requirements found in DLAR § 1.490 and OFPPA § 22, we find it unnecessary to address plaintiffs' arguments that DESC's deviations violated FAR §§ 52.103(a), 52.252-5, and the Regulatory Flexibility Act, 5 U.S.C. §§ 601-612. Likewise, we find it unnecessary to address whether, if valid, DESC's purported class deviation expired.

It is well settled that "if government officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound by estoppel, acquiescence, or failure to protest." *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1552 (Fed. Cir. 1995) (citing *Chris Berg, Inc. v. United States*, 426 F.2d 314, 317 (Ct. Cl. 1970); *Rough Diamond Co. v. United States*, 351 F.2d 636, 639-43 (Ct. Cl. 1965)); *see also Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1451 (Fed. Cir. 1997); *Phoenix Petroleum*, No. 97-315C, slip op. at 5. In *Phoenix Petroleum*, the court found that EPA clauses benefit both the government and contractors by preventing either party to the contract from being unduly harmed by market fluctuations, and thus trigger the rule stated in *LaBarge*. *See Phoenix Petroleum*, No. 97-315C, slip op. at 5; *see also Calcasieu Refining Co. v. United States*, No. 02-1219C, slip op. at 14 (Fed. Cl. July 31, 2003).

While it is true that an individual can, under certain circumstances, waive regulatory, statutory, and even constitutional rights, *see Reservation Ranch v. United States*, 39 Fed. Cl. 696, 712 (1997), rights which implicate the institutional concerns of the United States government in application of the law may not be waived. *See Commodity Futures Trading Com. v. Schor*, 478 U.S. 833, 850-51 (1986) (holding that while personal rights can be waived, structural principles are not waivable); *see also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 82 (1982) ("If a promisee need only wait until a contract expires to enforce an illegal provision, the defense of illegality would obviously be ephemeral. . . . And if it be suggested that Kaiser should not have waited so long to assert its defense, the Court has held that 'rules of estoppel will not be permitted to thwart the purposes of statutes of the United States.'") (citing *Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 176 (1942)). The FAR provisions at issue here certainly raise institutional concerns. If we were to adopt DESC's argument that contracting parties are free to waive mandatory FAR requirements, the parties to fuel contracts such as those at issue here would be free to rewrite federal procurement policy through negligence or collusion.

Defendant's reliance on *Whittaker* and *AT&T* is misplaced. In *Whittaker*, the Federal Circuit held that the successor to a contract was precluded from challenging its validity despite the fact that it contained an alleged regulatory violation, because the successor "fail[ed] to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge." *Whittaker*, 124 F.3d at 1446. As stated in both *Gold Line* and *Phoenix Petroleum*, the alleged breach of procurement regulations raised in *Whittaker* occurred after the contract award, while the breach at issue in *Gold Line* and *Phoenix* was *inherent* in the award. *Phoenix Petroleum*, No. 97-

315C, slip op. at 14; *Gold Line*, 54 Fed. Cl. at 296. Those cases involved the same basic EPA clauses at issue here, and for the same reason we find that the rationale presented in *Whittaker* is inapplicable to cases such as this one, which challenge the inherent legality of a contract.

We agree with the decisions in *La Gloria* and *Phoenix Petroleum* that the present facts are more akin to *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988), and that the rationale of *Whittaker* is inapplicable here. *See La Gloria*, 56 Fed. Cl. at 226; *Phoenix Petroleum*, No. 97-315C, slip op. at 5. In *Beta Systems*, the plaintiff contractor sought relief from an EPA clause that adjusted contract price based on changes in labor and material costs. The Federal Circuit held that if the use of the EPA clause violated the DAR, the government could not benefit from it: "If the . . . index that was selected does not comply with DAR 3-404.3(c)(3)c.5, even approximately, it is not controlling whether or not Beta or the government foresaw, or accepted the risk of failing to foresee, this defect in the index." *Beta Sys.*, 838 F.2d at 1186.

