# In the United States Court of Federal Claims

No. 02-466 C
(Filed: January 26, 2004)

(Originally Filed Under Seal: January 13, 2004)

| | |
|---|---|
| **SUNOCO, INC. AND PUERTO RICO SUN OIL COMPANY,** | |
| Plaintiffs, | |
| v. | |
| **THE UNITED STATES,** | |
| Defendant. | |

*J. Keith Burt*, Mayer, Brown, Rowe & Maw, Washington, DC, for Plaintiff

*Steven J. Gillingham*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for Defendant

**OPINION**

**DAMICH**, Chief Judge

## I. Introduction

At issue before the Court is a Motion for Partial Summary Judgment brought by the Defense Energy Support Center (DESC) (Defendant) and a Cross-Motion for Partial Summary Judgment brought by Sunoco, Inc. & Puerto Rico Sun Oil Company (Plaintiffs). For the reasons set forth herein, Defendant's motion regarding its claim that EPA Clause B19.33 is illegal is DENIED. Defendant's motion regarding the contracts in which DESC received a deviation is DENIED. Defendant's motion regarding its claim that Plaintiffs waived their right to challenge implementation of the EPA clause is DENIED. Defendant's motion regarding its claim that Plaintiffs failed to allege a harm is DENIED.

Plaintiffs' cross-motion regarding the illegality of the EPA clause is GRANTED. Plaintiffs' cross-motion regarding the illegality of the deviations is GRANTED. Plaintiffs' cross-motion regarding

their claim that Defendant's waiver argument is insufficient is DENIED.

## II. Background

Plaintiffs and Defendant had a series of long term contracts for the purchase of approximately $1.49 billion worth of military fuel between 1984 and 1999.[1] Because of the frequent fluctuation in the price of oil, the contracts contained a standard price adjustment clause, Clause B19.33, known as the Economic Price Adjustment (EPA) clause. The clause permitted DESC to change the monthly price it paid Plaintiffs for fuel based on changes in certain price indexes. Prior to 1995, these price indexes were published by the Department of Energy (DOE) in the Petroleum Marketing Monthly (PMM Indexes).[2] Beginning in 1995, the price indexes were based on regional average prices reported in the Platts Oilgram Price Report (Platts). The EPA clause was included in 40 of the 41 contracts at issue between Plaintiffs and the DESC.

Plaintiffs did not object to the price adjustments made pursuant to the contracts until February 21, 2001, when Plaintiffs alleged that the EPA clause was illegal. Plaintiffs submitted certified claims to DESC's Contracting Officer that were denied on October 15, 2001. The Contracting Officer stated that DESC paid Plaintiffs exactly fair market value for the fuel supplied under the contracts. Plaintiffs appeal this final decision, seeking recovery of at least $194,891,267.89 plus interest.

## III. Discussion

### A. Standard of Review

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the Court of Federal Claims (RCFC) Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, (1986). A material fact is one that might significantly affect the outcome of the litigation. *Anderson*, 477 U.S. at 248. If the nonmovant fails to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial, the movant is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court must draw all reasonable inferences in favor of the nonmovant. *Anderson*, 477 U.S. at 255. When the case is before the court on cross-motions for summary judgment, each motion is evaluated under the same standard. *Cubic Defense Sys., Inc. v. United States*, 45 Fed. Cl. 450, 457 (1999).

---

[1] The DESC is a part of the Defense Logistics Agency (DLA), under the Department of Defense. From 1980 to 1999, the DESC was the sole purchaser and user of military grade fuels.

[2] The PMM Indexes are a compilation of transaction prices in United States petroleum markets based upon sales data that refiners are required to submit to the DOE pursuant to 15 U.S.C. § 772.

Contract interpretation is a question of law. *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir. 1996); *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993). The purpose of contract interpretation is to carry out the intent of the parties. *See Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991); *Alvin, Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1565 (Fed. Cir. 1987); *Hegeman-Harris & Co. v. United States*, 440 F.2d 1009, 1014 (Ct. Cl. 1971). The intention of the parties to a contract controls its interpretation. *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed. Cir. 1988).

