IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 02-466C
(Chief Judge Damich)

---

SUNOCO, INC., AND PUERTO RICO SUN OIL COMPANY,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

**PLAINTIFFS' MOTION PURSUANT TO RCFC 56(f) TO REFUSE DEFENDANT'S APPLICATION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR A CONTINUANCE TO PERMIT DISCOVERY**

---

J. Keith Burt
Mayer, Brown, Rowe & Maw, LLP
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3208

Attorneys for Plaintiffs,
Sunoco, Inc. and Puerto Rico
Sun Oil Company

*Of Counsel*:

Gary A. Winters
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006

January 17, 2006

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........ ii

ARGUMENT ........ 2

I. DESC'S PROPOSED FINDINGS OF FACT FOR WHICH SUNOCO REQUIRES DISCOVERY ........ 4

II. WELL-PLEADED ALLEGATIONS IN SUNOCO'S AMENDED COMPLAINT APPLICABLE TO ALL COUNTS FOR WHICH SUNOCO requires DISCOVERY ........ 8

III. WELL-PLEADED ALLEGATIONS IN COUNT I OF SUNOCO'S AMENDED COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY ........ 11

IV. WELL-PLEADED ALLEGATIONS IN COUNT II OF SUNOCO'S AMENDED COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY ........ 12

V. WELL-PLEADED ALLEGATIONS IN COUNT III OF SUNOCO'S AMENDED COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY ........ 13

VI. WELL-PLEADED ALLEGATIONS IN COUNT IV OF SUNOCO'S AMENDED COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY ........ 14

VII. WELL-PLEADED ALLEGATIONS IN COUNT V OF SUNOCO'S amended COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY ........ 14

VIII. WELL-PLEADED ALLEGATIONS IN COUNT VI OF SUNOCO'S amended COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY ........ 16

IX. WELL-PLEADED ALLEGATIONS IN COUNT VII OF SUNOCO'S amended COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY ........ 19

X. FACTS WITH RESPECT TO DESC'S AFFIRMATIVE DEFENSE OF WAIVER FOR WHICH SUNOCO REQUIRES DISCOVERY ........ 19

CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. United States*, 391 F.3d 1212 (Fed. Cir. 2004) ....................1

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................2

*Celotex Corp. v Catrett*, 477 U.S. 317 (1986) ....................1, 2, 20

*Dunkin' Donuts of Am., Inc. v. Metallurgical Exoproducts Corp.*, 840 F.2d 917 (Fed. Cir. 1988) ....................2

*Gregory Lumber Co. v. United States*, 9 Cl. Ct. 503 (1986) ....................2

*Jade Trading, LLC v. United States*, 60 Fed. Cl. 558 (2004) ....................2

*Sweat Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560 (Fed. Cir. 1987) ....................3

*Ward v. United States*, 471 F.2d 667 (3d Cir. 1973) ....................2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SUNOCO, INC. | ) | |
| | ) | |
| And | ) | |
| | ) | No. 02-466C |
| PUERTO RICO SUN OIL COMPANY, | ) | (Chief Judge Damich) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MOTION PURSUANT TO RCFC 56(f) TO REFUSE DEFENDANT'S APPLICATION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR A CONTINUANCE TO PERMIT DISCOVERY**

Pursuant to RCFC 56(f), Plaintiffs, Sunoco, Inc. and Puerto Rico Sun Oil Company (collectively "Sunoco"), respectfully submit their Motion To Refuse Defendant's Application For Summary Judgment Or, In The Alternative, For A Continuance To Permit Discovery.

The Defense Energy Support Center's ("DESC's") pending Motion to Dismiss states in its first paragraph that, in addition to seeking dismissal under RCFC 12(b)(1) and 12(b)(6), DESC alternatively seeks summary judgment pursuant to RCFC 56(b) on all grounds save Sunoco's minority price preference claim. (DESC's Mot. at 1.) While DESC's request for dismissal under RCFC 12(b)(1) and 12(b)(6) must accept the truth of all well-pleaded allegations in Sunoco's Amended Complaint, *Adams v. United States*, 391 F.3d 1212, 1218 (Fed. Cir. 2004), DESC's request for summary judgment seeks to go beyond the well-pleaded allegations in the Complaint. DESC's request for summary judgment must be denied because Sunoco has not had an adequate opportunity for discovery on any of its claims and, therefore, cannot present facts essential to justify its opposition. *Celotex Corp. v Catrett*, 477 U.S. 317, 326 (1986). Accordingly, pursuant to RCFC 56(f), this Court should refuse DESC's application for summary judgment or, in the alternative, grant a continuance so that Sunoco can obtain the discovery it requires.

**ARGUMENT**

RCFC 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Consistent with RCFC 56(f) and its companion provision in the Federal Rules of Civil Procedure, the Supreme Court has made clear that summary judgment should not be granted until the non-movant has "had an opportunity to make full discovery." *Celotex*, 477 U.S. at 326; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986) (Rule 56(f) requires that "summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition"); *Dunkin' Donuts of Am., Inc. v. Metallurgical Exoproducts Corp.*, 840 F.2d 917, 919 (Fed. Cir. 1988) (summary judgment is "inappropriate unless a tribunal permits the parties adequate time for discovery"). Accordingly, requests to refuse judgment or for a continuance under RCFC 56(f) are "generally favored and should be liberally granted." *Jade Trading, LLC v. United States*, 60 Fed. Cl. 558, 565 (2004) (internal citations omitted); *Gregory Lumber Co. v. United States*, 9 Cl. Ct. 503, 532 (1986) ("[W]e embrace with approval the requirement of a liberal construction of Rule 56(f). . . .").

Although Sunoco has received DESC's contract files with respect to the fuel contracts at issue in this case as well as a substantial number of documents from DESC as part of discovery in a similarly situated case, Sunoco has not had an opportunity to obtain all of the documents it requires, take depositions of key DESC witnesses or obtain any discovery from key third parties. Discovery is required either because information is uniquely held by DESC or because Sunoco is required to depose any number of former employees that are now third-party witnesses. *See, e.g., Ward v. United States*, 471 F.2d 667, 670 (3d Cir. 1973) (holding that when the crucial facts are solely in the possession of the moving party, "a motion for a continuance of a motion for

summary judgment for purposes of discovery should, we think, ordinarily be granted almost as a matter of course").

Sunoco sets forth below and in the Rule 56(f) declaration accompanying this motion (*see* Exhibit A) the discovery it requires to respond to DESC's request for summary judgment, without access to which Sunoco is unable to present by affidavit or other sworn testimony facts essential to its opposition. Sunoco first sets forth each of DESC's proposed findings of fact for which it requires discovery to respond. Next, Sunoco sets forth for each count in its Complaint the well-pleaded allegations with respect to which, if DESC is deemed to meet its burden in challenging the allegation,[1] Sunoco requires discovery to establish. Sunoco requires complete discovery with respect to each of the enumerated proposed findings of fact and with respect to each of the enumerated allegations in the Complaint.

Of course, to the extent that the Court were to find that any of DESC's proposed findings of fact enumerated below are not material to resolving DESC's motion, discovery with respect to those findings of fact would not be required to resolve the motion. Similarly, to the extent that the Court were to find that DESC does not challenge any of Sunoco's well-pleaded allegations enumerated below and that those allegations may be deemed admitted for purposes of the motion, discovery with respect to those allegations would not be required to resolve the motion. By way of illustration, if the Court were to agree with Sunoco that DESC does not challenge Sunoco's factual allegations concerning misrepresentation or mistake (see Sunoco's Opp'n at pp. 31, 41-42) and that those allegations should be deemed true for purposes of resolving DESC's motion, discovery would not be required concerning those allegations. Conversely, were the Court to find that DESC's motion in fact challenges Sunoco's allegations of misrepresentation and mistake, then discovery would be required.

[1] *See Sweat Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (moving party must provide "affidavits or other evidence which, unopposed, would establish its right to judgment").

## I. DESC'S PROPOSED FINDINGS OF FACT FOR WHICH SUNOCO REQUIRES DISCOVERY

Sunoco sets forth below DESC's proposed findings of fact for which Sunoco requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

> A. Def.'s PFF No. 6: Sunoco's contracts were competitively awarded through negotiated solicitations, pursuant to 48 C.F.R. ("FAR") part 15 ("Contracting by Negotiation"), and, beginning in 1996, FAR part 12 ("Acquisition of Commercial Items"). Walker Decl ¶¶ 5, 18. The base prices in Sunoco's contracts were determined to be reasonable based on adequate price competition or on established catalog or market prices of commercial items sold in substantial quantities to the general public. Walker Decl. ¶ 7.

> B. Def.'s PFF No. 9: DESC began using EPA clauses based upon crude o costs in 1973, in response to increases in crude oil costs experienced by suppliers as a result of the Arab oil embargo. At that time, the Government had imposed controls upon the price of crude oil. After the price restraints were lifted, DESC gave suppliers the option of selecting an EPA clause based either upon actual crude oil costs, or upon market prices for similar products. In 1981, having concluded that allowing that choice presented too many administrative problems, including difficulties in evaluating and comparing bids that used different EPA indexes, DESC began using market-based indexes exclusively. DESC chose a refined product market index because that index was believed to closely mirror changes in refiners' costs, over time, although a given price index might not track costs over shorter periods. See Def. Exh. 5, 9.

