# SECOND SUPPLEMENTAL APPENDIX

Page 506

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BARRETT REFINING CORPORATION, )
Plaintiff, )
v. ) No.: 96-15C
) 96-724C
THE UNITED STATES, ) 96-725C
) 96-726C
Defendant. ) 97-321C

*Courtroom 3*
National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Wednesday,
July 29, 1998

The parties met, pursuant to the notice of the Judge, at 9:07 a.m.

BEFORE: HON. ERIC G. BRUGGINK
Associate Judge

APPEARANCES:

For the Plaintiff:
JAMES D. BACHMAN, ESQ.
ALICE D'ONAFRIO
Doyle & Bachman
919 18th Street, N.W.
Washington, D.C. 20006
(202) 659-4740
JOHN A. BARRETT, JR.
President, Barrett Refining Corp.
1210 Gordon Cooper Drive
Shawnee, Oklahoma 74801

Page 507

*APPEARANCES: (continued)*

For the Defendant:
SHERRY L. FLOYD, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-8278
KAREN E. SCHOOLS, ESQ.
Defense Fuel Supply Center (DFSC-G)
8725 John J. Kingman Road, Suite 4950
Fort Belvoir, Virginia 22060-6222
(703) 767-5010
//
//
//
//
//
//
//
//

Page 508

C O N T E N T S

VOIR

*WITNESSES: DIRECT CROSS REDIRECT RECROSS DIRE*

For the Defendant:
Robert Myrben 514 524 531 532 –
Henry Steven Prime 533 556 564 – –
John Harold Ayers 568 588 – – –
Edith Duhaine 589 614 – – –
John S. Cook 618 632 – – –
Lawrence Calvin Ervin 634 656 668 670 –
George Roland Schink 671 – – – –
//
//
//
//

Page 509

*E X H I B I T S*

PLAINTIFF'S

EXHIBITS: IDENTIFIED RECEIVED DESCRIPTION

226 561 – Bid evaluation model
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//



/

AFTERNOON SESSION

1:25 p.m.

THE CLERK: Court is back in session.

Whereupon,

EDITH DUHAINE

having been previously duly sworn, was recalled as a witness herein and was examined and testified further as follows:

THE COURT: All right, Mr. Bachman, are your ready to proceed?

MR. BACHMAN: Yes, Your Honor, I have no further questions of this witness.

THE COURT: All right.

Any redirect?

MS. SCHOOLS: No other questions, Your Honor.

THE COURT: Thank you very much. You may step down.

(Witness excused.)

THE COURT: Ready for your next witness?

MS. FLOYD: Yes, Your Honor. The Government calls Mr. John Cook as its next witness.

THE COURT: Mr. Cook, if you would raise your right hand.



Whereupon,

JOHN S. COOK

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

THE COURT: Thank you. Have a seat.

DIRECT EXAMINATION

BY MS. FLOYD:

*Q Could you please state your full name for the record?*

A John S. Cook.

*Q By whom are you employed?*

A The Department of Energy, the Energy Information Administration.

*Q What is your title?*

A I am currently director of the Petroleum Division within the Office of Oil and Gas.

*Q Are you located in Washington, D.C.?*

A Yes.

*Q Can you state what your educational background is, please?*

A I have a Ph.D. in economics and Master's Degrees in both economics and mathematics.

*Q Can you elaborate on your experience following your Ph.D.?*

A I spent three years teaching graduate-level



economics courses at the University of South Carolina; five years at the Bureau of Labor Statistics, first as an economist and then as a Branch Chief, doing research on service industry pricing; and then the last 18 years at the Department and the Energy Information Administration with petroleum statistics.

*Q All right. Can you describe your responsibilities in your current position?*

A Okay. Basically, we do petroleum analyses and short-term forecasting functions. We collect a lot of data on crude oil and refined products, supplies, and prices, and we publish them in the PMM.

THE COURT: What is PMM?

THE WITNESS: I'm sorry. That's the Petroleum Marketing Monthly.

THE COURT: It is your own publication?

THE WITNESS: It's our own publication. It comes out monthly. It has average prices for crude oil and gasoline, distillates, those kinds of things. We publish them at the state level and at regional levels, like the East Coast and national-level figures.

THE COURT: Okay.

BY MS. FLOYD:

*Q Can you describe, also, what the Energy Information Administration is?*



A Basically, it does two things. For all the energy sources, including coal, electricity, and natural gas, as well as petroleum, we do analyses, special studies for Congress and other interested parties, short-term and long-term forecasting and collect and publish data on coal, electricity, the various energy sources.

THE COURT: Does that satisfy some statutory duty?

THE WITNESS: Yes. The Agency was formed in '77 by the Department of Energy Act. The data programs themselves are required by the Federal Energy Emergency Act. There are a number of other statutes that require a centralized energy data base for prices and supplies, and so these programs are all in response to those legislative mandates.

THE COURT: Well, who is your primary customer or client for that data?

THE WITNESS: Virtually, every sector of the market uses the data. State energy offices are a key user, given that the data are at the state level. They not only use it to forecast and to track the market, but, for example, they work with Health and Human Services to assist the poor in paying their energy bills. You get a price spike like we saw in heating oil in 1996, and a lot of the low-income families can't pay their bills.

Congress will pass a supplementary appropriation,



2

Page 621

and these price data are used, along with others, to allocate out the extra funding to the various states.
Most -- know, the heating oil is consumed in the Northeast, which is also where the higher prices are, so those states, in using those data, qualify for a larger share of the allocation.
A lot of other examples -- the Bureau of Economic Analysis uses the price data as input to various tables that they do in preparing the gross domestic product. BLS themselves uses the data in putting out their International Pricing Index.
GAO, like us, has used the price data on a number of occasions to analyze the factors driving prices up, like in '96, when we had gasoline spikes.
The Northeast Congressional Coalition, some 200 state Congressional offices, are very attune to the data, again, because they tend to be the consuming states in the Northeast and pay the higher prices. So they have a number of programs that they watch, including the Low-Income Energy Assistance Program, the Weatherization Programs, and Energy Efficiency Programs, where the data are used to help them formulate legislation and what not.
THE COURT: Is it just retail prices you track, or --
THE WITNESS: No, both wholesale and resale --

