IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SUNOCO, INC.<br><br>And<br><br>PUERTO RICO SUN OIL COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 02-466C<br>(Judge Block) |

**<u>PLAINTIFFS' MOTION FOR LEAVE TO FILE A SUPPLEMENTAL BRIEF</u>**

Plaintiffs, Sunoco, Inc. and Puerto Rico Sun Oil Company (collectively "Sunoco"), respectfully seek leave to file a Supplemental Brief in response to DESC's Motion to Dismiss. Sunoco seeks leave to file a Supplemental Brief for the limited purpose of bringing to the Court's attention DESC's startling reversal of the position it advances here in another similarly situated military fuels case. With respect to Sunoco's claim in Count I that DESC's match price auction of contracts to small businesses violates the Office of Federal Procurement Policy Act ("OFPPA"), DESC previously asserted in its Reply here that its match price auction is "consistent with the FAR" and, therefore, its auction is legal. DESC's Reply to Sunoco's Opp'n to DESC's Mot. to Dismiss at 25. Recently, however, in *Gary-Williams Energy Company v. United States*, No. 03-2106C (Fed. Cl.), DESC submitted a sworn declaration from one of its contracting officers, Mr. John Walker, stating that DESC's match price auction in fact violates the requirements of the FAR. *See* DESC's Mot. to Dismiss at Def. App. 6 (March 3, 2006) (filed in *Gary-Williams Energy Company v. United States*, No. 03-2106C (Fed. Cl.)). Because DESC's concession in *Gary-Williams* undermines its defense of its auction here, Sunoco seeks leave to file a Supplemental Brief to bring DESC's concession and reversal of position to the Court's attention.

For the foregoing reasons, Sunoco respectfully requests that its Motion for Leave to File a Supplemental Brief be granted.

s/J. Keith Burt
J. Keith Burt
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3208 (Phone)
(202) 263-5208 (Fax)

Attorneys for Plaintiffs,
Sunoco., Inc. and Puerto Rico
Sun Oil Company

*Of Counsel:*

Gary A. Winters
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006

March 20, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SUNOCO, INC.<br><br>And<br><br>PUERTO RICO SUN OIL COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 02-466C<br>(Judge Block) |

**PLAINTIFFS' SUPPLEMENTAL BRIEF**

Plaintiffs, Sunoco, Inc. and Puerto Rico Sun Oil Company (collectively "Sunoco"), respectfully submit this Supplemental Brief.

## I. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON SUNOCO'S CLAIMS THAT DESC ILLEGALLY AUCTIONED THE AWARD OF MILITARY FUEL CONTRACTS

In its Opposition to DESC's Motion to Dismiss, Sunoco establishes that DESC's auction of fuel contracts to small businesses violates the Office of Federal Procurement Policy Act ("OFPPA"). Sunoco explains that DESC's practice of offering contracts to small businesses willing to match the lowest bid price, or adjusted bid price, of a large business violates OFPPA's express prohibition on the disclosure of "contractor bid or proposal information or source selection information *before* the award of a Federal agency procurement contract." 41 U.S.C. § 423(a)(1) (emphasis added); *see* Sunoco's Opp'n to DESC's Mot. to Dismiss at 52-59.

In its Reply in support of its Motion to Dismiss, DESC asserts that its match price auction of contracts to small businesses complies with OFPPA because its auction is "consistent with the FAR." DESC's Reply to Sunoco's Opp'n to DESC's Mot. to Dismiss at 25. In its original motion, DESC similarly asserts that, in auctioning fuel contracts, it "followed the FAR provisions" and that its "procedures are consistent with

applicable procurement and small business laws and regulations." DESC's Mot. to Dismiss at 32-33. DESC relied for these assertions on, *inter alia*, the declaration of one of its contracting officers, Mr. John Walker, who stated that DESC's match price auction operated "in substantially the same manner" as the procedures in the FAR. DESC's Mot. to Dismiss at Def. Supp. App. 2.