The defendant also argues that the latest decision in the *AT&T* litigation saga, *AT&T*, 307 F.3d 1374, requires a recognition of the waiver doctrine in this case. That argument is well-addressed in *Calcasieu Refining*, No. 02-1219C, slip op. at 15-16, and *Hermes Consol., Inc. v. United States*, No. 02-1460C, 2003 U.S. Claims LEXIS 237, at * 46-63 (Fed. Cl. Aug. 7, 2003), although we do not completely agree with the conclusions reached in those cases. The *AT&T* litigation involved a suit by a contractor for failure to comply with a statute prohibiting the award of fixed-price contracts unless the program risk had been evaluated by proper authorities within DOD. After the Federal Circuit affirmed the trial court's decision that the contract was void ab initio, *Am. Tel. & Tel. Co. v. United States*, 124 F.3d 1471, 1479 (Fed. Cir. 1992), the Circuit revisited the issue en banc, vacating the prior decision and holding that the violation of the statute did not void the contract. *Am. Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1375 (Fed. Cir. 1999) (en banc). The case was eventually resolved in the government's favor, and the court even went so far as to say, in dicta, that

> the proper time for AT&T to have raised the issues that it now presents was at the time of contract negotiation, when effective remedy was available. This, AT&T did not do. For reasons evident above, even were AT&T to have stated a valid claim for reformation, this court's case law would require a finding that AT&T waived that claim.

*AT&T*, 307 F.3d at 1381.

The *AT&T* decision, some have suggested, leaves the court's waiver doctrine unclear. In *Calcasieu*, for example, the court stated, "The recent decision, *AT&T* V, recognizes that a knowledgeable contractor can waive the right to claim based on an illegal pricing provision. [However,] [t]he older cases enforce a strict rule against waiver when the contractor is the beneficiary of the offending clause." *Calcasieu*, No. 02-1219C, slip op. at 18; *see also Hermes Consol.*, No. 02-1460C, 2003 U.S. Claims LEXIS 237, at 50-65 (discussing the impact of *AT&T*). We find it difficult to believe that the court in *AT&T* would *sub silentio* overrule, in dicta, the well-established rule that waiver is inappropriate where government officials execute a contract in violation of a mandatory regulation enacted for the contractor's protection.

We believe *AT&T* must be read in light of its specific context. After having affirmed the decision that the government was bound by the regulatory provisions at issue, the en banc court addressed the specific issue of whether it was proper to find the contract void ab initio after its completion. *AT&T*, 177 F.3d at 1373-74. The court concluded that "[l]egislative intent and precedent both lead to the conclusion that the AT&T contract was not void ab initio as a consequence of the agency's noncompliance." *Id*. at 1374. The court noted the strong policy in favor of "supporting the integrity of contracts made by and with the United States," and that "the policy underlying the enactment must be considered in determining the remedy for its violation, when the statute itself does not announce the sanction of contract invalidity." *Id*. In light of legislative intent, the court held that mere imperfect compliance with the regulation at issue was not grounds for voiding the contract. *Id*. at 1375.

The court's holding, in this respect, added nothing to the law of this Circuit. A contract should only be declared void ab initio in unusual circumstances. *See, e.g.*, *Ala. Rural Fire Ins. Co. v. United States*, 572 F.2d 727, 733-34 (Ct. Cl. 1978); *John Reiner & Co. v. United States*, 325 F.2d 438, 440 (Ct. Cl. 1963) (stating "the court should ordinarily impose the binding stamp of nullity only when the illegality is plain"). The en banc court in *AT&T* made note of this precedent and acknowledged that the *usual* remedy for the government's failure to abide by mandatory regulations after a contract has been completed is to reform it to correct the illegal term or allow recovery under an implied contract theory. *AT&T*, 177 F.3d at 1375-76. However, the court only addressed whether the contract at issue in that case was void ab initio, and not whether *AT&T* was due any remedy under a different theory. *Id*. at 1377 ("Although the parties discuss possible remedies, the issue of what relief may be available to AT&T is not before us, for the Court of Federal Claims did not consider AT&T's claims on the premise that the underlying contract was not

void. We have not considered this issue, and express no view thereon.").