B. FAR Framework for EPA Clauses

The Federal Acquisition Regulation (FAR) authorizes the use of economic price adjustments in a fixed-price contract to "provide[ ] for [the] upward and downward revision of the stated contract price upon the occurrence of specified contingencies." FAR § 16.203-1. The FAR deems EPA clauses to be of three general types, set forth in FAR § 16.203-1:

> (a) Adjustments based on established prices. These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items.
> (b) Adjustments based on actual costs of labor or material. These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.
> (c) Adjustments based on cost indexes of labor or material. These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

The particular circumstances under which an EPA clause is prohibited are addressed in FAR § 16.203-3, which acts as a provision of limitation on the use of EPA clauses. FAR § 16.203-3 states:

> A fixed price contract with economic price adjustment shall not be used unless the contracting officer determines that it is necessary[,] either[:] [(1)] to protect the contractor and the Government against significant fluctuations in labor or material costs[;] or [(2)] to provide for contract price adjustment in the event of changes in the contractor's established prices.

C. Whether the EPA Clause in Plaintiffs' Contracts Violates the FAR

The Court begins its analysis of EPA Clause B19.33 by noting that it is unconvinced by Plaintiffs' briefs and oral argument presentation that the Federal Circuit decision in *Barrett Refining Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001) establishes the clause's illegality. In *Barrett*, the Federal Circuit affirmed the Court of Federal Claims' grant of *quantum valebant* relief to plaintiff after an EPA clause contained in the supplier's contracts with the DESC was held to be unenforceable. The Federal Circuit there did not determine the illegality of the EPA clause. Rather, it took as a given that the EPA clause was unenforceable and entered judgment accordingly in favor of the plaintiff for

underpayment. Plaintiffs attempt to set forth a chain of logic that the Federal Circuit only had jurisdiction because the judgment of the Court of Federal Claims rested on an implied-in-fact contract (rather than an implied-in-law contract), which could only exist because a portion of the express contract was no longer in force due to the presence of DESC's illegal prices. This Court cannot accept that logic because the Federal Circuit's decision was based on an *assumption* of illegality. The Federal Circuit never made an express ruling of illegality, and case law indicates that *stare decisis* does not attach to issues that "merely lurk in the record." *Wester v. Fall*, 266 U.S. 507, 511 (1925). Further, the jurisdiction of the Federal Circuit could be established simply by a well-pled allegation of an implied-in-fact contract. Thus, no reasonable chain can be shown indicating that the Federal Circuit ruled on the legality of an EPA clause in *Barrett*. Overly-broad construction of the holding would be inappropriate.

Turning to Defendant's arguments, the main assertion is that EPA Clause B19.33 is not expressly prohibited, and is therefore authorized and enforceable. Specifically, Defendant argues the legality of the EPA clause by simultaneously asserting that: (a) the EPA clause need not fall under FAR § 16.203-1; (b) if it must fall under FAR § 16.203-1, it falls under subsection (a) of FAR § 16.203-1; and (c) FAR § 16.203-3 only requires that one of the two provisions contained therein be present, and one was present in this instance.

1. Whether EPA Clause B19.33 Must Fall Under FAR § 16.203-1

Despite Defendant's arguments to the contrary, the court in *MAPCO*, *Gold Line*, *La Gloria*, and *Hermes* found FAR § 16.203-1 to be restrictive rather than illustrative. *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 405 (1992); *Gold Line Refining, Ltd. v. United States*, 54 Fed. Cl. 285 (2002); *La Gloria Oil & Gas Co. v. United States*, 56 Fed. Cl. 211 (2003); *Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 3, 11 (2003). The underlying rationale for narrowly construing the requirements of FAR § 16.203-1 is that it must be read in conjunction with FAR § 16.203-3. Specifically, FAR § 16.203-3 is a limitation on FAR § 16.203-1. Read together, the use of an EPA clause is confined to circumstances where it is necessary to protect the parties from significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices. As the court stated in *MAPCO*,

> It would be folly if an EPA clause could only be utilized if one of the two mischiefs described by the 'Limitations' provision were present, but then the solution were not limited to addressing that mischief. Logically, therefore, the purpose of using an EPA clause is to make adjustments specifically to meet the two forms of instability set out in [FAR] § 16.203-3.
>
> *MAPCO*, 27 Fed. Cl. at 412.

This Court agrees with the interpretation proffered by other cases considering this issue. The Limitations section would appear pointless if it did not serve to narrow the circumstances under which an EPA clause is permissible.