> C. Def.'s PFF No. 10: In part D, the EPA clause provided a unique "reference price" (sometimes called a "base reference price") for each refined petroleum product sought in the RFP. Id. at 202. An offeror would propose a "base price" for each product offered. That price was subject to adjustment, based upon changes in the reference price. Specifically, B.19.33 provided that "[t]he prices payable under this contract for listed items shall be the base [proposal] price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the reference price increases or decreases per like unit of measure from the base reference price." Def. Exh. 11; Pl. App. 202 (part D ¶(c)). The base price was primarily for evaluation purposes. Because the base price would be adjusted during performance, it was not expected to be the price the contractor received for fuel. Walker Decl. ¶ 4.

> D. Def.'s PFF No. 11: From 1984 to 1994, the EPA clauses in Sunoco's contracts were based upon prices published in the Petroleum Marketing Monthly ("PMM"), a Department of Energy ("DOE") publication. Compl. ¶ 10; Walker Decl. ¶ 8; Stip.12.

> E. Def.'s PFF No. 13: A significant feature of the PMM is the three-month lag time DOE requires to obtain the sales data for any particular month. Thus, for example, sales data for April are published in July. Walker Decl. ¶ 8; Def. Exh. 11; Pl. App. 202 (Part D(a). This was significant in DESC's

administration of the PMM-based EPA clauses, because B19.33 provided for monthly adjustments. Id. To accommodate DOE'S three-month lag, DESC made monthly adjustments on an interim basis, and then reconciled them when PMM data for that month were published. Id.

F. Def.'s PFF No. 14: Beginning in 1995, Sunoco's DESC contracts included an EPA clause based, not upon PMM prices, but upon regional average prices reported in a commercial publication, Platts Oilgram Price Report ("Platts"). Walker Decl. ¶ 10; Schink Decl. ¶ 4. Platts is published daily. Walker Decl. ¶ 10. Contract prices were adjusted weekly pursuant to DESC's Platts-based EPA clause, that is, contract prices remained in effect for one week. Id. Therefore, DESC was able to discontinue the burdensome interim payment and reconciliation process required by the PMM-based EPA clause.

G. Def.'s PFF No. 15: In January, 1986, DESC's Office of Market Research and Analysis prepared a recommendation to change the procedure by which offers were submitted in DESC's solicitations for bulk fuels. SA 18. Due to the three-month lag time for prices to be published in PMM, offerors were required to submit offers tied to a reference price that had not yet been published. SA 18 ¶ 1; see PFF 13 . That is, the clause provided that the base reference price was the PMM price published for the month before the submission of best and final offers. Id. As the recommendation noted, "[s]ince the Best and Final offers are submitted before the base reference is known, offerors must guess at the relationship between the offered price and the reference." Id. at par. 2. The recommendation noted that "the movement of PMM compared to other references as used for interim price adjustments may have moves as much as one or two cents per gallon out of step with such interim references." Id. at par. 3. The recommendation noted that offerors might increase their price to compensate for the unknown factor of what the PMM reference price would be when it was eventually published and, therefore, recommended that the best and final price be tied to an already published final and interim reference price. "For example, if the best and final date were November 15th, the final base EPA reference price would be PMM for August and the interim base reference would be the publication(s) . . . for the month of July." SA 18-19.

H. Def.'s PFF No. 16: In 1987, DESC's Office of Market Research and Analysis prepared a decision paper concerning the ". . . means of price escalation used in the domestic programs." SA 20 ¶ 1. The purpose of the decision paper was to decide whether the economic price adjustment clauses DESC was then using to adjust contract prices in long term contracts for the supply of domestic bulk fuels should be either modified to change the use of the unpublished PMM reference price, or changed to use market prices published in Platts and other "trade journals" rather than prices in PMM. SA 21 ¶ 1(Issue). The paper considered four options for adjusting long term contract prices in domestic bulk fuel contracts. SA 20 ¶ 2. The four options were: 1) to keep the price adjustment system then in use by DESC, 2) to modify the system then in use to " . . . reduce offer price uncertainties," 3) to adjust prices twice monthly using "trade journal" prices, and 4) to adjust prices weekly using "trade journal" prices. Id., at par 2; SA 25-26, Decision Options.

I. Def.'s PFF No. 17: The decision paper included a detailed discussion of the options available to DESC to adjust contract prices. SA 21-26. In a paragraph entitled "Background," the paper described the economic price adjustment system that DESC had been using since 1983. SA 21, Background.

The paper set forth nine criteria by which to judge proposed escalation systems, ". . . 1) product; 2) geography; 3) timing; 4) timeliness; 5) commonality; 6) independence from contractor influence; 7) basis in actual sales; 8) market risk; and 9) simplicity." Id. at Discussion. The paper then compared PMM prices to "trade journal" prices for using those nine criteria. SA 21-25.

J. Def.'s PFF No. 18: The paper concluded that:

> [t]he current PMM based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk. Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals. By the criteria of product, geography, and commonality there is no clear alternate between the alternate systems.

SA 21 at Discussion.

K. Def.'s PFF No. 19: The paper included a detailed analysis of each of the nine criteria and whether each favored the PMM, the trade journal prices, or neither. The paper found that the product criterion favored neither, because "[b]oth the PMM and trade publications publish prices of similar commercial products. . . ." SA 21. Regarding geography, the paper found that both PMM and trade publications prices were published in ". . . the geographical area where the requirements are located." SA 22. Regarding commonality, the paper found that either PMM or trade publications were acceptable to both DESC and contractors, based upon the fact that DESC had used PMM prices successfully in bulk fuels for three years and had used trade publication prices successfully in contracts for ground fuels and overseas bulk programs. Id.

L. Def.'s PFF No. 20: The paper concluded that the contractor influence, contractor sales, and market risk factors favored PMM. SA 22-23. The paper observed that, although both PMM and trade publications were independent of DESC contractors, trade publications might be influenced by the moves of large "market players" "given their informal method of conducting market surveys," whereas the PMM was a survey of actual sale prices. SA 22. Regarding market risk, the paper found that DESC ". . . contract prices are susceptible to market risk if they escalate on indices which do not correlate well with actual sales prices. PMM prices are actual sales price averages. SA 23. Trade publication prices were considered more ". . . variable in quality. . . ." Id. The study also found that trade publication prices were more susceptible to "price stickiness," and increased the market risk of higher prices during time periods of declining prices because sellers might be slow to lower posted prices. Id.

M. Def.'s PFF No. 21: The paper concluded that the timing and timeliness criteria favored trade publication prices. As the paper explained, because trade publication prices were published on a daily or weekly basis rather than monthly, the timing of those prices would reduce the ". . . possibility that contractors will build a contingency premium into their prices." SA 22. By contrast, because PMM was published with a three month lag-time, it necessitated the use of interim pricing and reconciliations, i.e., more adjustments. Id.

N. Def.'s PFF No. 22: Finally, the paper set forth a summary of the "pros and cons" of the four alternatives. The paper concluded that the preferred option was to modify the existing use of PMM prices by using the latest published

PMM price as the base reference price. That, the study reasoned, would eliminate "margin uncertainty" and allow bidders to base their offered prices on a known reference price. The paper pointed out that "[s]everal individuals and contractors have suggested that [DESC] modify its current system in this manner." SA 25. Starting in 1987, DESC began using this modified PMM-based adjustment, and continued to do so until 1995, when the use of trade publication prices began. See PFF 14. An example of the PMM adjustment clause in use between 1987 and 1993 is contained at Def Exh. 11, Pl. App. 201-03.

O. Def.'s PFF No. 23: In September, 1994, DESC requested a one-time FAR deviation to authorize the use of price adjustment based on market prices published in Platts and Oil Price Information Service ("OPTS") for that year's annual bulk fuels contract, in lieu of PMM prices. Walker Decl. ¶ 17; Def. Exh.13; P1. App. 571-74. In the request for a FAR deviation, DESC set forth reasons for switching from PMM prices to Platts and OPTS prices. DESC stated that the PMM prices had been reliable, but that using Platts and OPTS would provide several advantages. In addition to eliminating the need for two price adjustments, DESC stated, "commercial publications [such as Platts are] widely accepted by industry" and would be simpler to use. Def. Exh.13; Pl. App. 574. See also, Def. Exh. 15, at 3. DESC further noted that its Office of Market Research and Analysis had studied the proposed Platts-based clauses and found them to provide reliable bases for price adjustments. Id.; see also Walker Decl. ¶ 17.

P. Def.'s PFF No. 24: In January, 1995, DESC sought a Class Deviation and change to the Defense Logistics Agency Acquisition Regulation ("DLAR") that would explicitly authorize DESC to base its EPA clauses upon "industry publications" (including Platts and OPTS). Def. Exh.15. The bases for DESC's request for such permanent authorization were the same as set forth in its request for an individual deviation the previous fall. Id. at p. 3, ¶ III. B. DESC noted that "industry publications" were published more often and would eliminate the "need for double calculations of price adjustments, a significant savings to the government." Id. The deviation request noted that, due to the lag time between interim and final billing under PMM, "contractors likely build in a price cushion." The deviation also noted that the use of an "industry publication" was similar to the "way adjustments are done commercially in that commercial publications are widely accepted by industry." Id.