Page 622

retail. For example, in gasoline, you got it all. It's broken out by the type of gasoline we formulated -- conventional, what have you, bulk transactions at the wholesale level, spot -- in other words, transactions -- Rack transactions and dealer tank wagons are all identified.
The retail level, you have, basically, just two categories. Sales -- pump sales, through company outlets, and other end-user sales.
The distillate market is broken out into the various standard end-use categories -- residential, industrial, commercial, and what have you.
The wholesale transactions are basically just A-category.
THE COURT: Such as what?
THE WITNESS: It includes all types of transactions, spots, and contracts, but they're not broken out. The wholesale market, basically, is only broken out into bulk, rack, what have you, in the gasoline for the gasoline --
THE COURT: By product?
THE WITNESS: -- price. The other products are not as detailed at the wholesale level. Gasoline is, but not the distillates and resids. There's more detail in the retail end of the distillates than there is for gasoline, primarily because of the, the consumer -- or the customer

Page 623

use.
Again, the states and various energy committees and staffers -- the Northeast Midwest Coalition -- are heavy users of the data and were involved in developing the forms, and these seem to be the categories that they were most interested in.
THE COURT: We are talking about actual purchasers using the data, or Governmental entities that are not doing purchasing?
THE WITNESS: More Governmental users.
THE COURT: Is there some statutory duty on the part of the sellers or the buyers to make -- report the data?
THE WITNESS: Yes, Your Honor, it is mandatory. Again, the FEA Act makes it mandatory that all energy firms report these kinds of data to the Department. There are --
THE COURT: Is it data at the microscopic level, or is it -- is their lumping together of sales, or how does that work?
THE WITNESS: Well, a refiner, again for gasoline, will have to -- for each state that they do business in, report for each of these categories the total amount of monthly sales, bulk transactions, for example, or retail outlet transactions, and the average price of all those transactions that occurred in that month.

Page 624

So they will have to keep detailed accounting, computerized accounting records, to report that data to us. And once the data comes in, their, their process -- aggregated, averaged up to the state level across all the companies that report to us, and then averaged further to regional levels and national levels.
THE COURT: What actually gets printed in your report?
THE WITNESS: Okay. For gasoline, again, you'll have -- for the State of Virginia, you'll have an average price for reformulated gasoline --
THE COURT: We are talking about at the wholesale level?
THE WITNESS: Both. That's what --
THE COURT: All right.
THE WITNESS: -- I was going to say. For reformulated gasoline, you'll have the pump price, the retail price. You'll also have the rack price. At the wholesale level, the bulk price, the dealer tank wagon price, and you'll have it split further for conventional gasoline.
Central Virginia uses conventional, so they'll be prices state level that aren't, per se, you know, Central Virginia, just not disaggregated that far. But, you know, it's a common use of the data since that's where that

Page 625

consumption occurs.
Heating oil -- on the retail side, you'd have for Virginia residential prices, industrial prices, commercial prices, agricultural prices, and then you would have the wholesale price.
BY MS. FLOYD:
*Q I would like to have you turn to Defendant's Exhibit 145, page 75, and that should be in a binder right on your left, probably fourth binder in on 45, and then if you could, turn to page 75 of Exhibit 145.*
A Page 75?
*Q I am sorry. Exhibit 145.*
A Okay. You lift it out of here, right? Okay.
*Q And page 75.*
A Okay.
*Q Okay. At page 76, can you identify what this document is? It extends to page 89.*
A Okay. This is the form, the 782A that we collect these data I was talking about on.
(The document referred to was marked for identification as Defendant's Exhibit 145.)
*Q Is this the track form that is used, to your knowledge?*
A Yes. You can tell from the numbers in the right-

Page 626

hand corner.
*Q Can you explain how this form is used, with particular attention to kerosene-based jet fuel?*
A Okay. Well, the form itself is mailed -- or companies sometimes get them electronically now -- to the various refiners that are expected to fill the forms out, and within 20 to 30 days after the reference month, which, for example, if it's January of this year, 1998, and they've kept their records, they would simply report for all the states that they do jet fuel business in. The total volume on line 213 --
*Q And --*
A -- the average price --
*Q -- what page of the document are you referring to?*
A Well, I'm using -- I think it's 78.
*Q Okay. Can you --*
A Page 78.
*Q Where is 213?*
A That's the fourth line down for jet fuel.
*Q Under "Part 4, Monthly State Sales of Other Petroleum Products"?*
A Right. They report any retail sales and wholesale sales, for example.
*Q How would they report this?*
A Well, they can fill it out if it comes out of

Page 627

their computer records, depending on how automated they are.
They get a printout, and they should have a system that would give them this specific price, and they can transcribe it over. Some of them actually have these forms computerized, where they can take data directly out of their data base and put it on the form and then e-mail it to us, so that they don't have to even transcribe it any longer.
But, basically, they keep the totals and the average prices, and they put them on these lines and mail them to us.
*Q Okay.*
THE COURT: How much time do they have to get this data in for any particular period?
THE WITNESS: It's due 30 days after the reference month, so that'd be the end of February for January data. If it isn't in by 10 days after that, they'll get a call to remind them that the form is due.
THE COURT: Does that happen very often?
THE WITNESS: Yes. It's not unusual to have a non-response, initial anyway, early in the cycle, especially with downsizing going on in the industry and what not. Resources are tight, and -- but they get them in. The *response rate is pretty close to 100 percent -- 97 percent.*
THE COURT: When you get late data, do you plug it in to the period that it originally belonged in, or --

Page 628

THE WITNESS: Yes. We have a preliminary and a final publication system. The preliminary data for January would come out, and 60 days later, the March/April time frame, and we might not have full reporting by then, so we would impute for the handful of missing jet fuel refiners, but then by the following month, when the data are final, we'd have virtually all of them, and those data would go in for January and come out in April or May.
BY MS. FLOYD:
*Q Okay. This form that we have in front of us, has this form been modified over the years?*
A Yes, it has. With the Clean Air Act and the introduction of reformulated gasoline, that's when we detail
the gasoline products to the degree that you now see them on
the previous page.
*Q But in terms of the kerosene-type jet fuel, has this form remained pretty much the same since the period, say, 1991?*
A Yes, ma'am.
*Q Now, when the Energy Information Administration reports this data, can you describe the manner in which it reports the information that you've obtained from this group of people.*
A Okay. It comes out in the Petroleum Marketing Monthly, in hard copy, to a subscriber list. Respondents

Page 629

get it for free -- not for free since they had to supply the data -- but, in return.

It goes out to many of the customers that I mentioned earlier in hard copy, but it's also put on the Internet, and we have electronic bulletin boards, where it's made available.

THE COURT: Uh-huh.

THE WITNESS: -- for customers who want to pull it in more quickly.

Company analysts, for example, will load the data into their spread sheets for tracking markets, as quickly as they can get it off the Internet, which is usually three weeks earlier than the hard copy.