In what can only be described as a startling, if not troubling, reversal of position, Mr. Walker recently submitted a contrary declaration in the similarly situated military fuels case of *Gary-Williams Energy Company v. United States*, No. 03-2106C (Fed. Cl.). In *Gary-Williams*, Mr. Walker states that DESC's match price auction violates the requirements of the FAR. Specifically, Mr. Walker explains that DESC offered "match price" contracts to small businesses before awarding contracts to large businesses and then offered any set aside quantities not awarded at the match price to large businesses:

> The difference between the standard FAR and DFARS set aside clauses and procedures and the set aside clauses and procedures in DESC bulk acquisitions was that DESC's set aside quantities were offered to small businesses and small, disadvantaged businesses *before* award of the basic quantities. If no small or small, disadvantaged business offeror accepted the set aside quantities at the offered price, *i.e.*, there was a set aside "failure," the set aside quantities would be added back to the basic quantities and awarded to the low offeror.

*See* Declaration of John Walker at 6-7, DESC's Mot. to Dismiss at Def. App. 6 (March 3, 2006) (filed in *Gary-Williams Energy Company v. United States*, No. 03-2106C (Fed. Cl.)) (attached as Exhibit 1 to this Supplemental Brief) (emphasis added). In contrast, Mr. Walker explains that the FAR requires that "match price" contracts not be offered to small businesses until after contracts are awarded to large businesses and that any set aside quantities not awarded at the match price be re-solicited in a new acquisition:

> The standard FAR and DFARS procedures provide that set aside quantities are offered *after* the basic quantities are awarded. Under the standard FAR and DFARS procedures, if there is a set aside failure, the quantities are not awarded under the basic acquisition, but are re-solicited under a new acquisition.

*Id*. at 6-7 (emphasis added). These departures from the FAR's requirements that Mr. Walker concedes in his declaration in *Gary-Williams* are exactly the violations of the FAR's requirements that Sunoco alleges in its Opposition to DESC's Motion to Dismiss and that DESC denies in its Reply. *Compare* Sunoco's Opp'n to DESC's Mot. to Dismiss at 55-59 *with* DESC's Reply to Sunoco's Opp'n to DESC's Mot. to Dismiss at 25.

Consistent with Sunoco's position here, GAO has similarly recognized DESC's departure from the FAR when DESC auctions contracts to small businesses. B-230556, 1988 WL 227932 (Sep. 6, 1988). GAO states:

> For partial set-asides, FAR 19.502(3)(c) requires that the contracting officer must *first* award the non-set-aside portion using normal contracting procedures. . . . If a set-aside acquisition is not awarded, the supplies or services for which no award was made is recompeted. FAR 19.507(a).
>
> The D[E]SC procedures differ from the FAR procedures in two substantial respects . . . The second difference is that in the event of set-aside failures, the set-aside portion is not recompeted. Under the D[E]SC procedures both large and small firms are required to submit offers on total quantities just as if there was no set-aside. In this way, in the event a set-aside acquisition cannot be filled, other offers can be considered.

1988 WL 227932 at 3 (emphasis added; some internal paragraphing omitted).[1]

This distinction between awarding contracts to large businesses first and only then awarding "match price" contracts to small businesses is fundamental to compliance with OFPPA. Once contracts are awarded to large businesses, the procurement is at an end for them. Accordingly, the subsequent disclosure of their bid prices does not run afoul of the OFPPA's prohibition on disclosure of pricing information "before the award . . . to which the information relates." 41 U.S.C. § 423(a)(1). Furthermore, awarding contracts to large businesses first (and re-soliciting any unawarded set aside volumes) precludes the

[1] In its opinion, GAO reviewed DESC procurements that took place prior to the enactment of the provisions of OFPPA relevant here. Accordingly, the GAO opinion has no bearing on whether DESC's procurements comply with OFPPA.

perverse result whereby a large business is forced to bid lower in order to discourage small businesses from accepting the "match price," with the result that the volumes remain available for award to the large business. *See* Sunoco's Opp'n to DESC's Mot. to Dismiss at 58.