On remand to the Court of Federal Claims, the court refused to award AT&T a contract price readjustment because, unlike *Beta Systems*, AT&T could not establish that its contract contained a price term that violated a mandatory regulation:

> We are not concerned in this case with a statute that proscribes the use of a fixed-price contract. Rather, Section 8118, and the government's failure to abide by it, was identified in the en banc decision simply as "governmental non-compliance with internal review and reporting procedures." Thus, the government's omission was simply a failure to abide by housekeeping rules.

*Am. Tel. & Tel. Co. v. United States*, 48 Fed. Cl. 156, 159-60 (Fed. Cl. 2000) (citing *AT&T*, 177 F.3d at 1376).

Whether AT&T waived any right to raise an illegality argument was not addressed by the en banc court nor the Court of Federal Claims on remand. The case was resolved without the need to address that issue. On subsequent appeal, the Federal Circuit agreed with the lower court. Its statements concerning whether or not AT&T waived any claim it might have had were unnecessary to the resolution of that case. After having concluded that the lower court was correct in determining that AT&T's contract was not one which fit into the narrow set of cases in line with *Beta Systems*, but only involved regulations intended as "internal governmental direction," the court commented that "the record simply provides no evidence that AT&T sought a cost reimbursement contract during contract negotiations." *AT&T*, 307 F.3d at 1380. The court found that at that stage of the litigation it would have been inappropriate to reform the contract from one based on a fixed cost to one providing for cost reimbursement. *See id.* at 1380-81.

In light of its unusual procedural history, we believe it would be imprudent to read the *AT&T* decision rejecting AT&T's reformation argument as overruling *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1552 (Fed. Cir. 1995), *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1451 (Fed. Cir. 1997), and *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988). While waiver is certainly a valid defense to claims falling outside the *Beta Systems* line of cases—*i.e.*, those cases not involving the government's failure to abide by mandatory regulations intended for the benefit of the contractor—to extend the defense to cases falling within the *Beta Systems* line of case may impinge upon the institutional concerns of the United States in application of the law.

*See Commodity Futures Trading Com. v. Schor*, 478 U.S. 833, 850-51 (1986); *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982). The *Beta Systems* rule acts not only to protect the parties but also to ensure that Federal procurement regulations do not simply become the private property of parties to a government contract.

IV. Harm to plaintiffs

Defendant argues that to recover, plaintiffs must allege and prove that they were harmed by the illegal EPA clauses. Plaintiffs have not yet presented evidence of harm or damages, deferring their evidence until subsequent proceedings. Plaintiffs allege they are entitled to quantum valebant relief, and that their burden later will be to show that they were paid less than fair market value. Defendant concedes that there likely will be a difference between the prices that plaintiffs' experts would assign to fuel sold and the prices plaintiffs offered and received on their contracts. Defendant argues that this difference, however, does not establish that plaintiffs suffered cognizable harm. Instead, it argues that the court should recognize a subtle distinction between harm and damages. Def.'s Reply & Opp'n. to Pl.'s Mot. for Summ. J. at 23 (citing 1 DOBBS' LAW OF REMEDIES § 3.1 (2d. ed. 1993) ("The amount of harm may be either more or less than the amount of damages. . . . [T]he term damages is best reserved for the claim or the remedy rather than the underlying loss or injury.")).

According to defendant, plaintiffs have shown no disadvantage or change in position and therefore have not proved harm. Defendant argues that because of the competitive process of awarding the contract, plaintiffs were never entitled to fair market value, and therefore are unable to establish any real harm. At best, plaintiffs would have been entitled to a competitively-awarded contract price based on a non-EPA index. The illegal index itself caused no harm to plaintiffs, it is argued, unless it somehow caused them to propose base prices below fair value. Defendant alleges that, to recover, plaintiffs must prove that the EPA clauses somehow suppressed their offered base prices.[15/]

We disagree for two reasons. First, plaintiffs are not required to allege harm with particularity at this stage. Any disagreement on the part of the

---

[15/]Defendant notes, however, that if the EPA clauses tended to lower prices during contract performance, as alleged, then that flaw likely would have caused plaintiffs, in reality, to raise their proposed prices.

defendant regarding the amount of harm actually suffered by plaintiffs will be addressed as part of plaintiffs' damages claim at a later stage in the proceedings.