2. Whether EPA Clause B19.33 Falls Under FAR § 16.203-1(a)

Based on the conclusion that the EPA clause must fall within one of the three types of clauses described in FAR § 16.203-1, the Court evaluates the clause to determine if it can fit within FAR § 16.203-1(a), as Defendant asserts in its briefs. Having heard this same argument offered by Defendant more than 10 years ago, the court in *MAPCO* determined that whether the average price figures taken from the indexes used qualify as "published or otherwise established prices of specific items or the contract end items" depends on the interpretation of the phrase "established prices." The court in *MAPCO* questioned whether the phrase refers to the *contractor's* established prices, as the plaintiff there asserted, or to any agreed-upon price adjustment system, such as the PMM Indexes.

Essentially, the same arguments are before this Court. The parties here appear to be taking the same positions as those taken by plaintiff and defendant in *MAPCO.* And, as in *MAPCO*, this Court finds that the phrase refers to the *contractor's* established prices.[3] The significance of this finding is that the price figures from the PMM Indexes and Platts do not qualify as Plaintiffs' established prices. Rather, they reflect an amalgamation of prior sales data. Such figures fail to adequately protect the contractor. As the court stated in *MAPCO*, the pricing used does not "divide the risk of economic uncertainty between the parties" in the manner required by the FAR. *MAPCO*, 27 Fed. Cl. at 406. The Court here agrees with the logic employed in *MAPCO* and adopts the result, holding that the EPA clause at issue does not fall under FAR § 16.203-1(a).[4]

3. Whether FAR § 16.203-3 Only Requires that One of the Two Provisions Contained Therein be Present, and Whether One was Present

For purposes of completeness, the Court notes that Defendant misconstrues the requirements of FAR § 16.203-3. Despite Defendant's belief that any EPA clause is enforceable if the Contracting Officer makes a threshold determination that one of the two needs identified in the provision exists, the language of FAR § 16.203-3 implies otherwise. The provision is entitled "Limitations," and as such it instructs that the EPA clause must either protect the contractor and the Government against significant

---

[3] In *MAPCO*, Judge Bruggink looked to the Limitations section, FAR § 16.203-3, which specifically refers to "contractor's established prices." Being located in the same section, he interpreted the language of FAR § 16.203-3 to plainly give meaning to the phrase "established prices" used in FAR § 16.203-1(a). Examination of the legislative history of FAR § 16.203 provided further guidance, revealing that FAR Subpart 16.2 is largely a reproduction of Defense Acquisition Regulation (DAR) § 3-404.3(a). The DAR provision clearly refers to the need to make any adjustments because of fluctuations in the *contractor's* established prices. Based on this logical chain, an EPA clause is permissible when it makes adjustments based on a contractor's established prices, not when it uses standards that do not reflect the contractor's market.

[4] The Court notes that this is the same conclusion reached in *Gold Line* and *La Gloria*.

fluctuations in labor or material costs or provide for contract price adjustments in the event of changes in the contractor's established prices. As *MAPCO* correctly noted, "[f]or the "Limitations" section to have an effect, it must serve not only as an entry point for using an EPA clause, but also as the method to justify the clause actually used." *MAPCO*, 27 Fed. Cl. at 412. Defendant has failed to demonstrate that EPA Clause B19.33 accomplishes either of the provisions of FAR § 16.203-3. For this reason, in addition to the failure of the clause to fall under one of the three general types described in FAR § 16.203-1, EPA Clause B19.33 is illegal and unenforceable.

D. The 11 Contracts Approved Through the FAR Deviation Process

For 11 of the 41 contracts at issue, Defendant obtained a deviation from the FAR. Deviations are available from mandatory FAR provisions in FAR § 1.4. Defendant claims that for 5 of the 11 contracts, three individual deviations were obtained. For the remaining 6 contracts, a permanent class deviation was obtained.

1. Whether 5 of the 11 Contracts Were Authorized by Individual Deviations

Defendant contends that it obtained individual deviations for two contracts in January 1993, two contracts in November 1994, and one contract in March 1995.[5] The definition of an individual deviation under FAR § 1.403 is that which affects "only one contract action." The parties' dispute focuses on the meaning of this phrase. While Defendant contends that "one contract action" means a single contract solicitation or a single procurement, Plaintiffs argue that "one contract action" means one single contract.