Q. Def.'s PFF No. 25: The DESC request also noted that "industry publications" had been used for DESC programs other than bulk fuels for years. Id. As it did in its earlier request, DESC stated that its "Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable for price adjustments." Id. The Office of Market Research and Analysis study to which both deviation requests referred was the 1987 study described in PFF 19-25. SA 35, 1.20-36, 1.19.

R. Def.'s PFF No. 26: Thus, beginning in 1995, the "base reference" price for Sunoco's Bulk Fuels Program contracts were regional average prices reported in Platts. Walker Decl. ¶ 10; Schink Decl. ¶ 4. Because Platts was published daily, DESC was able to adjust prices weekly, and, therefore, was able to discontinue the burdensome interim payment and reconciliation process required by the PMM-based EPA clause. Walker Decl. ¶ 10.

S. Def.'s PFF No. 27: In accordance with 15 U.S.C. § 644 and FAR Part 19, many of DESC's bulk fuels program solicitations included partial small business set-asides. SA 1-2. Beginning in 1988, pursuant to 10 U.S.C. § 2323, DESC solicitations also included an evaluation preference of up to 10 per cent for small disadvantaged business concerns. SA 5. DESC solicitation clauses I237.05, Notice of Evaluation Preference for Small Disadvantaged Business Concerns, and I237.06, Notice of Partial Small Business Set-Aside with Preferential Consideration for Small

T. Def.'s PFF No. 28: The clauses provided that the set-aside price would be the highest price the Government would pay for the non-set-aside portion of the fuel required for a location, and allowed negotiation with small business offerors to obtain that price. DESC did not provide small business concerns with either the identity or the prices of other offerors. SA 2. The negotiated price DESC allowed small business concerns to match was comprised of the fuel price the Government would pay plus a figure for transportation costs to the destination. Id.

U. Def.'s PFF No. 29: During performance of the contracts at issue here, Sunoco never raised any question regarding the legality of the EPA clauses, and it never complained that it was not being paid fairly. Walker Decl. ¶ 12. Nor did Sunoco ever object to any of the hundreds of monthly and weekly price adjustments made under the contracts' PMM-based and Platts-based EPA clauses. Id. In its proposal for each contract for which DESC's contract file still exists, Sunoco expressly stated that it agreed to all terms and conditions. Id. Sunoco submitted offers continually from 1984 to 1999. Id.

## II. WELL-PLEADED ALLEGATIONS IN SUNOCO'S AMENDED COMPLAINT APPLICABLE TO ALL COUNTS FOR WHICH SUNOCO REQUIRES DISCOVERY

Sunoco sets forth below the well-pleaded allegations, contained in paragraphs 8 to 30 of its Amended Complaint, that are applicable to all counts and for which Sunoco requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. DESC has acknowledged at least two authorized purposes for its price adjustment clause: First, to protect DESC and Plaintiffs against market fluctuations, and, second, to ensure that the prices DESC paid Plaintiffs for military fuel under the long-term contracts reflected at least fair market value.

B. A January 5, 1993 memorandum from DLA's Deputy Director, Directorate Contracting and Production, states that DESC's standard price adjustment clause was intended both to "ensure[] that the contract price will be awarded and remain at the market price," and to "ensure[] that the sale will be at the market price, which is fair and reasonable."

C. DESC's price adjustment clause permitted DESC to adjust the prices it paid Plaintiffs for fuel based on changes in indexes published by the

Department of Energy ("DOE") in the *Petroleum Marketing Monthly* (hereafter "PMM").

D. DESC was one of the principal users of PMM and worked with DOE in determining how PMM was published. A March 23, 1989 internal memorandum from DESC's Director, Office of Market Research and Analysis, states: "DOE normally will work with us to see that our needs are satisfied as we are one of the primary users of PMM." DESC never disclosed to its suppliers such as Plaintiffs its role in publication of PMM.

E. In basing price adjustments on PMM, DESC represented and warranted that PMM was adequate to accomplish its purposes of protecting against market fluctuations and ensuring that the prices DESC paid for military fuel reflected at least fair market value.

F. In basing price adjustments on PMM, DESC represented and warranted that PMM accurately reflected at least the fair market value for fuel and that prices for military fuel were fair and reasonable.

G. DESC's Pre-Negotiation Briefing Memoranda, which established pricing policies for DESC's military fuel contracts, expressly provided that DESC's price adjustment clause was "non-negotiable." Accordingly, suppliers of military fuel such as Plaintiffs were required to accept DESC's use of PMM to set military fuel prices or exit the market for military fuel.

H. Contrary to the acknowledged purposes of DESC's price adjustment clause, DOE did not design or intend for PMM to be used to set or adjust prices in response to market fluctuations, and PMM did not reflect at least the fair market value for military fuel.

I. Among the many inadequacies of PMM for use in setting military fuel prices, PMM suffered from a statistical flaw known as an "index number problem," whereby different categories or classes of fuel were used to calculate the value of the index in different months. Such an index number problem renders use of PMM essentially meaningless for measuring changes in price levels from month to month as DESC did. After this case was filed, DOE publicly conceded that PMM suffered from an index number problem.

J. As early as January 1986, DESC concluded in an internal assessment that "the movement of PMM as compared to other [market] references . . . indicates that PMM may have moves as much as one or two cents per gallon out of step with such . . . references." In contrast, DESC typically required suppliers such as Plaintiffs to submit bids to sell military fuel to the one-ten-thousandth of a cent ($.000001).

K. DESC did not disclose to its suppliers such as Plaintiffs its 1986 assessment and, notwithstanding the assessment, continued to use PMM in its price adjustment clause.

L. In 1987, DESC conducted a second study of PMM which found that PMM did not protect against market fluctuations and did not ensure that the prices DESC paid for military fuel under the long-term contracts reflected at least fair market value.

M. DESC did not disclose this 1987 study to its suppliers such as Plaintiffs and, despite the study, continued to use PMM in its price adjustment clause.

N. Seven years later, in 1994, senior officials at DLA learned of DESC's 1987 study, and, upon review of the study, directed DESC to stop using PMM to set military fuel prices.

O. In implementing DLA's directive, DESC admitted that its use of PMM had distorted military fuel prices materially, stating in internal documents that "direct contract price comparisons are not possible" between DESC's military fuel prices and fair market value.

P. Consistent with DESC's internal admissions, a DOE report admits that PMM differed by as much as nineteen percent from comparable prices published by the Bureau of Labor Statistics.

Q. Thus, DESC, as the sole purchaser and user of military fuel, used PMM on a "non-negotiable" basis to set military fuel prices despite knowing that PMM was not designed to be used to set or adjust prices, and despite knowing that PMM did not reflect at least fair market value and did not result in fair and reasonable prices.

R. As a result of DESC's use of PMM in its price adjustment clause, DESC paid Plaintiffs prices for military fuel that were materially below fair market value and were not fair and reasonable.

S. DESC also used other indexes in its price adjustment clause to make price adjustments. On information and belief, DESC also knew that some of the other indexes it used to set or adjust prices were not appropriate for these purposes.

T. Beyond DESC's use of PMM and other price indexes to set military fuel prices below fair market value, DESC distorted the market value of military fuel in other ways.

U. DESC conducted an auction for fuel contracts, whereby DESC offered fuel contracts to bidders that agreed to match the price, or adjusted price, of other bidders. More than fifty percent of the fuel offered (as a percentage of that purchased) commonly was subject to DESC's auction. In furtherance of DESC's auction, DESC procured purchases of fuel set aside for small business together with purchases from large businesses rather than conducting the two procurements separately.

V. DESC also provided a ten percent price preference to minority-owned suppliers. In some years, more than twenty percent of the fuel offered (as a percentage of that purchased) was subject to DESC's minority price preference.

W. As a result of DESC's auction of fuel contracts and its ten percent price preference for minority-owned suppliers, DESC paid Plaintiffs prices for military fuel that were materially below fair market value and were not fair and reasonable.

## III. WELL-PLEADED ALLEGATIONS IN COUNT I OF SUNOCO'S AMENDED COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY

Sunoco sets forth below the well-pleaded allegations in Count I, contained in paragraphs 38 to 45 of its Amended Complaint, for which Sunoco requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

> A. DESC knowingly awarded and administered Plaintiffs' contracts in violation, *inter alia*, of FAR § 16.203 by basing price adjustments on indexes rather than on Plaintiffs' own established fuel prices.
>
> B. Even if FAR § 16.203 permitted DESC to base price adjustments on indexes rather than on Plaintiffs' own established fuel prices, DESC knowingly awarded and administered Plaintiffs' contracts in violation, *inter alia*, of FAR § 16.203 by basing price adjustments on indexes that were not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel.
>
> C. DESC knowingly awarded and administered Plaintiffs' contracts in violation, *inter alia*, of FAR § 15.802(b) [currently codified at FAR § 15.402(a)] by using PMM and other indexes to establish prices for military fuel that were not fair and reasonable.
>
> D. DESC knowingly awarded and administered each of Plaintiffs' contracts in violation, *inter alia*, of the Office of Federal Procurement Policy Act and its implementing regulations (and, prior to its enactment, FAR § 15.610) by using prohibited auction techniques, whereby DESC awarded contracts to bidders that agreed to match other bidders' prices.
>
> E. DESC knowingly awarded and administered Plaintiffs' contracts in violation, *inter alia*, of DOD Federal Acquisition Regulation ("DFAR") pt. 219 by improperly soliciting and awarding portions of the procurements set aside for small businesses together with those for large businesses.
>
> F. DESC knowingly awarded and administered Plaintiffs' contracts in violation, *inter alia*, of the equal protection component of the fifth amendment's due process clause by extending to minority-owned businesses bidding preferences that were not narrowly tailored to further a compelling governmental interest.
>
> G. DESC thus combined its substantial market power and substantial ability to affect the price of military fuel with a knowing violation of law and regulation to reduce the price it paid for military fuel below fair market value.
>
> H. DESC's violation of law and regulation in awarding and administering Plaintiffs' contracts damaged Plaintiffs.