THE COURT: Is the term "price" defined anywhere in your instructions?

THE WITNESS: Types of prices, but not the term "price" itself. It is --

THE COURT: What I gather from what I have heard is that people have different means of coming up with a net price to a customer, in lieu of discounts and add-ons and everything else. What are you asking for?

THE WITNESS: Yes, indeed. Any discounts or premium that are charged for a given type of transaction are to be included in the averages that are reported to us. So in residential heating oil, if the sale is to a certain

Page 630

customer, cash or paid within seven days or something like that, that would be one price.

That would be averaged up for that company, compared to other customers that may be on a different arrangement, a credit arrangement, or a capped fixed price arrangement, or what have you, a full-service contract, or whatever.

Lots of different types of residential prices to their customers they might have for that state and that month, and they're all averaged together and reported for that month.

BY MS. FLOYD:

*Q If, say, a company has a posted price with a discount, what would you want to be reported to you?*

A The actual average -- the actual transactions price. If for that family -- that heating oil firm, actually billed them for posted minus the discount, and, you know, even if taxes were involved and what not, we would -- we'd want the taxes taken out, and that's the way we do this. But we will want the actual average price for that company over all of the transactions for that state for that month, so for that customer, it would be what you said -- posted minus the discount today.

If they pay cash, that's the way it is. It's posted minus some kind of discount for paying right away.

Page 631

*Q Okay. I believe you indicated earlier that the data is filed on a state-wide basis. Is that correct?*

A Yes.

*Q How is it reported to subscribers of the data theory? Does it report on a state-wide basis, or is it reported in groups? How do you report these?*

A You mean in the publication, the Monthly?

*Q Yes, the publication.*

A It's state level. There are summary tables in the front, 18 to 20 of them, that are national level and have a time series for, say, gasoline retail prices. And in the detail table or for each of these little individual gasoline markets by state.

*Q Now, have any changes in the processing or the methodology been made in the collection of data or the processing of data or the analysis of data or the recording of data with respect to the Petroleum Marketing Monthly since 1990?*

A No, no methodological changes recognizing that we -- we sample in heating oil, for example -- the bulk of that residential market is conducted by small mom-and-pop-type firms, and we have a sample of those wholesalers and distributors, and we will resample from time to time. But that's not a change, that's part of the program.

In jet fuel, we have a census of refiners only, so

Page 632

it's irrelevant in that case. It just goes every month, all the refiners, and they do what I said, and we add them up, and that's it. We've been doing that for 18 years.

MS. FLOYD: I have no further questions, Your Honor.

CROSS-EXAMINATION

BY MR. BACHMAN:

*Q In connection with your purpose at Department of Energy for preparing this publication, do you believe it's your responsibility to prepare the PMM to be used as a price index for contracting purposes by industry in buying and selling refined products? Do you publish the PMM for purposes of using it as a price index, like OPIS or Platt's?*

A We're not opposed to it being used for that purpose. We don't, per se, collect the data and justify its collection with OMB for that specific use.

We justify its collection on the basis of its general value in measuring actual average prices, wholesale and retail, for everything from crude oil from the wellhead to the pump for state energy offices or various federal agencies, and most especially for Congressional committees for analysis purposes, forecasting, market tracking, all those uses.

It's, it's, it happens to be useful, according to oil companies and DFSC for indexing, as well, but we didn't

specifically design it for that.

*Q Okay. Your statutory authorization, were you mandated to prepare it for that purpose, or is it for the purpose of, like, advising Congress on the fuel costs for the poor, heating oil cost?*

A It's more the latter.

*Q What is the latter? I –*

A Advising Congress on market conditions, state energy offices on market conditions, price behavior, in general.

*Q Okay. If there was an error in this index, could a refiner sue you?*

A Never had one sue me.

*Q Do you believe you have a fiduciary obligation to the refining industry in connection with the publication of this index, if it's even intended as an index?*

A No. I think I have a responsibility to protect their data, to keep it confidential. If they were going to sue me, it might be over that, that I had somehow leaked their proprietary data out, but they owe me the data for market tracking purposes, and they're supposed to make it accurate to me, and to the best of my knowledge, especially in jet fuel, it's a very accurate series.

*Q Do you track your data with OPIS and/or Platt's?*

A We compare it with a number of things, not just



OPIS and Platt's, recognizing that there's a lot of products here. For gasoline, for example, we track our data – price data with BLS, the volume data with another EI series, we refer to as the Products Supplied Series.

We also track it with federal highway usage data.

Heating oil, likewise – our prices are compared with BLS prices.

MR. BACHMAN: I have no further questions, Your Honor.

MS. FLOYD: I have no redirect, Your Honor.

THE COURT: All right. Thank you, sir. You can step down.

(Witness excused.)

MS. FLOYD: Your Honor, Mr. Larry Ervin will be our next witness, and Ms. Karen Schools will be examining him.

THE COURT: All right. All right.

Mr. Ervin, if you would raise your right hand.

Whereupon,

LAWRENCE CALVIN ERVIN

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

THE COURT: Thank you, have a seat.

//

//



DIRECT EXAMINATION

BY MS. SCHOOLS:

*Q Good afternoon. What is your full name?*

A Lawrence Calvin Ervin.

*Q What is your current position?*

A I'm the Acting Director of the Office of Market Research and Competition at the Defense Energy Support Center.

*Q What is your educational background?*

A I attended the University of Maryland in College Park, up the road here. I received a Bachelor's of Arts in economics in 1975, and a Master's of Science in Agricultural and Resource Economics in 1980.

*Q How long have you been employed by the Defense Fuel Supply Center?*

A Since September of 1980.

*Q What positions have you held at the Defense Fuel Supply Center?*

A I've been employed as a staff member in the office where I – which I currently direct, as – I've been employed as an industry economist, as a market research analyst, as the liaison officer and manager of the Center's Strategic Petroleum Reserve Program and also as Acting Director – I was also called Acting Chief during one period when our organization was slightly different.



*Q What have your responsibilities been in these positions?*

A Analysis of industry information, pricing data, supply statistics, news, and current event-type analysis. Analyses of pricing material and provision of pricing-related material to other offices at the Field Center, mostly, our Comptroller and our Procurement Divisions, our buying divisions.

*Q As part of your responsibilities in the Office of Market Research, did you assist in developing the EPA clauses that appear in DFSC's contracts?*

A Yes, I did.

*Q Why was an EPA clause included in these contracts?*

A We wanted our prices to reflect, as closely as possible, market levels for the same or similar commercial fuels in the marketplace. We wanted our prices to – and I think the concern there is, at least partly, that they not be, you know, reflect too poorly on the upside, obviously, that we wanted the prices to go up and also down when market prices of the similar fuels went down.