DESC apparently would assert that it has a FAR deviation authorizing its departure from the FAR and somehow its violation of OFPPA. *See* Ex. 1 at 7 (making the bare assertion that DESC "had deviations authorizing the use of its clauses and procedures"). However, DESC may not use a deviation to authorize the very conduct OFPPA prohibits. *See generally Gardner v. Brown*, 5 F.3d 1456 (Fed. Cir. 1993). The entire focus of OFPPA is to "prohibit contractors . . . from soliciting or receiving bidding or other sensitive information about their competitors during the procurement" and to "limit greatly the number of people given access to procurement sensitive information." H. Rep. No. 100-911 at 18. Permitting the disclosure of competitors' procurement-sensitive information to essentially all small businesses during an on-going competition eviscerates this purpose.

Moreover, DESC has not proffered its alleged deviation, has not established that its alleged deviation authorizes the specific departures at issue here and not others,[2] has not established that its alleged deviation was published in the *Federal Register* for public comments, and, *a fortiori*, has not established that any public comments properly were considered as part of the decision to grant its alleged deviation. *See generally La Gloria Oil and Gas Company v. United States*, 56 Fed. Cl. 211, 217-24 (2003) (addressing requirements for a FAR deviation); *Sunoco, Inc. v. United States*, 59 Fed. Cl. 390, 395-96 (2004) (same). Whatever DESC may seek to do with its alleged deviation, without a vastly larger showing, it profits DESC nothing here. *Id.*

---

[2] *See* B-230556, 1988 WL 227932 at 3 (noting that DESC departs from the FAR by not paying small businesses "'the highest unit prices(s)' paid under the FAR").

In conclusion, DESC's admission that its match price auction does not comply with the requirements of the FAR bars even the vestige of a defense to Sunoco's claims that DESC's auction violates OFPPA. Accordingly, and as more fully set forth in Sunoco's Opposition to DESC's Motion to Dismiss, DESC is not entitled to judgment as a matter of law on Sunoco's claim that DESC illegally auctioned the award of military fuel contracts.

s/J. Keith Burt
J. Keith Burt
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3208 (Phone)
(202) 263-5208 (Fax)

Attorneys for Plaintiffs,
Sunoco., Inc. and Puerto Rico
Sun Oil Company

*Of Counsel:*

Gary A. Winters
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006

March 20, 2006

EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GARY-WILLIAMS ENERGY CORPORATION<br><br>Plaintiff<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 03-2106C<br>(Judge G. Miller) |

DECLARATION OF JOHN R. WALKER

1. My name is John R. Walker and I am a contracting officer with the Defense Energy Support Center (DESC). I have been with DESC since 1983, except for a period from 1987-1989, when I worked for the Naval Sea Systems Command. I have been a DESC contracting officer since 1989.

2. DESC or its predecessor, the Defense Fuel Supply Center (DFSC), awarded Gary-Williams Energy Corporation ("Gary Williams") a series of 13 contracts between 1987 and 1999 that are the subject of economic price adjustment (EPA) clause claims. The contracts were for the supply of JP-4, JP-5 and JP-8 jet fuels. JP-4 is a naphtha based jet fuel, and was primarily used by the Air Force and Army in aircraft. JP-8 is a kerosene based jet fuel used primarily in Air Force and Army aircraft. JP-5 is a kerosene based fuel used by the Navy. Its salient characteristic is a high flashpoint, which enhances its safety for use in planes that land on aircraft

carriers. Typically, the JP-5 supplied by Gary Williams was used by the Air Force to purge fuel systems.

3. These contracts were awarded in DESC's program for the supply of bulk fuels to various military locations. Most of the contracts were indefinite quantity-type contracts for one year and called for the delivery of large volumes of fuel. According to our records, the Government paid Gary Williams in excess of $187 million for more than 331 million gallons of fuel under these contracts.

4. The contracts contained a base price for each line item, which was subject to an EPA clause. The contracts provided that the contract base prices would be adjusted as called for in the EPA clause because the petroleum market is dynamic and ever changing. Using any petroleum market escalator, whether daily, weekly, or monthly will result in contract price adjustments. Thus, the base price in the contracts was used for evaluation purposes, and, more importantly, as the baseline from which price adjustments were calculated under the EPA clauses in the contracts. As a result of the operation of the EPA clauses, when the market declines below the level it was at as of the effective date of the base price as measured by the escalator, the contractor is paid less than the base price.