More fundamentally, we disagree with the assumption behind defendant's argument. In *Barrett Refining Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001), the Federal Circuit affirmed the decision of this court that once price escalation clauses are found unauthorized and unenforceable, there is "no longer any express clause covering price escalation, and thus, nothing to preclude an implied-in-fact agreement on that term." *Id.* at 1059. The court further agreed that it was proper to find, as a matter of fact, that the government promised to pay at least fair market value. *Id.* Therefore, once it is determined that an EPA clause is invalid, the clause is struck, and the court incorporates an implied-in-fact promise to pay fair market value. *See La Gloria*, 56 Fed. Cl. at 225 ("[C]ontrary to defendant's assertions, plaintiff is entitled to prove harm by establishing, under an appropriate valuation methodology, that it failed to receive fair market value."); *Phoenix Petroleum*, No. 97-315C, slip op. at 5. Plaintiffs are therefore entitled to quantum valebant relief irrespective of what prices a different clause might have produced.

V. Determining fair market value

The issue remaining for the court then is the proper method by which to determine fair market value, given that the contracts were awarded under a competitive process. A damages model that fails to acknowledge that the illegal contracts were awarded under competitive circumstances would seem to be inadequate. On the other hand, crafting an accurate damages model that incorporates the competitive process would seem to be a difficult (if not impossible) task.

Plaintiffs assert that we should apply the same formula here as applied in *Pride Companies, L.P. v. United States*, 2000 U.S. Claims LEXIS 213 (Fed. Cl. May 10, 2000), to determine fair market value. The court in *Pride* applied the following formula: (Platt's spot price) + (a long-term DESC contract premium) + (transportation cost). *Id.* at *4. Defendant argues instead that fair market value should be determined by what plaintiffs would have been paid using an alternative escalator clause with the same base prices and then incorporating plaintiffs' base price offers to the government.

In *Barrett*, we found that fair market value should be determined using the contract award price and a modified EPA clause that utilizes the Platt's

index, as set out in that opinion. 42 Fed. Cl. at 138. On appeal, the Federal Circuit affirmed most of our methodology but modified it so that the government might raise any counterclaims for amounts paid by the government in excess of fair market value. *See Barrett*, 242 F.3d at 1064-65. As specifically stated in that opinion, we were instructed to

> determine the amount of the payments made under the unauthorized price escalation clause and order Barrett to refund that to the government, subject to Barrett's claim for fair market value. In that process, the court should make findings regarding the base price that the government agreed to in each of the contracts in question. If the base price exceeded the fair market value, then the Court of Federal Claims should only order Barrett to refund payments made in excess of the base price.

*Id*.

We decline to further examine the merits of the parties' competing theories of damages at this time. Instead, we view the conflict as a mixed question of law and fact for the court to resolve subsequently. The parties are allowed to pursue differing damages models as long as they are consistent with the guidelines set out by the Federal Circuit in *Barrett*.

## CONCLUSION

Plaintiffs' cross-motion for partial summary judgment is granted in part, and denied in part. Defendant's motion for summary judgment is denied. The scope of this opinion does not reach those contracts containing clauses B19.19 or B19.34,[16/] nor the contract allegedly containing a fixed price.[17/]

---

[16/] DLA600-90-D-0466, DLA600-91-D-0469, DLA600-95-D-0458, DLA600-87-D-1060, DLA600-91-D-1023, DLA600-94-D-1270, SPO600-95-D-1281. Nor do we intend this decision to reach contract DLA600-89-D-1016, which contains an EPA clause adjusting price based on OPIS.

[17/] DLA600-86-D-0537. We also note that Tesoro has failed to provide us with any evidence of contract DLA600-88-D-0457. It is therefore not ripe for summary judgment.

Because of the importance of the issues addressed herein, and the prospect of lengthy and expensive litigation on damages, we invite the parties' views on whether all or parts of this opinion should be certified under 28 U.S.C. § 1292(d)(2). If the court is persuaded that certification of any of the issues is appropriate, the opinion will be amended granting permission to appeal. The parties are directed to make their views known on or before October 7, 2003, by brief.

s/Eric Bruggink
ERIC G. BRUGGINK
Judge