Substantially similar arguments were proffered in *La Gloria*, where the court found the individual deviations invalid based on its interpretation that "one contract action" means a single contract. In *La Gloria*, the court spent a great deal of time exploring the March 2002 change in language from the term "contracting action" to "contract action." While the parties here do not base their arguments on the significance of that alteration, the Court does note that the Federal Register stated that "the Councils do not intend to make any substantive change to the FAR by this proposal." *La Gloria*, 56 Fed. Cl. at 219 (citing 65 Fed. Reg. 34894 (May 30, 2000)). Rather, the final rule "amends the FAR to provide for consistent use of the term 'contract action.'" *Id.* (citing 67 Fed. Reg. 13053-1 (March 20, 2002)). Given such a purpose, the Court looks toward the similar language of Defense Logistics Acquisition Regulation (DLAR) §1.403, which defines an individual deviation as that which affects "only one contract or transaction." FAR § 5.001 defines a "contract action" as "an action resulting in a contract." Because the Court interprets the language of FAR § 1.403 to apply to only one contract, it appears that Defendant erred by only obtaining three individual deviations for the aforementioned 5 contracts. As a result of the FAR violation, the individual deviations are unauthorized

[5] The 5 contracts are DLA 600-93-D-0508, DLA 600-93-D-0509, SPO 600-95-D-0482, SPO 600-95-D-0483, and SPO 600-95-D-0524.

and invalid.

2. Whether the Remaining 6 of the 11 Contracts Were Authorized by a Permanent Class Deviation

Defendant contends that in October 1995, it obtained a permanent class deviation for 6 contracts at issue - - SPO 600-96-D-0463, SPO 600-96-D-0474, SPO 600-96-D-0505, SPO 600-97-D-0469, SPO 600-98-D-0469, and SPO 600-99-D-0464. According to FAR § 1.404, "[c]lass deviations affect more than one contract action."

The first issue here is whether Defendant was required to publish its class deviation, and whether it did indeed publish such a deviation. Plaintiffs cite to various authorities for the proposition that publication was necessary, including Section 22 of the Office of Federal Procurement Policy Act (OFPP Act),[6] FAR § 1.5,[7] and DLAR § 1.490(b).[8] Plaintiffs then claim that Defendant failed to satisfy the requirements of these regulations. Defendant counters that publication is only necessary for class deviations that are adopted as FAR revisions, and that Defendant satisfied the publication requirement when the DLA published a proposed permanent regulatory revision in the Federal Register in October 1995. The specific conflict between the parties is thus whether that publication of a proposed permanent FAR revision has the effect of publishing a request for a class deviation. The answer, simply, is no. As the court noted in *La Gloria*, "[P]ublished notice of a permanent FAR revision informs the public of a potential, but not immediate, change in the law, while published notice of a class deviation informs the public of an immediate, but not permanent, change in the law." *La Gloria*, 56 Fed. Cl. at 221. Thus, Defendant's publication of the proposed permanent FAR revision does not obviate the need for separate publication of a class deviation, as publication of the class deviation would have notified the public of an immediate and nonpermanent change to the particular regulation.

The second issue is whether EPA Clause B19.33 was properly recognized as a deviation clause. Pursuant to FAR § 52.103(a) and FAR § 52.252-5, the word "DEVIATION" should be indicated in clauses in which an authorized deviation is used. While Defendant's briefs fail to address this issue, it appears to the Court beyond doubt that the labeling requirement applies to this case and

---

[6] Pursuant to § 22 of the OFPP Act, "[N]o procurement regulation . . . or form (including amendments or modifications thereto) . . . that has a significant effect beyond the internal operating procedures of the agency issuing the procurement . . . regulation . . . or form . . . may take effect until . . . after the . . . regulation . . . or form is published for public comment in the Federal Register."

[7] FAR § 1.501-2(b) states "The opportunity to submit written comments on proposed significant revisions shall be provided by placing a notice in the Federal Register."

[8] According to DLAR § 1.490(b), "Requests for class deviations which have a significant cost or administrative impact upon contractors or offerors must be published in the Federal Register."

that Defendant has failed comply with this requirement. *See La Gloria*, 56 Fed. Cl. at 224.

The third and fourth issues, whether Defendant's failure to conduct a regulatory flexibility analysis violated the Regulatory Flexibility Act (RFA),[9] and whether the class deviation was temporary in nature and had expired,[10] are irrelevant. Having found that the class deviation was unauthorized and unenforceable as a matter of law, the Court sees no reason to further analyze such an alleged class deviation.