## IV. WELL-PLEADED ALLEGATIONS IN COUNT II OF SUNOCO'S AMENDED COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY

Sunoco sets forth below the well-pleaded allegations in Count II, contained in paragraphs 48 to 59 of its Amended Complaint, for which Sunoco requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. DESC knowingly awarded and administered Plaintiffs' contracts in violation of law and regulation.

B. In awarding and administering Plaintiffs' contracts, DESC knowingly based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of DESC's price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

C. In awarding and administering Plaintiffs' contracts, DESC knowingly based price adjustments on PMM and other indexes that were not designed or intended to be used to set or adjust prices and which did not reflect at least the fair market value of military fuel.

D. In awarding and administering Plaintiffs' contracts, DESC knew that the contracts did not provide for payment of at least the fair market value of military fuel and knew that the contracts did not provide for fair and reasonable prices.

E. In awarding and administering Plaintiffs' contracts, DESC worked with DOE to determine how PMM was published and to "see that our needs are satisfied as . . . one of the primary users of PMM."

F. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose its violation of law and regulation.

G. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that it based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

H. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value.

I. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that the contracts did not provide for payment of at least fair market value for military fuel and did not provide for fair and reasonable prices.

J. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that DESC worked with DOE to determine how PMM was published and to "see that our needs are satisfied as . . . one of the primary users of PMM."

K. Plaintiffs reasonably relied upon DESC's material and/or fraudulent misrepresentations as an inducement to enter the contracts.

L. DESC's material and/or fraudulent misrepresentations damaged Plaintiffs.

## V. WELL-PLEADED ALLEGATIONS IN COUNT III OF SUNOCO'S AMENDED COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY

Sunoco sets forth below the well-pleaded allegations in Count III, contained in paragraphs 62 to 73 of its Amended Complaint, for which Sunoco requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. DESC's compliance with law and regulation in awarding and administering the contracts was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

B. DESC's basing price adjustments on PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

C. DESC's basing price adjustments on standards that were designed or intended to be used to set or adjust prices and which reflected at least the fair market value of fuel was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

D. DESC's paying at least fair market value for military fuel and DESC's paying fair and reasonable prices were material conditions of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

E. DESC's negotiating and administering the contracts in good faith was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

F. In contravention of DESC's contractual obligations, DESC violated law and regulation in awarding and administering the contracts.

G. In contravention of DESC's contractual obligations, DESC based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

H. In contravention of DESC's contractual obligations, DESC based price adjustments on standards such as PMM and other indexes that were not designed or intended to be used to set or adjust prices and which did not reflect at least the fair market value of fuel.

I. In contravention of DESC's contractual obligations, DESC did not pay at least fair market value for military fuel and did not pay fair and reasonable prices for fuel.

J. In contravention of DESC's contractual obligations, DESC did not negotiate and administer the contracts in good faith. Instead, DESC used a non-negotiable illegal price adjustment clause that based price adjustments on PMM and other indexes, and worked with DOE to determine how PMM was published and to "see that our needs are satisfied as . . . one of the primary users of PMM."

K. DESC's contravention of its contractual obligation constituted breach of contract.

L. DESC's breach of contract damaged Plaintiffs.

## VI. WELL-PLEADED ALLEGATIONS IN COUNT IV OF SUNOCO'S AMENDED COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY

Sunoco sets forth below the well-pleaded allegations in Count IV, contained in paragraphs 76 to 79 of its Amended Complaint, for which Sunoco requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. DESC knowingly awarded and administered Plaintiffs' contracts in violation of law and regulation.

B. DESC's violation of law and regulation in awarding and administering Plaintiffs' contracts rendered at least the price terms of Plaintiffs' contracts invalid and unenforceable.

C. DESC's violation of law and regulation in awarding and administering Plaintiffs' contracts damaged Plaintiffs.

D. At least the pricing terms of Plaintiffs' contracts are replaced by an implied-in-fact contract to pay the fair market value of the fuel Plaintiffs delivered to DESC.

## VII. WELL-PLEADED ALLEGATIONS IN COUNT V OF SUNOCO'S AMENDED COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY

Sunoco sets forth below the well-pleaded allegations in Count V, contained in paragraphs 82 to 97 of its Amended Complaint, for which Sunoco requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. DESC's compliance with law and regulation in awarding and administering the contracts was a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

B. DESC's basing price adjustments on PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value was a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

C. DESC's basing price adjustments on standards that were designed or intended to be used to set or adjust prices and that reflected at least the fair market value of fuel was a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

D. DESC's paying at least fair market value for the military fuel it purchased and DESC's paying fair and reasonable prices were a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

E. DESC's negotiating the contracts in good faith was a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

F. DESC violated law and regulation in awarding and administering the contracts.

G. DESC based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protecting against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

H. DESC based price adjustments on PMM and other indexes that were not designed or intended to be used to set or adjust prices and that did not reflect at least fair market value.

I. DESC did not pay at least fair market value for military fuel or pay fair and reasonable prices.

J. DESC did not negotiate the contracts in good faith.

K. DESC's violation of law and regulation in awarding and administering the contracts constituted a failure of consideration and frustrated the purpose of the contracts.

L. DESC's failure to base price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value constituted a failure of consideration and frustrated the purpose of the contracts.

M. DESC's use of PMM and other indexes that were not designed or intended to be used to set or adjust prices and that did not reflect at least fair market value constituted a failure of consideration and frustrated the purpose of the contracts.

N. DESC's failure to pay at least fair market value for military fuel and its failure to pay fair and reasonable prices constituted a failure of consideration and frustrated the purpose of the contracts.

O. DESC's failure to negotiate the contracts in good faith constituted a failure of consideration and frustrated the purpose of the contracts.

P. This failure of consideration and frustration of the purpose of the contracts damaged Plaintiffs.

## VIII. WELL-PLEADED ALLEGATIONS IN COUNT VI OF SUNOCO'S AMENDED COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY

Sunoco sets forth below the well-pleaded allegations in Count VI, contained in paragraphs 109 to 124 of its Amended Complaint, for which Sunoco requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. Plaintiffs entered and performed the contracts with the intent that they comply with law and regulation. This was a material condition upon which Plaintiffs reasonably relied in entering the contracts.

B. Plaintiffs entered and performed the contracts with the intent that PMM and other indexes were adequate to accomplish the stated purposes of DESC's price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value. This was a material condition upon which Plaintiffs reasonably relied in entering the contracts.

C. Plaintiffs entered and performed the contracts with the intent that the standards used to make price adjustments were designed or intended to be used to set or adjust prices and reflected at least fair market value. This was a material condition upon which Plaintiffs reasonably relied in entering the contracts.

D. Plaintiffs entered and performed the contracts with the intent that DESC pay at least fair market value for military fuel and pay fair and reasonable prices. This was a material condition upon which Plaintiffs reasonably relied in entering the contracts.

E. DESC did not comply with law and regulation in awarding and administering the contracts.

F. DESC did not use PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against

market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

G. DESC based price adjustments on PMM and other indexes that were not designed or intended to be used to set or adjust prices and that did not reflect at least fair market value.

H. DESC did not pay fair market value for military fuel or pay fair and reasonable prices.

I. If DESC did not knowingly award and administer the contracts in violation of law and regulation, as alleged above, then DESC must be presumed to have intended to award and administer the contracts in accordance with law and regulation.

J. If DESC did not know that the PMM and other indexes were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value, as alleged above, then DESC must be presumed to have used the PMM and other indexes with the intent that they were adequate to accomplish the stated purposes of its price adjustment clause.

K. If DESC did not know that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value, as alleged above, then DESC must be presumed to have used PMM and other indexes with the intent that they were designed or intended to be used to set or adjust prices and reflected at least fair market value.

L. If DESC did not knowingly fail to pay at least fair market value for military fuel and did not knowingly fail to pay prices that were fair and reasonable, as alleged above, then DESC must be presumed to have intended to pay at least fair market value for military fuel and to have intended to pay fair and reasonable prices.

M. As a result of a mistake, DESC and Plaintiffs entered and performed the contracts in violation of law and regulation.

N. As a result of a mistake, DESC and Plaintiffs entered and performed the contracts using the PMM and other indexes that were not adequate to accomplish the stated purposes of DESC's price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

O. As a result of a mistake, DESC and Plaintiffs entered and performed the contracts using PMM and other indexes that were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value.