So, it was mainly a case of risk sharing, I guess, with our contractors of the market price fluctuations.

*Q Was your office involved in the selection of escalators that were used in the EPA clause?*

A Yes.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - X
LA GLORIA OIL AND GAS :
COMPANY, :
Plaintiff, :
vs. : No. 02-465C
THE UNITED STATES, : (Judge Hewitt)
Defendant. :
- - - - - - - - - - - - - - X Pages 1-50

Deposition of JACOB BOURNAZIAN
District of Columbia
Wednesday, December 3, 2003

Reported by: Marilyn Feldman, RPR
Job No. 156784

0



December 3, 2003
10:00 a.m.



7

the PMM back to the 1980s?
A. Yes.
Q. Are they all currently employed by EIA?
A. Yes.
Q. To your knowledge, none of the project managers from the PMM from the early 1980s to now have left the agency; is that correct?



A. Yes.
Q. Let's turn to the first request, request no. 17, which is on page 6 of Plaintiff's Exhibit 2. Request 17 reads: "All documents relating to communications between DESC and EIA concerning use of the PMM index to adjust prices in DESC's price adjustment clauses."
What efforts did you undertake to collect documents in response to that and what did you find?
A. First, in response to that request there was confusion in our organization on the use of the term "indices" because that's not a term we use and we don't -- an index is a ratio of two numbers with a baseline being in the denominator, but we only publish statistics prices. So my assumption is you meant just price data when you used the word index. Is that correct?
Q. I think that's a fair assumption.
A. Okay. So the efforts in responding to 17, everyone was asked to check if they have any

U.S. DEPARTMENT OF ENERGY
Energy Information Administration

Form Expires: 12/31/03

# EIA-782A:
# REFINERS'/GAS PLANT OPERATORS' MONTHLY PETROLEUM PRODUCT SALES REPORT

Schedule I

This report is mandatory under Public Law 93-275. Failure to comply may result in criminal fines, civil penalties and other sanctions as provided by law. *For the provisions concerning the confidentiality of information submitted on this form, see Section VI of the instructions.* *Public reporting* burden for this collection of information is estimated to average 14.4 hours per response, including the time of reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Energy Information Administration, Office of Statistical Standards EI-73, Mail Station: 2F-081 Forrestal, 1000 Independence Ave. SW, Washington, DC 20585; *and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.*

## PART I. IDENTIFICATION DATA

*Complete items 1 thru 7 for new respondents and corrections to label only.*

1. Name
2. Name of Contact Person
3. Contact's Telephone Number ( ) -
4. Street/Box/RFD
5. City
6. State
7. Zip Code

*For assistance in completing this form, call (800) 638-8812.*

8. Reference Month

| Mo | Yr |
|---|---|
| | |

9. Type of Report *(Check one)*

(1) ☐ Original
(2) ☐ Revision, to Report Dated:

| Mo | Day | Yr |
|---|---|---|
| | | |

10. The Number of States For Which You Are Reporting

11. Date of This Report

| Mo | Day | Yr |
|---|---|---|
| | | |

12. Type of Entity *(Check one)*

(1) ☐ Refiner/ Gas Plant Operator
(2) ☐ Reseller
(3) ☐ Reseller/Retailer
(4) ☐ Retailer

13. Which of the following best describes this firm at the end of this reference month?

(1) ☐ In operation
(2) ☐ Temporarily or seasonally inactive
(3) ☐ Sold or leased to another . . . See the Specific Instructions
(4) ☐ Permanently ceased operation . . . See the Specific Instructions

## PART II. CERTIFICATION

I certify that the information provided herein and appended hereto is true and accurate to the best of my knowledge.

14. Name
15. Title
16. Signature
17. Date of Signing

Title 18 USC 1001 makes it a criminal offense for any person knowingly and willingly to make to any Agency or Department of the United States any false, fictitious or fraudulent statements as to any matter within its jurisdiction.

# REFINERS'/GAS PLANT OPERATORS' MONTHLY PETROLEUM PRODUCT SALES REPORT

Schedule II

**IDENTIFICATION DATA**

Firm Name

2. DOE Identification Number

3. Page ____ of ____

. Reference Month — Mo / Yr

5. Type of Report *(Check one)*
(1) ☐ Original
(2) ☐ Revision, to Report Dated — Mo / Da / Yr

6. Enter the abbreviation of the state for which this schedule is being filed.
A separate Schedule II should be filed for each state. *(See Appendix A for state abbreviations.)* STATE

**PART III. MONTHLY STATE SALES OF FINISHED MOTOR GASOLINE** *(Report volumes in thousands gal.; prices in $0.000 per gal.)*

| Line No. | Product *(Refer to definitions)* | RETAIL SALES *(Direct Sales to End-Users)* — SALES THROUGH COMPANY-OPERATED RETAIL OUTLETS (1) | | RETAIL SALES — SALES TO OTHER END-USERS (2) | | WHOLESALE SALES (Sales for Resale) (3) | |
|---|---|---|---|---|---|---|---|
| | Finished Motor Gasoline | Volume *(a)* | Unit Price *(b)* | Volume *(c)* | Unit Price *(d)* | Volume *(e)* | Unit Price *(f)* |
| 7 | Leaded Regular | | | | | | |
| 8.1 | Unleaded Regular | | | | | | |
| 8.2 | Unleaded Midgrade | | | | | | |
| 9 | Premium | | | | | | |

**PART IV. MONTHLY STATE SALES OF NO. 2 DISTILLATES** *(Report volumes in thousands gal.; prices in $0.000 per gal.)*

| | Product *(Refer to definitions)* | RETAIL SALES (Direct Sales to End-Users) — RESIDENTIAL SALES (1) | | COMMERCIAL/ INSTITUTIONAL SALES (2) | | INDUSTRIAL SALES (3) | | SALES THROUGH COMPANY-OPERATED RETAIL OUTLETS (4) | | SALES TO OTHER END-USERS (Includes Sales to Utilities and Agriculture) (5) | | WHOLESALE SALES (Sales for Resale) (6) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Volume *(a)* | Unit Price *(b)* | Volume *(c)* | Unit Price *(d)* | Volume *(e)* | Unit Price *(f)* | Volume *(g)* | Unit Price *(h)* | Volume *(i)* | Unit Price *(j)* | Volume *(k)* | Unit Price *(l)* |
| 10 | No. 2 Diesel Fuel | | | | | | | | | | | | |
| 11 | No. 2 Fuel Oil | | | | | | | | | | | | |