5. The contracts were awarded pursuant to competitive negotiated solicitations under Federal Acquisition Regulation (FAR) Part 15, and later under FAR Part 12. Most of the solicitations were done on an annual basis. DESC's general practice with regard to making the FAR 16.203-3 determination to use an economic price adjustment clause is to include the determination in the acquisition plan for the solicitation. The acquisition plan is maintained in what we call the pre-award or solicitation file, because the plan applies to the solicitation as a whole. Copies of the plan are not kept in individual contract files.

6. DESC, on the domestic bulk solicitations for the annual requirements, typically receives dozens of offers, which in combination exceed the Government's requirements. The Government's annual fuel requirements are sufficiently large that no single offeror is capable of satisfying them. Consequently the Government accepts that combination of offers from multiple suppliers that results in the lowest overall cost.

7. DESC ensured that contracts were awarded at fair and reasonable prices as mandated by the FAR. Prices were determined fair and reasonable based on adequate price competition or on established catalog or market prices of commercial items sold in substantial quantities to the general public. See FAR 15.403, formerly 15.804-3.

8. From 1984-1994, the EPA clause in the domestic bulk fuels contracts, B19.33, provided for price adjustments based upon the monthly average sales price or market price of refined petroleum products as reported by the Department of Energy, Energy Information Administration, in its publication the Petroleum Marketing Monthly ("PMM"). Prices under the PMM clause were effective for one month.

9. The PMM is a compilation of transaction prices in U.S. petroleum markets. Refiners, including Gary Williams, are required by law to submit sales data to DOE on a monthly basis. The PMM price averages are based on petroleum product sales information reported to DOE and grouped by product, type of sale, states, and by geographic regions. Because the PMM contains averages of actual sales prices, DESC considers it to be a reliable indicator of price movements in the petroleum products market. There is a three-month lag time from DOE to obtain the sales data and publish the PMM. Thus, for example, January sales data is published in April, and February data in May. Prices were adjusted monthly under the PMM clause. Because of the

time lag, interim adjustments were made, subject to reconciliation when the PMM was published.

10. Beginning in 1995, these domestic bulk fuels contracts included an EPA clause based upon regional average prices reported in widely used industry publications, either Platts Oilgram Price Report (Platts), or Oil Price Information Service (OPIS). After 1995, Gary Williams's contracts contained EPA clauses based on prices in Platts. Platts is published daily on weekdays. Contract prices under the Platts-based EPA clause were adjusted weekly based on weekly averages of Platts prices.

11. These EPA clauses ensured that the prices that were offered and agreed to in the contracts were adjusted according to the movements of fuel prices in the publications. If the market price went up one cent, the contract price would likewise go up one cent. If the market price went down a penny, the contract price went down a penny. The contract prices were adjusted in this way on a regular basis through the term of the contracts.

12. Based on my review of the files, Gary Williams made no objection to the legality of the EPA clauses, and made no complaints that it was not being paid a fair price for its products until it submitted the claims. For each contract where the Government's contract file still exists, Gary Williams specifically stated in its offer that it agreed to the EPA clauses. Price change modifications were issued either weekly or monthly, depending on the clause in a particular contract, for the products that are the subject of the claims under these contracts. Gary Williams did not object to any of these hundreds of price change notices. Gary Williams submitted offers continually during the period 1987-1999.

13. Gary Williams submitted 13 certified claims between May 28 and July 31, 2002, for approximately $35 million. Gary Williams's principal contention was that the EPA clause in its

contracts was illegal, citing the MAPCO court decision.

14. I denied Gary Williams's claims in a final decision dated October 31, 2002. I concluded that the EPA clauses were legal and authorized and that Gary Williams had received fair market value for its fuel.

15. Prior to the MAPCO decision, DESC contracting officers believed that the market-based EPA clauses were authorized and that they protected contractors in the ways identified in the FAR. However, in response to the Court's decision in the MAPCO case, DESC took steps to ensure the validity of its EPA clauses by obtaining FAR deviations authorizing the use of the market-based EPA clauses.