E. The One Contract Not Containing an EPA Clause

One of the 41 contracts does not contain the EPA clause. Contract DLA600-88-D-0543 provides for a firm and fixed price with no price adjustment. The contract states unambiguously that the EPA clause was deleted from the standard contract. In their briefs, Plaintiffs stated that they did not have a complete copy of this contract. At oral argument, Plaintiffs requested that Defendant disclose the contract and that if their review showed no EPA clause, they would dismiss their claim with regard to that count. Defendant agreed to share the contract file with Plaintiffs. Plaintiffs received the contract file subsequent to oral argument and the parties filed a joint stipulation of voluntary dismissal with regard to that count on August 21, 2003. Therefore, Defendant's motion regarding that claim is deemed moot.

F. Whether Plaintiffs Suffered a Harm

In analyzing the issue of harm, the Court has read the parties' initial briefs as well as supplemental briefs submitted subsequent to oral argument. The Court begins by reciting the general principle put forth in Defendant's initial motion that government contractors have the "burden of establishing the fundamental facts of liability, causation, and resultant injury." *Penn. Dep't of Transp. v. United States*, 226 Ct. Cl. 444, 451 (1981). This burden does require Plaintiffs to allege that they have been harmed.[11] What it does not do, however, is require Plaintiffs to demonstrate the extent of harm that they suffered, as such a showing is appropriate in proceedings construing damages.

---

[9] According to 5 U.S.C. § 603(a), agencies must "make available for public comment an initial [RFA]. Such analysis shall describe the impact of the proposed rule on small entities. The initial [RFA] or a summary shall be published in the Federal Register at the time of the publication of general notice of proposed rulemaking for the rule."

[10] *See* DLAR § 1.490(a)(i).

[11] The Court does not reach this conclusion based on *LaBarge*, 46 F.3d 1547. Despite Defendant's assertions that the *LaBarge* case stands for the proposition that there can be no relief when no harm is shown, the Federal Circuit's main rationale for denying relief in that case was that there was no underlying illegality.

In reviewing the complaint, it appears that Plaintiffs do allege a harm, indicating that pursuant to the EPA clause, they were paid below fair market value for the fuel supplied to the DESC. This allegation is sufficient in light of *Barrett* and its later interpretation in *La Gloria*. In *Barrett*, the Federal Circuit affirmed the reasoning of the Court of Federal Claims that once an illegal EPA clause is struck down, an implied-in-fact contract remains in its place, entitling a contractor to receive fair market value. *Barrett*, 242 F.3d at 1059. The measure of actual harm incurred by a contractor is to be determined to figure the appropriate *quantum valebant* relief. Thus, harm arises from a contractor's failure to receive fair market value and its actual calculation is determined as a means of arriving at an appropriate damages award. Judge Hewitt later followed this process in *La Gloria*, striking down an illegal EPA clause and then stating, "In determining the *quantum valebant* relief, the measure of actual harm incurred by La Gloria must be determined." *La Gloria*, 56 Fed. Cl. at 225.

Because Plaintiffs have met their burden of establishing an allegation of harm, there exists a genuine issue of material fact as to the extent of harm suffered by Plaintiffs. Therefore, summary judgment on this issue in favor of Defendant is inappropriate.

G. Whether Plaintiffs Waived Their Right to Challenge the Implementation of the EPA Clause

Having found the EPA clause illegal and unenforceable, the Court now turns to the issue of waiver. Despite Defendant's initial assertions that it could not persuasively argue waiver, it now claims that Plaintiffs have waived any right to challenge the illegality of the contracts at issue because, year after year, they have willfully performed such contracts.

Both parties have cited various Federal Circuit cases in support of their positions. The Court has analyzed these cases, as well as other Court of Federal Claims cases, including the comprehensive analysis proffered by Judge Block in *Hermes II*.[12] As the court stated in *Hermes*, it appears that the pertinent cases dealing with waiver tend to be of one of two progeny - - the *Beta Systems/Chris Berg/Gold Line* type (Type I)[13] and the *E. Walters/Whittaker/AT&T ("AT&T V")* type (Type II).[14]

---

[12] Both *Hermes* decisions dealt with cross-motions for summary judgment. *Hermes Consolidated v. United States* (58 Fed. Cl. 3 (2003)) ("*Hermes I*") was the initial decision, and *Hermes Consolidated v. United States* (2003 U.S. Claims Lexis 312) ("*Hermes II*") specifically addressed the issue of waiver.