P. As a result of a mistake, DESC and Plaintiffs entered and performed the contracts that did not provide for the payment of at least fair market value for military fuel and did not provide for payment of fair and reasonable prices.

Q. If DESC and Plaintiffs had not been mistaken, DESC and Plaintiffs would not have entered and performed the contracts in violation of law and regulation.

R. If DESC and Plaintiffs had not been mistaken, DESC and Plaintiffs would not have entered and performed the contracts using the PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

S. If DESC and Plaintiffs had not been mistaken, DESC and Plaintiffs would not have entered and performed the contracts using PMM and other indexes to set or adjust prices.

T. If DESC and Plaintiffs had not been mistaken, DESC and Plaintiffs would not have entered and performed the contracts that did not provide for the payment of at least fair market value for military fuel and did not provide for payment of fair and reasonable prices.

U. Alternatively, if DESC was not mistaken in awarding and administering contracts in violation of law and regulation, then DESC knew or should have known of Plaintiffs' mistake and failed to meet its duty timely to disclose this mistake to Plaintiffs.

V. Alternatively, if DESC was not mistaken in awarding and performing the contracts using the PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value, then DESC knew or should have known of Plaintiffs' mistake and failed to meet its duty timely to disclose this mistake to Plaintiffs.

W. Alternatively, if DESC was not mistaken in awarding and performing contracts using PMM and other indexes to set or adjust prices, then DESC knew or should have known of Plaintiffs' mistake and failed to meet its duty timely to disclose this mistake to Plaintiffs.

X. Alternatively, if DESC was not mistaken in entering and performing contracts that did not provide for payment of at least fair market value for military fuel and that did not provide for payment of fair and reasonable prices, then DESC knew or should have known of Plaintiffs' mistake and failed to meet its duty timely to disclose this mistake to Plaintiffs.

Y. The parties' mutual mistake and/or DESC's failure to disclose Plaintiffs' unilateral mistake damaged Plaintiffs.

## IX. WELL-PLEADED ALLEGATIONS IN COUNT VII OF SUNOCO'S AMENDED COMPLAINT FOR WHICH SUNOCO REQUIRES DISCOVERY

Sunoco sets forth below the well-pleaded allegations in Count VII, contained in paragraphs 127 to 133 of its Amended Complaint, for which Sunoco requires discovery in order to present by affidavit or other sworn testimony facts essential to its opposition:

A. With no fully supporting claim of right, DESC took possession of and infringed upon Plaintiffs' property rights in and in relation to the fuel it delivered.

B. DESC's taking of Plaintiffs' property was for a public purpose.

C. To the extent that DESC's taking of Plaintiffs' property was effected in conjunction with a violation of law and regulation, DESC acted within the general scope of its authority to procure the fuel.

D. DESC effected a taking of Plaintiffs' property within the meaning of the Fifth Amendment of the United States Constitution.

E. DESC has not paid Plaintiffs just compensation for the taking of Plaintiffs' property.

F. DESC's failure to pay Plaintiffs just compensation for the taking of its property violated the Fifth Amendment of the United States Constitution and thereby damaged Plaintiffs.

## X. FACTS WITH RESPECT TO DESC'S AFFIRMATIVE DEFENSE OF WAIVER FOR WHICH SUNOCO REQUIRES DISCOVERY

With respect to DESC's affirmative defense of waiver, Sunoco requires full discovery concerning negotiation, award and performance of the fuel contracts, and concerning DESC's prices and indexes in the fuel contracts, in order to present by affidavit or other sworn testimony facts essential to its opposition concerning DESC's allegation that:

A. Sunoco intentionally relinquished any known rights with respect to the fuel contracts it entered with DESC.

## CONCLUSION

Pursuant to RCFC 56(f), this Court should not adopt any of the proposed findings of fact enumerated above, disregard any of the well-pleaded allegations enumerated above, or grant DESC's request for summary judgment without affording Sunoco "an opportunity to make full

discovery" and to present the resulting evidence. *Celotex*, 477 U.S. at 326. Accordingly, as set forth in RCFC 56(f), this Court should refuse DESC's application for summary judgment or, in the alternative, grant a continuance so that Sunoco can obtain the discovery it requires to present evidence essential to its Opposition.

Respectfully submitted,

s/J. Keith Burt

J. Keith Burt
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3208 (Phone)
(202) 263-5208 (Fax)

Attorneys for Plaintiffs,
Sunoco, Inc. and Puerto Rico
Sun Oil Company

*Of Cou*nsel:

Gary A. Winters
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006

January 17, 2006

**EXHIBIT A**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SUNOCO, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PUERTO RICO SUN OIL COMPANY, | ) | No. 02-466C |
| | ) | (Chief Judge Damich) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF J. KEITH BURT**

I, J. Keith Burt, declare the following:

1. I am counsel of record for Plaintiffs, Sunoco, Inc. and Puerto Rico Sun Oil Company (collectively "Sunoco").

2. Because there has been no meaningful discovery in this case beyond the production of the parties' contract files, DESC is in control of substantial evidence necessary for Sunoco to respond to DESC's motion for summary judgment. In addition, Sunoco is required to depose any number of former employees that are now third-party witnesses. Without access to this evidence, Sunoco is unable to present by affidavit or other sworn testimony facts essential to its Opposition.

3. Specifically, with respect to the following of Defendant's proposed findings of fact, Sunoco requires discovery:

> A. Def.'s PFF No. 6: Sunoco's contracts were competitively awarded through negotiated solicitations, pursuant to 48 C.F.R. ("FAR") part 15 ("Contracting by Negotiation"), and, beginning in 1996, FAR part 12 ("Acquisition of Commercial Items"). Walker Decl ¶¶ 5, 18. The base prices in Sunoco's contracts were determined to be reasonable based on adequate price competition or on established catalog or market prices of commercial items sold in substantial quantities to the general public. Walker Decl. ¶ 7.

> B. Def.'s PFF No. 9: DESC began using EPA clauses based upon crude o costs in 1973, in response to increases in crude oil costs experienced by suppliers as a result of the Arab oil embargo. At that time, the Government had imposed controls upon the price of crude oil. After the price restraints were lifted, DESC gave suppliers the option of selecting an EPA clause based either upon

actual crude oil costs, or upon market prices for similar products. In 1981, having concluded that allowing that choice presented too many administrative problems, including difficulties in evaluating and comparing bids that used different EPA indexes, DESC began using market-based indexes exclusively. DESC chose a refined product market index because that index was believed to closely mirror changes in refiners' costs, over time, although a given price index might not track costs over shorter periods. See Def. Exh. 5, 9.

C. Def.'s PFF No. 10: In part D, the EPA clause provided a unique "reference price" (sometimes called a "base reference price") for each refined petroleum product sought in the RFP. Id. at 202. An offeror would propose a "base price" for each product offered. That price was subject to adjustment, based upon changes in the reference price. Specifically, B.19.33 provided that "[t]he prices payable under this contract for listed items shall be the base [proposal] price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the reference price increases or decreases per like unit of measure from the base reference price." Def. Exh. 11; Pl. App. 202 (part D ¶(c)). The base price was primarily for evaluation purposes. Because the base price would be adjusted during performance, it was not expected to be the price the contractor received for fuel. Walker Decl. ¶ 4.

D. Def.'s PFF No. 11: From 1984 to 1994, the EPA clauses in Sunoco's contracts were based upon prices published in the Petroleum Marketing Monthly ("PMM"), a Department of Energy ("DOE") publication. Compl. ¶ 10; Walker Decl. ¶ 8; Stip.12.

E. Def.'s PFF No. 13: A significant feature of the PMM is the three-month lag time DOE requires to obtain the sales data for any particular month. Thus, for example, sales data for April are published in July. Walker Decl. ¶ 8; Def. Exh. 11; Pl. App. 202 (Part D(a). This was significant in DESC's administration of the PMM-based EPA clauses, because B19.33 provided for monthly adjustments. Id. To accommodate DOE'S three-month lag, DESC made monthly adjustments on an interim basis, and then reconciled them when PMM data for that month were published. Id.

F. Def.'s PFF No. 14: Beginning in 1995, Sunoco's DESC contracts included an EPA clause based, not upon PMM prices, but upon regional average prices reported in a commercial publication, Platts Oilgram Price Report ("Platts"). Walker Decl. ¶ 10; Schink Decl. ¶ 4. Platts is published daily. Walker Decl. ¶ 10. Contract prices were adjusted weekly pursuant to DESC's Platts-based EPA clause, that is, contract prices remained in effect for one week. Id. Therefore, DESC was able to discontinue the burdensome interim payment and reconciliation process required by the PMM-based EPA clause.