**PART V. MONTHLY STATE SALES OF OTHER PETROLEUM PRODUCTS** *(Report volumes in thousands gal.; prices in $0.000 per gal.)*

| Line No. | Product *(Refer to definitions)* | RETAIL SALES (Direct Sales to End-Users) (1) | | WHOLESALE SALES (Sales for Resale) (2) | |
|---|---|---|---|---|---|
| | | Volume *(a)* | Unit Price *(b)* | Volume *(c)* | Unit Price *(d)* |
| 12 | No. 1 Distillate | | | | |
| 13 | Kerosene | | | | |
| 14 | Aviation Gasoline (Finished) | | | | |
| 15 | Kerosene-type Jet Fuel | | | | |
| 16 | No. 4 Fuel Oil | | | | |
| 17 | Residual Fuel Oil with 1 percent or less Sulfur | | | | |
| 18 | Residual Fuel Oil with greater than 1 percent Sulfur | | | | |
| 19 | Propane, Consumer Grade | | | | |



☆ U.S.G.P.O., 1989-617-010/60755

U.S. DEPARTMENT OF ENERGY
Energy Information Administration

Form Expires: 12/31/93

# INSTRUCTIONS FOR FILING THE EIA-782A: REFINERS'/GAS PLANT OPERATORS' MONTHLY PETROLEUM PRODUCT SALES REPORT

## GENERAL INFORMATION

### I. Purpose

The EIA-782A is designed to provide data on the sales of selected petroleum products (volumes and prices) to various categories of end-users and resellers by type of seller at the State level.

These data are collected pursuant to the provisions of the Federal Energy Administration (FEA) Act of 1974, P.L. 93-275. The data are used by the Department of Energy (DOE) in reviewing petroleum product supply, demand and price changes.

### II. Who Must Submit

Any firm that directly or indirectly controls a refinery or gas plant must prepare and file the EIA-782A each month.

### III. What and Where to Submit

Submit a single Schedule I as a cover sheet, and a separate Schedule II for each State in which the respondent sells one or more of the listed products. Send the completed EIA-782A to:

U.S. Department of Energy
Energy Information Administration
EI-43
Mail Station: BG-094 Forrestal
Washington, D.C. 20585

Certified computer printouts that are generally in the format of the EIA-782A will be accepted. Request DOE approval in advance by calling the number below if you plan to submit computer printouts.

If you have any questions concerning any of the EIA-782A instructions, call toll free (800) 638-8812. Firms located in Maryland should call (301) 495-8440.

### IV. When to Submit

The EIA-782A must be submitted to DOE no later than 30 calendar days after the close of each reference month. For example, if the reference month is June 1990, the report must be submitted to DOE by July 30, 1990.

### V. Sanctions

This report is mandatory under Public Law 93-275. Failure to comply with reporting requirements may result in criminal fines, civil penalties, and other sanctions as provided by law.

## GENERAL INFORMATION (Continued)

VI. Provisions Regarding Confidentiality of Information

The information contained on this form will be kept confidential and not disclosed to the public to the extent that it satisfies the criteria for exemption under the Freedom of Information Act (FOIA), 5 U.S.C. §552, the DOE regulations, 10 C.F.R. §1004.11, implementing the FOIA, and the Trade Secrets Act, 18 U.S.C. §1905.

Upon receipt of a request for this information under the FOIA, the DOE shall make a final determination whether the information is exempt from disclosure in accordance with the procedures and criteria provided in the regulations. To assist us in this determination, respondents should demonstrate to the DOE that, for example, their information contains trade secrets or commercial or financial information whose release would be likely to cause substantial harm to their company's competitive position. A letter accompanying the submission that explains (on an element-by-element basis) the reasons why the information would be likely to cause the respondent substantial competitive harm if released to the public would aid in this determination. A new justification does not need to be provided each time information is submitted on the form, if the company has previously submitted a justification for that information and the justification has not changed.

Except as otherwise provided by law, the information may be made available in response to an order of a Court of competent jurisdiction, or, upon request, to other components of the DOE, to any Committee of Congress, the General Accounting Office, or other Congressional agencies authorized by law to receive such information. Detailed provisions of the restrictions on the disclosure of this information can be found in the Policy on the Disclosure of Individually Identifiable Energy Information in the Possession of the EIA (45 Federal Register 59812 (1980)).

## GENERAL INSTRUCTIONS

I. To avoid double counting, respondents are to exclude sales to other companies (and their subsidiaries) who also report on the EIA-782A. A list of these companies is provided periodically to all respondents. Additional copies are available upon request.

II. Report all volumes in thousands of gallons; e.g., report 6,500 gallons as 7, and 6,400 gallons as 6. Leave both volume and price blank if no volumes were sold. Enter 1 for volumes between 0 and 1,499. Note: One barrel is equal to 42 gallons.

III. Enter data reflecting sales made during the reference month only. Exclude from all calculations any material prior period adjustments for volumes and/or prices, and revise the report(s) for the appropriate prior period(s).

Revisions to prior month's reports are required if previously reported prices or volume data are in error by more than plus or minus five percent (5%). All revisions must be submitted within 120 days after the end of the reference month. However, EIA must be notified of significant changes discovered after this date and will determine if a late resubmission is required.

Do not report negative volumes or prices; resubmit earlier reports instead.

IV. Report unit prices in decimals of U.S. dollars, expressed to the nearest tenth of a cent (e.g., $1.065). Unit prices are to be determined by dividing the total revenues derived from the sales of the product during the reference month by the total number of gallons sold. The unit price is the same as the weighted average price for all sales of that particular product to a particular group of customers or class-of-trade. The reported unit price should exclude all taxes on the sale of the petroleum product such as Federal, State, and local excise or sales taxes. Taxes in obtaining, importing, or producing petroleum products (such as crude oil or product importation tariffs, domestic crude oil taxes, facilities taxes, etc.) should not be excluded from

sales prices for EIA reporting purposes. For example, even though upstream expenses such as the Superfund tax may be shown as a separate line item on invoices of product sales, they should not be excluded from the reported sales price. Transportation costs that are paid as part of the sales price at the point of sale should be included in the reported unit price. Do not calculate unit prices using rounded volumes.

V. Report only the data for the products listed: DOE is not seeking full coverage of all petroleum products sold.

VI. Exclude amounts supplied to exchange partners except where the amount given up exceeds the amount received and the imbalance is invoiced as a sale during the reference month.