16. In late 1994, following a study by DESC's Office of Market Research and Analysis, DESC decided to switch domestic bulk EPA references from the PMM to two industry price publications, Platts and OPIS, because their assessments were found to adequately track PMM's sales prices and because there would no longer be a need to use an interim adjustment. DESC sought a class deviation for the new clause, publishing it for comment in the February 28, 1995, Federal Register. Neither Gary Williams nor any other oil company commented on the proposal. On October 5, 1995, the Director of Defense Procurement, who has authority to approve clauses, approved DESC's EPA clauses. Contracts SP0600-96-D-0524, SP0600-97-D-0523, SP0600-98-D-0473, SP0600-98-D-0489, SP0600-99-D-0470, and SP0600-99-D-0522 were awarded pursuant to the class deviation and contain authorized EPA clauses.

17. Many of the solicitations for these contracts provided that a portion of the requirement was set aside for participation by small business concerns. A copy of a sample of the DESC clause implementing the partial small business set aside, I237.07, is included in Defendant's appendix immediately following this declaration at App.9. Prior to 1988, similar

clauses were included in DESC's solicitations. Beginning in 1988, many DESC solicitations included an evaluation preference of up to 10 percent for small disadvantaged business concerns, a copy of DESC clause I237.05, which implemented this preference, is included in Def. App. at 10. Beginning in 1988 many DESC solicitations also included DESC clause I237.06, which provided that a portion of the requirement was set aside for exclusive participation by small business concerns with preferential consideration for small disadvantaged business concerns. A copy of that clause is at Def. App. 11-12.

18. DESC's partial set aside clauses operated in substantially the same manner as the standard FAR and DFARS clauses for partial small business set asides. After offers were received under the solicitations, they would be evaluated as if there were no set aside quantity. The set aside quantities would then be offered to small businesses based upon prices that DESC would otherwise pay under the solicitation had there been no set aside for supply of the location at which the set aside was placed, adjusted for transportation charges. In awarding the set aside quantities, the contracting officer would not furnish either the identity of the offeror, or the amount of the offered price that DESC would otherwise pay.

19. The difference between the standard FAR and DFARS set aside clauses and procedures and the set aside clauses and procedures in DESC bulk acquisitions was that DESC's set aside quantities were offered to small businesses and small, disadvantaged businesses before award of the basic quantities. If no small or small, disadvantaged business offeror accepted the set aside quantities at the offered price, *i.e.*, there was a set aside "failure," the set aside quantities would be added back to the basic quantities and awarded to the low offeror. The standard FAR and DFARS procedures provide that set aside quantities are offered after the basic quantities are awarded. Under the standard FAR and DFARS procedure, if there is a set aside

failure, the quantities are not awarded under the basic acquisition, but are re-solicited under a new acquisition. The reason DESC awards set aside failure quantities under the original acquisition rather than re-soliciting is due to the complexity and size of the annual bulk acquisition of fuels. This procedure enables DESC to acquire the entire requirement for bulk fuels without re-soliciting, thereby reducing procurement lead-time and saving considerable effort. The delay that would result from re-solicitation could adversely affect the mission and readiness posture of military units dependent upon those requirements. As the clauses at App. 9-12 show, DESC has, for decades, had deviations authorizing the use of its clauses and procedures.

20. Based on my review of the 12 Gary Williams contract files still available and those copies of the contracts included in the claims, Gary Williams was a small business eligible to participate in small business set asides for DESC bulk fuels. Gary Williams was a beneficiary of the small business match price program for at least 11 contracts. That is, for contracts DLA600-87-D-0583, DLA600-88-D-0573, DLA600-90-D-0559, DLA600-92-D-0522, DLA600-93-D-0549, DLA600-94-D-0520, SP0600-96-D-0524, SP0600-97-D-0523, SP0600-98-D-0489, SP0600-99-D-0470, and SP0600-99-D-0522 Gary Williams was awarded a quantity of the jet fuel that was set aside for acquisition from small business concerns.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 2, 2006

JOHN R. WALKER
Contracting Officer