[13] *Beta Sys., Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988); *Chris Berg, Inc. v. United States*, 426 F.2d 314 (Ct. Cl. 1970); *Gold Line*, 54 Fed. Cl. 285.

[14] *E. Walters & Co., Inc. v. United States*, 217 Ct. Cl. 254 (1978); *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997); *American Telephone and Telegraph Co. vs. United States*, 307 F.3d 1374 (Fed. Cir. 2002) ("*AT&T V*").

Specifically, Type I cases have held that when a contract or a provision thereof is in violation of the law but has been fully performed, the Court can reform it to correct the illegal term. *Gold Line*, 54 Fed. Cl. at 296. Inherent in such reformation of a fully performed contract containing an illegal term or provision is permission for the contractor to challenge that illegal term. *Id. at 297*. Type II cases have held that failure to timely challenge the validity of a provision waives such a right. *Whittaker*, 124 F.3d at 1446.

Having dissected both Type I and Type II cases, the Court adopts the Type II rationale. This Court is influenced by the reasoning employed by Judge Block in *Hermes I* and *II*, which it finds persuasive. The mere existence of the Type II line of cases shows that waiver of contract illegalities by government contractors is, at the very least, possible in some cases. If this case conceivably falls into the category of cases in which waiver is possible, then summary judgment is inappropriate. Hence, it must be determined if waiver is impossible in this case. In the end, this Court concludes that as a matter of law Plaintiffs could have waived their right to challenge the contracts' illegality.

Waiver is defined as "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464. Waiver of a legal right "may be either express or implied." *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1563 (Fed. Cir. 1990). Summary judgment in favor of Plaintiffs is inappropriate if a genuine issue of material fact exists as to whether Plaintiffs knew of the pricing illegality yet chose to proceed at the time and wait to bring suit. As Judge Block noted in *Hermes*, the *MAPCO* decision deeming the EPA clause illegal was decided in 1992. Nevertheless, Plaintiffs continued to enter into contracts with the government that contained EPA Clause B19.33 until 1999. Plaintiffs argue that the *MAPCO* decision, as only a trial level court decision, was not binding precedent, and that they were not on notice of the clauses' illegality. As a result, it is unclear if Plaintiffs had actual or imputed knowledge of this decision, and if this knowledge can be considered sufficient to constitute waiver of rights by Plaintiffs–factors necessary for an intentional abandonment of a known right.

It is somewhat unclear precisely what factors result in waiver. Opponents of applying waiver have sometimes attempted to distinguish Type I and Type II cases by examining whether or not the contract illegality is "inherent" to the contract, such as an illegal pricing term, or whether the illegality is only a potential illegality, as with an option provision to the contract. In *Hermes I*, however, Judge Block found that there were no true differences between the Type I and Type II cases with regard to illegalities "inherent" in the contract. (Fed. Cl. 3 at 15). This Court finds no real difference between an option provision and a pricing term. While an illegal pricing term, such as the one employed in the present case, alters the basis of consideration that is fundamental to construction of a valid contract, the presence or absence of a particular option term may also be a crucial element of consideration for a particular bidder and equally "inherent" to a decision to accept or reject a given contract.

An additional proffered distinction between the two lines of cases is that in Type I cases the underlying rationale appears to have been an attempt to avoid allowing the government to prosper because of illegalities contained in government-crafted contracts. In Type II cases, the courts have attempted to preserve the doctrine of waiver when a contractor has delayed challenging a contract

provision. In the end, as with other equitable doctrines, there seem to be no hard and fast rules dictating when waiver should be applied. Therefore, it is necessary to more closely examine the particular facts of a case before deciding if waiver is appropriate for the case.