G. Def.'s PFF No. 15: In January, 1986, DESC's Office of Market Research and Analysis prepared a recommendation to change the procedure by which offers were submitted in DESC's solicitations for bulk fuels. SA 18. Due to the three-month lag time for prices to be published in PMM, offerors were required to submit offers tied to a reference price that had not yet been published. SA 18 ¶ 1; see PFF 13 . That is, the clause provided that the base reference price was the PMM price published for the month before the submission of best and final offers. Id. As the recommendation noted, "[s]ince the Best and Final offers are submitted before the base reference is known, offerors must guess at the relationship between the offered price and the reference." Id. at par. 2. The recommendation noted that

"the movement of PMM compared to other references as used for interim price adjustments may have moves as much as one or two cents per gallon out of step with such interim references." Id. at par. 3. The recommendation noted that offerors might increase their price to compensate for the unknown factor of what the PMM reference price would be when it was eventually published and, therefore, recommended that the best and final price be tied to an already published final and interim reference price. "For example, if the best and final date were November 15th, the final base EPA reference price would be PMM for August and the interim base reference would be the publication(s) . . . for the month of July." SA 18-19.

H. Def.'s PFF No. 16: In 1987, DESC's Office of Market Research and Analysis prepared a decision paper concerning the ". . . means of price escalation used in the domestic programs." SA 20 ¶ 1. The purpose of the decision paper was to decide whether the economic price adjustment clauses DESC was then using to adjust contract prices in long term contracts for the supply of domestic bulk fuels should be either modified to change the use of the unpublished PMM reference price, or changed to use market prices published in Platts and other "trade journals" rather than prices in PMM. SA 21 ¶ 1(Issue). The paper considered four options for adjusting long term contract prices in domestic bulk fuel contracts. SA 20 ¶ 2. The four options were: 1) to keep the price adjustment system then in use by DESC, 2) to modify the system then in use to ". . . reduce offer price uncertainties," 3) to adjust prices twice monthly using "trade journal" prices, and 4) to adjust prices weekly using "trade journal" prices. Id., at par 2; SA 25-26, Decision Options.

I. Def.'s PFF No. 17: The decision paper included a detailed discussion of the options available to DESC to adjust contract prices. SA 21-26. In a paragraph entitled "Background," the paper described the economic price adjustment system that DESC had been using since 1983. SA 21, Background. The paper set forth nine criteria by which to judge proposed escalation systems, ". . . 1) product; 2) geography; 3) timing; 4) timeliness; 5) commonality; 6) independence from contractor influence; 7) basis in actual sales; 8) market risk; and 9) simplicity." Id. at Discussion. The paper then compared PMM prices to "trade journal" prices for using those nine criteria. SA 21-25.

J. Def.'s PFF No. 18: The paper concluded that:

> [t]he current PMM based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk. Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals. By the criteria of product, geography, and commonality there is no clear alternate between the alternate systems.

SA 21 at Discussion.

K. Def.'s PFF No. 19: The paper included a detailed analysis of each of the nine criteria and whether each favored the PMM, the trade journal prices, or neither. The paper found that the product criterion favored neither, because "[b]oth the PMM and trade publications publish prices of similar commercial products. . . ." SA 21. Regarding geography, the paper found that both PMM and trade publications prices were published in ". . . the geographical area where the requirements are located." SA 22. Regarding commonality, the paper found that either PMM or trade publications were acceptable to both DESC and contractors, based upon the fact that DESC had used PMM prices successfully in bulk fuels for

three years and had used trade publication prices successfully in contracts for ground fuels and overseas bulk programs. Id.

L. Def.'s PFF No. 20: The paper concluded that the contractor influence, contractor sales, and market risk factors favored PMM. SA 22-23. The paper observed that, although both PMM and trade publications were independent of DESC contractors, trade publications might be influenced by the moves of large "market players" "given their informal method of conducting market surveys," whereas the PMM was a survey of actual sale prices. SA 22. Regarding market risk, the paper found that DESC ". . . contract prices are susceptible to market risk if they escalate on indices which do not correlate well with actual sales prices. PMM prices are actual sales price averages. SA 23. Trade publication prices were considered more ". . . variable in quality. . . ." Id. The study also found that trade publication prices were more susceptible to "price stickiness," and increased the market risk of higher prices during time periods of declining prices because sellers might be slow to lower posted prices. Id.

M. Def.'s PFF No. 21: The paper concluded that the timing and timeliness criteria favored trade publication prices. As the paper explained, because trade publication prices were published on a daily or weekly basis rather than monthly, the timing of those prices would reduce the ". . . possibility that contractors will build a contingency premium into their prices." SA 22. By contrast, because PMM was published with a three month lag-time, it necessitated the use of interim pricing and reconciliations, i.e., more adjustments. Id.

N. Def.'s PFF No. 22: Finally, the paper set forth a summary of the "pros and cons" of the four alternatives. The paper concluded that the preferred option was to modify the existing use of PMM prices by using the latest published PMM price as the base reference price. That, the study reasoned, would eliminate "margin uncertainty" and allow bidders to base their offered prices on a known reference price. The paper pointed out that "[s]everal individuals and contractors have suggested that [DESC] modify its current system in this manner." SA 25. Starting in 1987, DESC began using this modified PMM-based adjustment, and continued to do so until 1995, when the use of trade publication prices began. See PFF 14. An example of the PMM adjustment clause in use between 1987 and 1993 is contained at Def Exh. 11, Pl. App. 201-03.

O. Def.'s PFF No. 23: In September, 1994, DESC requested a one-time FAR deviation to authorize the use of price adjustment based on market prices published in Platts and Oil Price Information Service ("OPTS") for that year's annual bulk fuels contract, in lieu of PMM prices. Walker Decl. ¶ 17; Def. Exh.13; P1. App. 571-74. In the request for a FAR deviation, DESC set forth reasons for switching from PMM prices to Platts and OPTS prices. DESC stated that the PMM prices had been reliable, but that using Platts and OPTS would provide several advantages. In addition to eliminating the need for two price adjustments, DESC stated, "commercial publications [such as Platts are] widely accepted by industry" and would be simpler to use. Def. Exh.13; Pl. App. 574. See also, Def. Exh. 15, at 3. DESC further noted that its Office of Market Research and Analysis had studied the proposed Platts-based clauses and found them to provide reliable bases for price adjustments. Id.; see also Walker Decl. ¶ 17.

P. Def.'s PFF No. 24: In January, 1995, DESC sought a Class Deviation and change to the Defense Logistics Agency Acquisition Regulation ("DLAR") that would explicitly authorize DESC to base its EPA clauses upon

"industry publications" (including Platts and OPTS). Def. Exh.15. The bases for DESC's request for such permanent authorization were the same as set forth in its request for an individual deviation the previous fall. Id. at p. 3, ¶ III. B. DESC noted that "industry publications" were published more often and would eliminate the "need for double calculations of price adjustments, a significant savings to the government." Id. The deviation request noted that, due to the lag time between interim and final billing under PMM, "contractors likely build in a price cushion." The deviation also noted that the use of an "industry publication" was similar to the "way adjustments are done commercially in that commercial publications are widely accepted by industry." Id.

Q. Def.'s PFF No. 25: The DESC request also noted that "industry publications" had been used for DESC programs other than bulk fuels for years. Id. As it did in its earlier request, DESC stated that its "Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable for price adjustments." Id. The Office of Market Research and Analysis study to which both deviation requests referred was the 1987 study described in PFF 19-25. SA 35, 1.20-36, 1.19.

R. Def.'s PFF No. 26: Thus, beginning in 1995, the "base reference" price for Sunoco's Bulk Fuels Program contracts were regional average prices reported in Platts. Walker Decl. ¶ 10; Schink Decl. ¶ 4. Because Platts was published daily, DESC was able to adjust prices weekly, and, therefore, was able to discontinue the burdensome interim payment and reconciliation process required by the PMM-based EPA clause. Walker Decl. ¶ 10.

S. Def.'s PFF No. 27: In accordance with 15 U.S.C. § 644 and FAR Part 19, many of DESC's bulk fuels program solicitations included partial small business set-asides. SA 1-2. Beginning in 1988, pursuant to 10 U.S.C. § 2323, DESC solicitations also included an evaluation preference of up to 10 per cent for small disadvantaged business concerns. SA 5. DESC solicitation clauses I237.05, Notice of Evaluation Preference for Small Disadvantaged Business Concerns, and I237.06, Notice of Partial Small Business Set-Aside with Preferential Consideration for Small

T. Def.'s PFF No. 28: The clauses provided that the set-aside price would be the highest price the Government would pay for the non-set-aside portion of the fuel required for a location, and allowed negotiation with small business offerors to obtain that price. DESC did not provide small business concerns with either the identity or the prices of other offerors. SA 2. The negotiated price DESC allowed small business concerns to match was comprised of the fuel price the Government would pay plus a figure for transportation costs to the destination. Id.

U. Def.'s PFF No. 29: During performance of the contracts at issue here, Sunoco never raised any question regarding the legality of the EPA clauses, and it never complained that it was not being paid fairly. Walker Decl. ¶ 12. Nor did Sunoco ever object to any of the hundreds of monthly and weekly price adjustments made under the contracts' PMM-based and Platts-based EPA clauses. Id. In its proposal for each contract for which DESC's contract file still exists, Sunoco expressly stated that it agreed to all terms and conditions. Id. Sunoco submitted offers continually from 1984 to 1999. Id.

4. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Sunoco's Amended Complaint, Sunoco requires discovery to establish the following allegations at paragraphs 8 to 30 of its Amended Complaint that apply generally to all of the counts in the Complaint:

A. DESC has acknowledged at least two authorized purposes for its price adjustment clause: First, to protect DESC and Plaintiffs against market fluctuations, and, second, to ensure that the prices DESC paid Plaintiffs for military fuel under the long-term contracts reflected at least fair market value.

B. A January 5, 1993 memorandum from DLA's Deputy Director, Directorate Contracting and Production, states that DESC's standard price adjustment clause was intended both to "ensure[] that the contract price will be awarded and remain at the market price," and to "ensure[] that the sale will be at the market price, which is fair and reasonable."

C. DESC's price adjustment clause permitted DESC to adjust the prices it paid Plaintiffs for fuel based on changes in indexes published by the Department of Energy ("DOE") in the *Petroleum Marketing Monthly* (hereafter "PMM").

D. DESC was one of the principal users of PMM and worked with DOE in determining how PMM was published. A March 23, 1989 internal memorandum from DESC's Director, Office of Market Research and Analysis, states: "DOE normally will work with us to see that our needs are satisfied as we are one of the primary users of PMM." DESC never disclosed to its suppliers such as Plaintiffs its role in publication of PMM.

E. In basing price adjustments on PMM, DESC represented and warranted that PMM was adequate to accomplish its purposes of protecting against market fluctuations and ensuring that the prices DESC paid for military fuel reflected at least fair market value.

F. In basing price adjustments on PMM, DESC represented and warranted that PMM accurately reflected at least the fair market value for fuel and that prices for military fuel were fair and reasonable.

G. DESC's Pre-Negotiation Briefing Memoranda, which established pricing policies for DESC's military fuel contracts, expressly provided that DESC's price adjustment clause was "non-negotiable." Accordingly, suppliers of military fuel such as Plaintiffs were required to accept DESC's use of PMM to set military fuel prices or exit the market for military fuel.

H. Contrary to the acknowledged purposes of DESC's price adjustment clause, DOE did not design or intend for PMM to be used to set or adjust prices in response to market fluctuations, and PMM did not reflect at least the fair market value for military fuel.

I. Among the many inadequacies of PMM for use in setting military fuel prices, PMM suffered from a statistical flaw known as an "index number problem," whereby different categories or classes of fuel were used to calculate the

value of the index in different months. Such an index number problem renders use of PMM essentially meaningless for measuring changes in price levels from month to month as DESC did. After this case was filed, DOE publicly conceded that PMM suffered from an index number problem.

J. As early as January 1986, DESC concluded in an internal assessment that "the movement of PMM as compared to other [market] references . . . indicates that PMM may have moves as much as one or two cents per gallon out of step with such . . . references." In contrast, DESC typically required suppliers such as Plaintiffs to submit bids to sell military fuel to the one-ten-thousandth of a cent ($.000001).

K. DESC did not disclose to its suppliers such as Plaintiffs its 1986 assessment and, notwithstanding the assessment, continued to use PMM in its price adjustment clause.

L. In 1987, DESC conducted a second study of PMM which found that PMM did not protect against market fluctuations and did not ensure that the prices DESC paid for military fuel under the long-term contracts reflected at least fair market value.

M. DESC did not disclose this 1987 study to its suppliers such as Plaintiffs and, despite the study, continued to use PMM in its price adjustment clause.

N. Seven years later, in 1994, senior officials at DLA learned of DESC's 1987 study, and, upon review of the study, directed DESC to stop using PMM to set military fuel prices.

O. In implementing DLA's directive, DESC admitted that its use of PMM had distorted military fuel prices materially, stating in internal documents that "direct contract price comparisons are not possible" between DESC's military fuel prices and fair market value.

P. Consistent with DESC's internal admissions, a DOE report admits that PMM differed by as much as nineteen percent from comparable prices published by the Bureau of Labor Statistics.

Q. Thus, DESC, as the sole purchaser and user of military fuel, used PMM on a "non-negotiable" basis to set military fuel prices despite knowing that PMM was not designed to be used to set or adjust prices, and despite knowing that PMM did not reflect at least fair market value and did not result in fair and reasonable prices.

R. As a result of DESC's use of PMM in its price adjustment clause, DESC paid Plaintiffs prices for military fuel that were materially below fair market value and were not fair and reasonable.

S. DESC also used other indexes in its price adjustment clause to make price adjustments. On information and belief, DESC also knew that some of the other indexes it used to set or adjust prices were not appropriate for these purposes.

T. Beyond DESC's use of PMM and other price indexes to set military fuel prices below fair market value, DESC distorted the market value of military fuel in other ways.

U. DESC conducted an auction for fuel contracts, whereby DESC offered fuel contracts to bidders that agreed to match the price, or adjusted price, of other bidders. More than fifty percent of the fuel offered (as a percentage of that purchased) commonly was subject to DESC's auction. In furtherance of DESC's auction, DESC procured purchases of fuel set aside for small business together with purchases from large businesses rather than conducting the two procurements separately.

V. DESC also provided a ten percent price preference to minority-owned suppliers. In some years, more than twenty percent of the fuel offered (as a percentage of that purchased) was subject to DESC's minority price preference.

W. As a result of DESC's auction of fuel contracts and its ten percent price preference for minority-owned suppliers, DESC paid Plaintiffs prices for military fuel that were materially below fair market value and were not fair and reasonable.

5. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Count I of Sunoco's Amended Complaint, Sunoco requires discovery to establish the following allegations at paragraphs 38 to 45 of its Complaint:

A. DESC knowingly awarded and administered Plaintiffs' contracts in violation, *inter alia*, of FAR § 16.203 by basing price adjustments on indexes rather than on Plaintiffs' own established fuel prices.

B. Even if FAR § 16.203 permitted DESC to base price adjustments on indexes rather than on Plaintiffs' own established fuel prices, DESC knowingly awarded and administered Plaintiffs' contracts in violation, *inter alia*, of FAR § 16.203 by basing price adjustments on indexes that were not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel.

C. DESC knowingly awarded and administered Plaintiffs' contracts in violation, *inter alia*, of FAR § 15.802(b) [currently codified at FAR § 15.402(a)] by using PMM and other indexes to establish prices for military fuel that were not fair and reasonable.

D. DESC knowingly awarded and administered each of Plaintiffs' contracts in violation, *inter alia*, of the Office of Federal Procurement Policy Act and its implementing regulations (and, prior to its enactment, FAR § 15.610) by using prohibited auction techniques, whereby DESC awarded contracts to bidders that agreed to match other bidders' prices.

E. DESC knowingly awarded and administered Plaintiffs' contracts in violation, *inter alia*, of DOD Federal Acquisition Regulation ("DFAR") pt. 219 by improperly soliciting and awarding portions of the procurements set aside for small businesses together with those for large businesses.

F. DESC knowingly awarded and administered Plaintiffs' contracts in violation, *inter alia*, of the equal protection component of the fifth amendment's due process clause by extending to minority-owned businesses bidding preferences that were not narrowly tailored to further a compelling governmental interest.

G. DESC thus combined its substantial market power and substantial ability to affect the price of military fuel with a knowing violation of law and regulation to reduce the price it paid for military fuel below fair market value.

H. DESC's violation of law and regulation in awarding and administering Plaintiffs' contracts damaged Plaintiffs.

6. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Count II of Sunoco's Amended Complaint, Sunoco requires discovery to establish the following allegations at paragraphs 48 to 59 of its Complaint:

A. DESC knowingly awarded and administered Plaintiffs' contracts in violation of law and regulation.

B. In awarding and administering Plaintiffs' contracts, DESC knowingly based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of DESC's price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

C. In awarding and administering Plaintiffs' contracts, DESC knowingly based price adjustments on PMM and other indexes that were not designed or intended to be used to set or adjust prices and which did not reflect at least the fair market value of military fuel.

D. In awarding and administering Plaintiffs' contracts, DESC knew that the contracts did not provide for payment of at least the fair market value of military fuel and knew that the contracts did not provide for fair and reasonable prices.

E. In awarding and administering Plaintiffs' contracts, DESC worked with DOE to determine how PMM was published and to "see that our needs are satisfied as . . . one of the primary users of PMM."

F. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose its violation of law and regulation.

G. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that it based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

H. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that

PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value.

I. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that the contracts did not provide for payment of at least fair market value for military fuel and did not provide for fair and reasonable prices.

J. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that DESC worked with DOE to determine how PMM was published and to "see that our needs are satisfied as . . . one of the primary users of PMM."

K. Plaintiffs reasonably relied upon DESC's material and/or fraudulent misrepresentations as an inducement to enter the contracts.

L. DESC's material and/or fraudulent misrepresentations damaged Plaintiffs.

7. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Count III of Sunoco's Amended Complaint, Sunoco requires discovery to establish the following allegations at paragraphs 62 to 73 of its Complaint:

A. DESC's compliance with law and regulation in awarding and administering the contracts was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

B. DESC's basing price adjustments on PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

C. DESC's basing price adjustments on standards that were designed or intended to be used to set or adjust prices and which reflected at least the fair market value of fuel was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

D. DESC's paying at least fair market value for military fuel and DESC's paying fair and reasonable prices were material conditions of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

E. DESC's negotiating and administering the contracts in good faith was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts.