VII. If firms do not maintain information sufficient to provide actual sales volumes and unit prices by the customer categories specified on the forms, estimates of sales volumes and unit prices may be provided. The basis for the estimates must be consistent with the standard accounting records maintained by the firm. The estimating procedure and data supporting the estimates should result in a reasonably accurate estimate which will be subject to review.

VIII. Report sales in the State where the transfer of title occurred. For FOB sales at a refinery/terminal, the State is the one in which the refinery/terminal is located. For delivered sales (by any mode of conveyance), the State is the one in which the buyer received the product (see Appendix A for a list of State abbreviations). If transfer of title occurs in the United States, volumes sold for export should be included under "Wholesale Sales." Residual fuel oil sales for vessel bunkering should be reported under "Retail Sales." No. 2 distillate sales for vessel bunkering should be reported under "Commercial/Institutional Sales."

IX. Report the entire firm's sales of the selected products. This includes sales made directly by the parent, affiliates, subsidiaries; or through commissioned agents. Exclude sales made among the parent firm, subsidiaries, and affiliates; i.e., intrafirm transfers/sales.

## SPECIFIC INSTRUCTIONS

### Schedule I
### Part I
### Identification Data

| Item | Instruction |
|---|---|
| 1 thru 7 | Complete items 1 thru 7 if you are a new respondent, or if information shown on the label is incomplete or incorrect. If changes need to be made, cross out the inappropriate information on the label and enter the correct information in the space(s) to the right of the label. |
| 8 | Enter the month and year of the reference month. |
| 9 | Check the type of report that is being submitted. |
| 10 | Enter the number of Schedule II pages submitted with Schedule I. This will reflect the total number of States for which reports are being submitted. |
| 11 | Enter the date this report is being filed. |
| 12 | Mark the appropriate type of entity according to the definitions provided. Refiners operating in more than one capacity should mark "Refiner/Gas Plant Operator." Firms engaging in both |

## SPECIFIC INSTRUCTIONS (Continued)

reselling and retailing should mark "Reseller/Retailer." Firms which directly or indirectly control a refiner should mark "Refiner/Gas Plant Operator." Firms which directly or indirectly control a gas plant operator should mark "Refiner/Gas Plant Operator." The type of entity should not change from month to month but should reflect the activity of the firm throughout the year.

13 Enter the status of the firm at the end of the reference month. If the firm has been sold, leased, or permanently ceased operation, submit a letter to DOE stating the reason for the change in status. If the firm has been sold or leased, provide the name and address of the new company, and the date of the transfer. If the firm has permanently ceased operation, provide the date the firm ceased operation. You may include the letter with your monthly report or send it separately to the address shown on Page 1.

### Schedule I
### Part II
### Certification

| Item | Instruction |
|---|---|
| 14 thru 17 | Enter the name and title of the individual designated by the company to sign the certification. The individual must sign in the space provided on the form and enter the date of the signing. |

### Schedule II
### Identification Data

| Item | Instruction |
|---|---|
| 1. | Enter the name of the reporting firm. |
| 2 | Enter the 10-digit identification number assigned to the reporting firm for this survey. This is the number printed in the upper left corner of the company identification labels which have been provided to you. |
| 3 | Sequentially assign a page number to each Schedule II page. Enter the total number of pages being submitted in item 10 on Schedule I. |
| 4 | Enter the month and year of the reference month for which this schedule is being submitted. |
| 5 | Check whether this is an original or revised report. |
| 6 | Enter the abbreviation for the State. See Appendix A for a list of State abbreviations. |

### Schedule II
### Part III
### Monthly State Sales of Finished Motor Gasoline

| Item | Instruction |
|---|---|
| 7 thru 9 | Include in the column headed "Sales to Other End-Users" all direct sales to end-users that were not made through company-operated retail outlets. Sales made to retail outlets other than those operated directly by the reporting company, its affiliates, or subsidiaries, should be included in the wholesale sales category (Sales for Resale). |

Report gasoline sales volumes and prices by grade in accordance with their classification at the time of sale. The intent of this form is to capture sales volumes and prices for gasoline sold as leaded regular, unleaded regular, premium (both leaded and unleaded), and a "midgrade" of unleaded gasoline that lies between unleaded regular and premium in both octane and price. For the majority of the United States, the octane ranges (R+M/2) below are appropriate for distinguishing among the four classes of gasoline to be reported:

**Leaded Regular** - Greater than or equal to 87, and less than or equal to 90 octane.

**Unleaded Regular** - Greater than or equal to 85, but less than 88 octane.

**Unleaded Midgrade** - Equal to, or greater than 88, but less than, or equal to 90 octane.

**Premium** - Greater than 90 octane, leaded or unleaded.

In general, automotive octane requirements are lower at high altitudes. Therefore, in some areas of the United States, such as the Rocky Mountain States, the octane ranges for the gasoline grades above may be 2 or more octane points lower. For other aspects of gasoline specifications, please see the Definitions section.

Blends of gasoline containing ethanol or other oxygenates should be reported according to the above criteria. Do not report ethanol (alcohol) sold separately for blending purposes.

Schedule II
Part IV
Monthly State Sales of
No. 2 Distillates

| Item | Instruction |
|---|---|
| 10 and 11 | Report volume and price data in accordance with **what the product was sold as, regardless of the actual specifications of that product.** If a No. 2 distillate was sold as a diesel fuel, report that volume and price in the category "No. 2 Diesel Fuel;" if a No. 2 distillate was sold as a heating or fuel oil, report that volume and price in the category "No. 2 Fuel Oil" even if that product conformed to the higher specifications of a diesel fuel. If sales of a No. 2 distillate were made for which no determination can be made as to whether the product was specifically sold as either a fuel oil or diesel fuel, sales volumes and prices should be classified in accordance with **your best estimate of the intended use** of the product regardless of the product specification; i.e., sales of No. 2 distillate that you believe will be used for heating purposes or as a boiler fuel should be reported under "No. 2 Fuel Oil," sales of No. 2 distillate that you believe will be used as transportation fuels should be reported as "No. 2 Diesel Fuel." |

Include under the category "Residential Sales" those sales of No. 2 fuel oil to individual customers or households (as opposed to businesses or institutions). Sales to apartment buildings/complexes or other multi-family dwellings should be excluded from the "Residential Sales" category but included in the "Commercial/Institutional Sales" category. For those sales to residential facilities for which the respondent is unsure as to where those sales are to be reported, respondents are asked to report those sales in the category that, in their best judgment, is more appropriate.