Finally, for Judge Block in *Hermes II*, the decision for a court to apply waiver boiled down to the fact that "the courts in [Type I] cases found the government's bad behavior the weightier in the equilibrium of equities. In [Type II cases], the contractor's conduct was found the more malefic." *Hermes II*, 2003 U.S. Claims Lexis 312 at *8. Which party behaved worse than the other is a factual question. So, too, have most Circuit Courts of Appeal concluded that waiver is a question of fact.[15] If, as this Court holds, the EPA clauses are illegal, the proper time for Plaintiffs to have challenged their legality was "at the time of contract negotiation, when effective remedy was available." *AT&T V*, 307 F.3d at 1381. Here, a question of fact remains as to whether or not Plaintiffs were aware of *MAPCO* and the legal effect that that knowledge had. It is also unclear why Plaintiffs waited approximately seven years after *MAPCO* to bring a challenge to these contracts based on *MAPCO.* Because of these unresolved factual issues, it is impossible to say that Plaintiffs could not have waived their rights in this case. As a result, there are outstanding issues of fact still to be resolved, and thus summary judgment is inappropriate on this issue.

H. What Type of Relief is Warranted?

Having determined the illegality of EPA Clause B19.33, the Court follows the Federal Circuit holding in *Barrett* that "once the unauthorized price escalation clause is struck out, the express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value for the fuel delivered . . . under the contract." *Barrett*, 242 F.3d at 1059. Having analyzed the extensive arguments proffered by the parties as to determining fair market value, the Court adopts the *Gold Line* rationale that "plaintiff is entitled to quantum valebant relief or, in the alternative, reformation of the EPA clause, the illegal contract term, in either case tailored to further, to the extent possible, the mutual intent of the parties to adjust prices in accordance with the FAR." *Gold Line*, 54 Fed. Cl. at 298. These issues will be taken up at a trial on damages if and when such a trial is deemed necessary.

For purposes of completeness, the Court notes its agreement with Defendant that judicial

---

[15] *See Ouimette v. E.F. Hutton & Co.*, 740 F.2d 72, 76 (1st Cir. 1984) *Gallien v. Connecticut General Life Ins. Co.*, 49 F.3d 878, 885-86 (2d Cir. 1995); *Matinchek v. John Alden Life Ins. Co.*, 93 F.3d 96, 103 (3rd Cir. 1996); *First Interstate Bank v. Interfund Corp.*, 924 F.2d 588, 595 (5th Cir. 1991); *William H. Sill Mortg., Inc. v. Ohio Casualty Ins. Co.*, 412 F.2d 341, 346 (6th Cir. 1969) *Rosenburg v. Lincoln American Life Ins. Co.*, 883 F.2d 1328, 1334 (7th Cir. 1989)*; Spalding v. Agri-Risk Services*, 855 F.2d 586 (8th Cir. 1988); *Intel Corp. v. Hartford Accident & Indemnity Co.*, 952 F.2d 1551, 1559 (9th Cir. 1991); *Lathem v. Sentry Ins.*, 845 F.2d 914, 917 (11th Cir. 1988).

estoppel should not be applied to mandate use of the formula implemented in *Pride Companies, L.P. v. United States*, 2000 U.S. Claims LEXIS 213 (Fed. Cl. May 10, 2000)(where the parties and the Court stipulated to use of a specific formula after the illegality of the EPA clause was admitted). Pursuant to the Federal Circuit test in *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1146, 1153-54 (Fed. Cir. 1988), a party may take a position strictly contrary to the one that it litigated against a *different party*, unless the current adversary demonstrates personal reliance on the decision granted in the prior suit, or prejudice, or misuse of the court. In this case, where the Plaintiffs are different than those in *Pride*, the Court cannot discern any personal reliance by Plaintiffs on the stipulated formula used in *Pride*, nor any prejudice or misuse of the court by Defendant. Accordingly, judicial estoppel does not apply to bar use of a different formula for calculating damages. Again, crafting appropriate relief will be taken up, if at all, at a trial on damages.

Before the issue of damages may be fully adjudicated, the question of waiver must be resolved. If Plaintiffs are found to have waived their rights, they will not be permitted to present their case at a trial on damages.

## IV. Conclusion

Accordingly, based on the foregoing,

IT IS ORDERED, as follows:

A. Defendant's Motion for Partial Summary Judgment is DENIED.

B. Plaintiffs' Cross-Motion for Partial Summary Judgment is GRANTED as to the illegality of the EPA clause and the deviations, and DENIED as to the concept of waiver.

C. Parties will file a Joint Status Report within 14 days of this order indicating if they believe a trial on the issue of waiver is necessary or if the issue can be resolved through motions.

S/Chief Judge Edward J. Damich