F. In contravention of DESC's contractual obligations, DESC violated law and regulation in awarding and administering the contracts.

G. In contravention of DESC's contractual obligations, DESC based price adjustments on PMM and other indexes that were not adequate to accomplish

the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

H. In contravention of DESC's contractual obligations, DESC based price adjustments on standards such as PMM and other indexes that were not designed or intended to be used to set or adjust prices and which did not reflect at least the fair market value of fuel.

I. In contravention of DESC's contractual obligations, DESC did not pay at least fair market value for military fuel and did not pay fair and reasonable prices for fuel.

J. In contravention of DESC's contractual obligations, DESC did not negotiate and administer the contracts in good faith. Instead, DESC used a non-negotiable illegal price adjustment clause that based price adjustments on PMM and other indexes, and worked with DOE to determine how PMM was published and to "see that our needs are satisfied as . . . one of the primary users of PMM."

K. DESC's contravention of its contractual obligation constituted breach of contract.

L. DESC's breach of contract damaged Plaintiffs.

8. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Count IV of Sunoco's Amended Complaint, Sunoco requires discovery to establish the following allegations at paragraphs 76 to 79 of its Complaint:

A. DESC knowingly awarded and administered Plaintiffs' contracts in violation of law and regulation.

B. DESC's violation of law and regulation in awarding and administering Plaintiffs' contracts rendered at least the price terms of Plaintiffs' contracts invalid and unenforceable.

C. DESC's violation of law and regulation in awarding and administering Plaintiffs' contracts damaged Plaintiffs.

D. At least the pricing terms of Plaintiffs' contracts are replaced by an implied-in-fact contract to pay the fair market value of the fuel Plaintiffs delivered to DESC.

9. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Count V of Sunoco's Amended Complaint, Sunoco requires discovery to establish the following allegations at paragraphs 82 to 97 of its Complaint:

A. DESC's compliance with law and regulation in awarding and administering the contracts was a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

B. DESC's basing price adjustments on PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value was a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

C. DESC's basing price adjustments on standards that were designed or intended to be used to set or adjust prices and that reflected at least the fair market value of fuel was a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

D. DESC's paying at least fair market value for the military fuel it purchased and DESC's paying fair and reasonable prices were a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

E. DESC's negotiating the contracts in good faith was a material part of the consideration upon which Plaintiffs reasonably relied in entering the contracts and a material purpose of the contracts.

F. DESC violated law and regulation in awarding and administering the contracts.

G. DESC based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protecting against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

H. DESC based price adjustments on PMM and other indexes that were not designed or intended to be used to set or adjust prices and that did not reflect at least fair market value.

I. DESC did not pay at least fair market value for military fuel or pay fair and reasonable prices.

J. DESC did not negotiate the contracts in good faith.

K. DESC's violation of law and regulation in awarding and administering the contracts constituted a failure of consideration and frustrated the purpose of the contracts.

L. DESC's failure to base price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value constituted a failure of consideration and frustrated the purpose of the contracts.

M. DESC's use of PMM and other indexes that were not designed or intended to be used to set or adjust prices and that did not reflect at least fair market value constituted a failure of consideration and frustrated the purpose of the contracts.

N. DESC's failure to pay at least fair market value for military fuel and its failure to pay fair and reasonable prices constituted a failure of consideration and frustrated the purpose of the contracts.

O. DESC's failure to negotiate the contracts in good faith constituted a failure of consideration and frustrated the purpose of the contracts.

P. This failure of consideration and frustration of the purpose of the contracts damaged Plaintiffs.

10. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Count VI of Sunoco's Amended Complaint, Sunoco requires discovery to establish the following allegations at paragraphs 109 to 124 of its Complaint:

A. Plaintiffs entered and performed the contracts with the intent that they comply with law and regulation. This was a material condition upon which Plaintiffs reasonably relied in entering the contracts.

B. Plaintiffs entered and performed the contracts with the intent that PMM and other indexes were adequate to accomplish the stated purposes of DESC's price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value. This was a material condition upon which Plaintiffs reasonably relied in entering the contracts.

C. Plaintiffs entered and performed the contracts with the intent that the standards used to make price adjustments were designed or intended to be used to set or adjust prices and reflected at least fair market value. This was a material condition upon which Plaintiffs reasonably relied in entering the contracts.

D. Plaintiffs entered and performed the contracts with the intent that DESC pay at least fair market value for military fuel and pay fair and reasonable prices. This was a material condition upon which Plaintiffs reasonably relied in entering the contracts.

E. DESC did not comply with law and regulation in awarding and administering the contracts.

F. DESC did not use PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

G. DESC based price adjustments on PMM and other indexes that were not designed or intended to be used to set or adjust prices and that did not reflect at least fair market value.

H. DESC did not pay fair market value for military fuel or pay fair and reasonable prices.

I. If DESC did not knowingly award and administer the contracts in violation of law and regulation, as alleged above, then DESC must be presumed to

have intended to award and administer the contracts in accordance with law and regulation.

J. If DESC did not know that the PMM and other indexes were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value, as alleged above, then DESC must be presumed to have used the PMM and other indexes with the intent that they were adequate to accomplish the stated purposes of its price adjustment clause.

K. If DESC did not know that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value, as alleged above, then DESC must be presumed to have used PMM and other indexes with the intent that they were designed or intended to be used to set or adjust prices and reflected at least fair market value.

L. If DESC did not knowingly fail to pay at least fair market value for military fuel and did not knowingly fail to pay prices that were fair and reasonable, as alleged above, then DESC must be presumed to have intended to pay at least fair market value for military fuel and to have intended to pay fair and reasonable prices.

M. As a result of a mistake, DESC and Plaintiffs entered and performed the contracts in violation of law and regulation.

N. As a result of a mistake, DESC and Plaintiffs entered and performed the contracts using the PMM and other indexes that were not adequate to accomplish the stated purposes of DESC's price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

O. As a result of a mistake, DESC and Plaintiffs entered and performed the contracts using PMM and other indexes that were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value.

P. As a result of a mistake, DESC and Plaintiffs entered and performed the contracts that did not provide for the payment of at least fair market value for military fuel and did not provide for payment of fair and reasonable prices.

Q. If DESC and Plaintiffs had not been mistaken, DESC and Plaintiffs would not have entered and performed the contracts in violation of law and regulation.

R. If DESC and Plaintiffs had not been mistaken, DESC and Plaintiffs would not have entered and performed the contracts using the PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

S. If DESC and Plaintiffs had not been mistaken, DESC and Plaintiffs would not have entered and performed the contracts using PMM and other indexes to set or adjust prices.

T. If DESC and Plaintiffs had not been mistaken, DESC and Plaintiffs would not have entered and performed the contracts that did not provide for the payment of at least fair market value for military fuel and did not provide for payment of fair and reasonable prices.

U. Alternatively, if DESC was not mistaken in awarding and administering contracts in violation of law and regulation, then DESC knew or should have known of Plaintiffs' mistake and failed to meet its duty timely to disclose this mistake to Plaintiffs.

V. Alternatively, if DESC was not mistaken in awarding and performing the contracts using the PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value, then DESC knew or should have known of Plaintiffs' mistake and failed to meet its duty timely to disclose this mistake to Plaintiffs.

W. Alternatively, if DESC was not mistaken in awarding and performing contracts using PMM and other indexes to set or adjust prices, then DESC knew or should have known of Plaintiffs' mistake and failed to meet its duty timely to disclose this mistake to Plaintiffs.

X. Alternatively, if DESC was not mistaken in entering and performing contracts that did not provide for payment of at least fair market value for military fuel and that did not provide for payment of fair and reasonable prices, then DESC knew or should have known of Plaintiffs' mistake and failed to meet its duty timely to disclose this mistake to Plaintiffs.

Y. The parties' mutual mistake and/or DESC's failure to disclose Plaintiffs' unilateral mistake damaged Plaintiffs.

11. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Count VII of Sunoco's Amended Complaint, Sunoco requires discovery to establish the following allegations at paragraphs 127 to 133 of its Complaint:

A. With no fully supporting claim of right, DESC took possession of and infringed upon Plaintiffs' property rights in and in relation to the fuel it delivered.

B. DESC's taking of Plaintiffs' property was for a public purpose.

C. To the extent that DESC's taking of Plaintiffs' property was effected in conjunction with a violation of law and regulation, DESC acted within the general scope of its authority to procure the fuel.

D. DESC effected a taking of Plaintiffs' property within the meaning of the Fifth Amendment of the United States Constitution.

E. DESC has not paid Plaintiffs just compensation for the taking of Plaintiffs' property.

F. DESC's failure to pay Plaintiffs just compensation for the taking of its property violated the Fifth Amendment of the United States Constitution and thereby damaged Plaintiffs.

12. With respect to DESC's affirmative defense of waiver, Sunoco requires full discovery concerning negotiation, award and performance of the fuel contracts, and concerning DESC's prices and indexes in the fuel contracts, in order to present by affidavit or other sworn testimony facts essential to its opposition concerning DESC's allegation that:

A. Sunoco intentionally relinquished any known rights with respect to the fuel contracts it entered with DESC.

I declare under penalty of perjury that the forgoing is true and correct.

Executed January 17, 2006.

J. Keith Burt