Include under the category "Commercial/Institutional Sales" those sales of either No. 2 fuel oil or No. 2 diesel fuel to firms engaged in transportation, wholesale or retail trade, finance, insurance and real estate. Also include sales to apartment buildings/complexes, and other multi-family dwellings, hotels and office buildings or complexes, sales to local, State or Federal

Governmental facilities or organizations, along with military sales including those directed to post exchanges. Sales to schools, hospitals, religious institutions, universities or other government-supported organizations are also to be included in this category.

Include under the category "Industrial Sales" those sales of either No. 2 fuel oil or No. 2 diesel fuel to public or private firms engaged in mining, construction, or manufacturing.

Include under the category "Sales Through Company-Operated Retail Outlets" those sales of No. 2 diesel fuel made through company-operated retail outlets which are subject to motor fuel gallonage taxes. Refer to the definition of company-operated retail outlets.

Include under the category "Sales to Other End-Users" (e.g., sales to agricultural customers or to utilities) sales of either No. 2 fuel oil or No. 2 diesel fuel to end-use customers not included in any of the above four categories.

Schedule II
Part V
Monthly State Sales of
Other Petroleum Products

| Item | Instruction |
|---|---|
| 12 thru 19 | Include under the category "Retail Sales" all direct sales to end-users. Include under the category "Wholesale Sales" all sales to resellers. |

## DEFINITIONS

1. Affiliate/Subsidiary - Entities directly or indirectly controlled by a parent.

2. *ASTM* - The acronym for the American Society for Testing and Materials.

3. *Aviation Gasoline (Finished)* - All special grades of gasoline for use in aviation reciprocating engines, as given in ASTM Specification D 910 and Military Specification MIL-G-5572. Excludes blending components which will be used in blending or compounding into finished aviation gasoline.

4. *Commercial/Institutional* - Firms engaged in transportation, wholesale or retail trade, finance, insurance, and real estate. Also included are apartment buildings/complexes and other multi-family dwellings, hotels, and office buildings or complexes, local, State or Federal facilities or organizations including the military, schools, hospitals, religious institutions, universities and all other government-supported organizations.

5. *Company-Operated Retail Outlet* - Any retail outlet (e.g., service station) selling gasoline or diesel fuel which is under the direct control of the firm filing this report by virtue of the ability to set the retail product price and directly collect all or part of the retail margin. This category includes retail outlets: (1) being operated by salaried employees of the company and/or its subsidiaries and affiliates, and/or (2) involving personnel services contracted by the firm.

6. *Distillate Fuel Oil* - A general classification for one of the petroleum fractions produced in conventional distillation operations. It is used primarily for space heating, on- and off-highway diesel engine fuel (including railroad engine fuel and fuel for agricultural machinery), and

electric power generation. Included are products known as No. 1, No. 2, and No. 4 fuel oils; and No. 1, No. 2, and No. 4 diesel fuels.

a. *No. 1 Distillate* - A petroleum distillate which meets the specifications for No. 1 Heating or Fuel Oil as defined in ASTM D 396 and/or the specifications for No. 1 Diesel Fuel as defined in ASTM Specification D 975.

(1) *No. 1 Diesel Fuel* - A volatile distillate fuel oil with a boiling range between 300-575°F and used in high-speed diesel engines generally operated under wide variations in speed and load. Includes type C-B diesel fuel used for city buses and similar operations. Properties are defined in ASTM Specification D 975.

(2) *No. 1 Fuel Oil* - A light distillate fuel oil intended for use in vaporizing pot-type burners. ASTM Specification D 396 specifies for this grade maximum distillation temperatures of 400°F at the 10-percent point and 550°F at the 90-percent point, and kinematic viscosities between 1.4 and 2.2 centistokes at 100°F.

b. *No. 2 Distillate* - A petroleum distillate which meets the specifications for No. 2 Heating or Fuel Oil as defined in ASTM D 396 and/or the specifications for No. 2 Diesel Fuel as defined in ASTM Specification D 975.

(1) *No. 2 Diesel Fuel* - A gas oil type distillate of lower volatility with distillation temperatures at the 90-percent point between 540-640°F for use in high-speed diesel engines generally operated under uniform speed and load conditions. Includes Type R-R diesel fuel used for railroad locomotive engines, and Type T-T for diesel-engine trucks. Properties are defined in ASTM Specification D 975.

(2) *No. 2 Fuel Oil* - A distillate fuel oil for use in atomizing type burners for domestic heating or for moderate capacity commercial-industrial burner units. ASTM Specification D 396 specifies for this grade distillation temperatures at the 90-percent point between 540°F and 640°F, and kinematic viscosities between 2.0 and 3.6 centistokes at 100°F.

c. *No. 4 Fuel* - A fuel oil for commercial burner installations not equipped with preheating facilities. It is used extensively in industrial plants. This grade is a blend of distillate fuel oil and residual fuel oil stocks that conforms to ASTM Specification D 396 or Federal Specification VV-F-815C; its kinematic viscosity is between 5.8 and 26.4 centistokes at 100°F. Also included is No. 4-D, a fuel oil for low- and medium-speed diesel engines that conforms to ASTM Specification D 975.

7. *Finished Motor Gasoline* - A complex mixture of relatively volatile hydrocarbons, with or without small quantities of additives, blended to form a fuel suitable for use in spark-ignition engines. Specification for motor gasoline, as given in ASTM Specification D 439-88 or Federal Specification VV-G-1690B, include a boiling range of 122° to 158°F at the 10-percent point to 365° to 374°F at the 90-percent point and a Reid vapor pressure range from 9 to 15 psi. "Motor gasoline" includes finished leaded gasoline, finished unleaded gasoline, and gasohol. Blendstock is excluded until blending has been completed. (Alcohol that is to be used in the blending of gasohol is also excluded.)

a. *Leaded Regular Gasoline* - Gasoline having an antiknock index (R+M/2) greater than or equal to 87 and less than or equal to 90, and containing more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.



17

**DEFINITIONS (Continued)**

b. *Unleaded Regular Gasoline* - Gasoline having an antiknock index (R+M/2) greater than or equal to 85 and less than 88, and containing not more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

c. *Unleaded Midgrade Gasoline* - Gasoline having an antiknock index (R+M/2) greater than or equal to 88 and less than or equal to 90, and containing not more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

d. *Premium Gasoline* - Gasoline having an antiknock index (R+M/2) greater than 90. Includes both LEADED premium gasoline as well as UNLEADED premium gasoline.

(1) *Leaded Premium Gasoline* - Gasoline having an antiknock index (R+M/2) greater than 90, and containing more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

(2) *Unleaded Premium Gasoline* - Gasoline having an antiknock index (R+M/2) greater than 90, and containing not more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

Note: For this survey, gasoline sales should be reported by grade in accordance with their classification at the time of sale. In general, automotive octane requirements are lower at high altitudes. Therefore, in some areas of the United States, such as the Rocky Mountain States, the octane ranges for the gasoline grades above may be 2 or more octane points lower.

8. *Firm* - Any association, company, corporation, estate, individual, joint-venture, partnership, or sole proprietorship or any other entity, however organized, including charitable, educational, or other charitable institutions, and the Federal government including operations, departments, Federal agencies, and other instrumentalities, and State and local governments.

9. *Gas Plant Operator* - Any firm, including a gas plant owner, which operates a gas plant and keeps the gas plant records. A gas plant is a facility in which natural gas liquids are separated from natural gas, or in which natural gas liquids are fractionated or otherwise separated into natural gas liquid products or both.

10. *Gasohol* - A blend of finished motor gasoline (leaded or unleaded) and alcohol (generally ethanol but sometimes methanol), limited to 10 percent by volume of alcohol. For the purpose of this survey report gasohol in the grade of gasoline in which it was sold.

11. *Industrial* - Firms engaged in mining, construction, or manufacturing.

12. *Kerosene* - A petroleum distillate that has a maximum distillation temperature of 401 degrees F at the 10-percent recovery point, a final boiling point of 572 degrees F, and a minimum flash point of 100 degrees F. Included are the two classifications recognized by ASTM Specification D 3699: No. 1-K and No. 2-K, and all grades of kerosene called range or stove oil which have properties similar to No. 1 fuel oil, but with a gravity of about 43° API and a maximum endpoint of 625°F. Kerosene is used in space heaters, cook stoves, and water heaters and is suitable for use as an illuminant when burned in wick lamps.

## DEFINITIONS (Continued)

13. *Kerosene-type Jet Fuel* - A quality kerosene product with a maximum distillation temperature of 400 degrees F at the 10-percent recovery point and a final maximum boiling point of 572 degrees F. The fuel is designated in ASTM Specification D1655 and Military Specification MIL-T-5624L (Grades JP-5 and JP-8). A relatively low-freezing point distillate of the kerosene type used primarily for commercial turbojet and turboprop aircraft engines.

14. *Parent* - A firm that directly or indirectly controls another entity.

15. *Propane, Consumer Grade* - A normally gaseous paraffinic compound ($C_3H_8$), which includes all products covered by Natural Gas Policy Act Specifications for commercial and HD-5 propane and ASTM Specification D 1835. EXCLUDES: feedstock propanes, which are propanes not classified as consumer grade propanes, including the propane portion of any natural gas liquid mixes, i.e., butane-propane mix.

16. *Reference Month* - The calendar month and year to which the reported cost, price, and volume information relates.

17. *Refiner* - A firm or the part of a firm that refines products or blends and substantially changes products, or refines liquid hydrocarbons from oil and gas field gases, or recovers liquefied petroleum gases incident to petroleum refining and sells those products to resellers, retailers, reseller/retailers or ultimate consumers. "Refiner" includes any owner of products which contracts to have those products refined and then sells the refined products to resellers, retailers, or ultimate consumers.

18. *Reseller* - A firm (other than a refiner) that carries on the trade or business of purchasing refined petroleum products and reselling them to purchasers other than ultimate consumers.

19. *Reseller/Retailer* - A firm (other than a refiner) that carries on the trade or business activities of both a reseller and a retailer; i.e., purchasing refined petroleum products and reselling them to purchasers who may be either ultimate or other than ultimate consumers.

20. *Residential* - In cases of sales of No. 2 Fuel Oil, includes individual customers or households (as opposed to businesses or institutions) who ostensibly use the fuel in a residence. Sales to apartment buildings/complexes or to other multi-family dwellings are excluded from the "Residential Sales" category and are included in the "Commercial/Institutional Sales" category.

21. *Residual Fuel Oils* - The topped crude of refinery operations, which includes No. 5 and No. 6 fuel oils as defined in ASTM Specification D 396 and Federal Specification VV-F-815C, Navy Special fuel oil as defined in Military Specification MIL-F-859E including Amendment 2 (NATO Symbol F-77), and Bunker C fuel oil. Residual fuel oil is used for the production of electric power, space heating, vessel bunkering, and various industrial purposes.

22. *Retailer* - A firm (other than a refiner, reseller, or reseller/retailer) that carries on the trade or business of purchasing refined petroleum products and reselling them to ultimate consumers.

23. *Sale* - The transfer of title from the seller to a buyer for a price. EXCLUDE: Intrafirm transfers, product consumed directly by the reporting firm, or sales of bonded fuel. Also exclude products delivered/loaned to exchange partners except where the amount given up exceeds the amount received and the differential is invoiced as a sale during the reference month.

24. *Unit Price* - Total revenue derived from the sale of product during the reference month divided by the total volume sold; also known as the weighted average price. Total revenue should exclude all taxes but include transportation costs that were paid as part of the purchase price.

25. *United States* - The 50 States and the District of Columbia.

## APPENDIX A

### LIST OF STANDARD STATE ABBREVIATIONS

| | | | | | |
|---|---|---|---|---|---|
| AL ... | Alabama | KY ... | Kentucky | ND ... | North Dakota |
| AK ... | Alaska | LA ... | Louisiana | OH ... | Ohio |
| AZ ... | Arizona | ME ... | Maine | OK ... | Oklahoma |
| AR ... | Arkansas | MD ... | Maryland | OR ... | Oregon |
| CA ... | California | MA ... | Massachusetts | PA ... | Pennsylvania |
| CO ... | Colorado | MI ... | Michigan | RI ... | Rhode Island |
| CT ... | Connecticut | MN ... | Minnesota | SC ... | South Carolina |
| DE ... | Delaware | MS ... | Mississippi | SD ... | South Dakota |
| DC ... | District of Columbia | MO ... | Missouri | TN ... | Tennessee |
| FL ... | Florida | MT ... | Montana | TX ... | Texas |
| GA ... | Georgia | NE ... | Nebraska | UT ... | Utah |
| HI ... | Hawaii | NV ... | Nevada | VT ... | Vermont |
| ID ... | Idaho | NH ... | New Hampshire | VA ... | Virginia |
| IL ... | Illinois | NJ ... | New Jersey | WA ... | Washington |
| IN ... | Indiana | NM ... | New Mexico | WV ... | West Virginia |
| IA ... | Iowa | NY ... | New York | WI ... | Wisconsin |
| KS ... | Kansas | NC ... | North Carolina | WY ... | Wyoming |